1  ETHAN BEARMAN (CA SBN 327490)
   ethan@thebearmanfirm.com
2  THE BEARMAN FIRM, INC.
   9460 Wilshire Blvd, Suite 830
3  Beverly Hills, CA 90212
   Phone: (747)232-7626
4
   Attorney for Plaintiff
5  VEM MILLER

6

7

8                  **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| VEM MILLER, | CASE NO.: 5:25-cv-00629 |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | 1. 42 U.S.C. § 1983 - FIRST AMENDMENT VIOLATIONS; |
| CHAD BIANCO, in his individual and official capacities; COUNTY OF RIVERSIDE, a municipal entity; RIVERSIDE COUNTY SHERIFF'S DEPARTMENT; DAVID CORONADO; and DOES 1 through 100, | 2. 42 U.S.C. § 1983 - FOURTH AMENDMENT VIOLATION; |
| | 3. 42 U.S.C. § 1983 - MUNICIPAL LIABILITY - FAILURE TO TRAIN; |
| Defendants. | 4. 42 U.S.C. § 1983 - MUNICIPAL LIABILITY – RATIFICATION; |
| | 5. 42 U.S.C. § 1983 - FAILURE TO INTERVENE; |
| | 6. TOM BANE CIVIL RIGHTS ACT - CAL. CIV. CODE § 52.1; |
| | 7. SLANDER PER SE; |
| | 8. LIBEL PER SE; |
| | 9. FALSE LIGHT; |
| | 10. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS. |
| | **DEMAND FOR JURY TRIAL** |

As and for its complaint, Plaintiff VEM MILLER, an individual, alleges as follows:

## INTRODUCTION

1. Plaintiff VEM MILLER ("**Miller**" or "**Plaintiff**") is a political supporter of the 45th and 47th President of the United States of America, Donald John Trump.

2. Mr. Miller is deeply involved in political support for the President and has been since 2016, including websites, podcasts, political rallies, meetings, and involvement at the local, state, and national Republican parties.

3. As a long-time resident of Nevada, and Second Amendment supporter, Mr. Miller owns firearms.

4. On October 12, 2024, just before the historic presidential election, in his enthusiasm for President Trump, Mr. Miller requested and received tickets to the President Trump rally at Coachella, Riverside County, California.

5. In accordance with his experience of attending political rallies in Nevada, Mr. Miller did what he believed to be the right thing by approaching Riverside County Sheriff's Department deputies approximately one mile from the site of the rally to announce that he was in possession of firearms.

6. Instead of simply issuing a citation to a fully compliant citizen, the Defendants chose to violate Mr. Miller's constitutional rights when they detained him so he would miss the rally, excessively searched his vehicle, ignored his medical distress, arrested him, performed a medical x-ray for which he expressly denied consent, and repeatedly failed to grant him his request for a statutorily required telephone call.

7. Subsequently, Defendant Sheriff Chad Bianco ("**Bianco**") decided to report to and appear on local and national news outlets to falsely proclaim that the Riverside County Sheriff's Department stopped the third "would-be Trump assassin": even though the Federal Bureau of Investigations and the United States

Secret Service decided not to interview Mr. Miller *because there was no reason to interview him as Mr. Miller was NOT an attempted Presidential assassin*.

8. By the morning hours of October 13, 2024, Defendant Bianco knew that the FBI and the Secret Service had already dismissed the idea that Mr. Miller was an assassin, and still Defendant Bianco proceeded to falsely and maliciously inform The Epoch Times in a text message; "We arrested a man trying to get in the perimeter with two firearms who ended up *saying he was going to kill the president*." Subsequently, Defendant Bianco told the Southern California News Group that they "stopped another assassination attempt," and that Mr. Miller had "multiple phony passports and driver's licenses." Defendant Bianco continued these false assertions during a news conference held that very afternoon at 3 p.m. Following the news conference and proceeding the next day, Defendant Bianco appeared on many news outlets, including renown Fox News Channel and News Nation, where he falsely proclaimed that Mr. Miller was there to assassinate President Trump, and that he and his department prevented Mr. Miller from becoming the "third assassin."

9. Defendant Bianco took advantage of a perceived golden opportunity to boost his own political career and jumpstart his campaign for Governor of California[1] by falsely claiming he stopped an attempted assassination of President Trump, demonstrating an outrageous, reckless disregard for Mr. Miller and his rights.

10. The aftermath of being falsely accused as an attempted presidential assassin has been utterly devastating to Mr. Miller: destroying his previous work opportunities, receiving threats which have led him into hiding, his parents' home (property) being raided by the Las Vegas Metropolitan Police Department on October 14, 2025, leaving him unable to obtain work, his ex-wife used those

---

[1] *Riverside County Sheriff Chad Bianco announces run for California governor*, ABC 7 Eyewitness News (Feb. 17, 2025, 11:16 PM) https://abc7.com/post/riverside-county-sheriff-chad-bianco-announce-run-california-governor/15921418/

allegations to prevent him from having any contact with his own children, and, to this day, consistently receiving multiple weekly threats and harassment.

## PARTIES

11. Plaintiff VEM MILLER is and at all times relevant to this Complaint an individual residing in the County of Clark, State of Nevada.

12. Defendant CHAD BIANCO is sued in his official capacity as the present Riverside County, California Sheriff, and individually. As the Sheriff, Defendant is responsible for employment practices and procedures within the Riverside Country Sheriff's Department.

13. Defendant COUNTY OF RIVERSIDE ("Riverside"), California, is the county responsible for Defendant Bianco and the Riverside County Sheriff's Department.

14. Defendant RIVERSIDE COUNTY SHERIFF'S DEPARTMENT ("RCSD") is the government agency which employs and trains the Sheriff's Deputies.

15. Defendant DAVID CORONADO ("Coronado") was employed by RCSD as a DEPUTY at all times relevant herein.

16. The true names or capacities, whether individual, corporate, associate, or otherwise of the Defendants named herein as DOES 1-100, are presently unknown to Plaintiff, who therefore sue said Defendants by such fictitious names. Plaintiff prays for leave to amend this Complaint to show the true names or capacities of these Defendants if and when the same have been determined.

## JURISDICTION AND VENUE

17. This action arises under Title 42 of the United States Code Sections 1983 and 1988. Jurisdiction is proper in this Court as conferred by Title 28 of the United States Code Section 1331.

18. The jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331,

1343(a)(4), and 29 U.S.C. § 794(a).

19. Venue is proper in this United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 in that County of Riverside, California is where a substantial part of the events or omissions giving rise to all the actions complained of herein took place.

**CALIFORNIA TORT CLAIMS ACT**

20. Plaintiff Miller exhausted his California Tort Claims Act statutory requirements under California Government Code Sections 910, et seq. in order to bring this action before this Court.

21. First, Plaintiff mailed his California Tort Claims Act Letter on January 16, 2025, via USPS Certified Mail to Riverside County, California; Clerk of the Board of Supervisors, Attention Claims Division, PO Box 1628, 4080 Lemon Street, 1st Fl., Riverside, CA 92502-1628. Plaintiff also mailed his California Tort Claims Act Letter on January 16, 2025, via USPS Certified Mail to the Riverside County Sheriff-Coroner at 4095 Lemon St., Riverside, CA, 92501-3600.

22. Second, Plaintiff received a NOTICE OF REJECTION OF CLAIM from the Riverside County Board of Supervisors dated January 22, 2025.

23. This action was brought within the six (6) months from the date of the Notice in accordance with California Government Code Section 945.6.

**FACTUAL ALLEGATIONS**

24. Plaintiff Vem Miller is a media professional who operates The America Happens Network, a conservative media entity. Between 2020 and 2024, Mr. Miller attended over twenty (20) events for President Donald J. Trump in both journalistic and social capacities.

25. Mr. Miller has consistently demonstrated support for President Trump through:

    a. Production of pro-Trump media content since 2020;

    b. Service as a Trump team leader and captain;

    c. Campaign work as an America First Republican candidate in 2022; and

d.  Active engagement in voter outreach efforts.

26. At approximately 3:45 PM on October 12, 2024, Mr. Miller approached the 52nd Street parking lot, approximately a one mile drive from the Trump rally venue in Coachella, California. Mr. Miller possessed valid entry passes for the event.

27. Following standard practice from his home state of Nevada, before attempting to enter the venue parking area Mr. Miller voluntarily drove up to a RCSD Deputy, and then voluntarily disclosed to this RCSD Deputy ("Deputy 1") that he owned and possessed two firearms, secured in his vehicle.

28. This initial interaction was captured on audio recording, during which Mr. Miller:

a.  Immediately disclosed the presence of firearms in his vehicle;

b.  Offered to have law enforcement hold the firearms;

c.  Presented valid identification and entry passes; and

d.  Made no attempt to enter the venue with firearms.

29. Following Mr. Miller's voluntary disclosure, Deputy 1 directed Mr. Miller to pull his vehicle into a nearby alcove. Subsequently, a second deputy ("Deputy 2") approached and asked Mr. Miller about why Mr. Miller was pulled over there. Mr. Miller repeated his voluntary disclosure, at which point, Deputy 2 received a call. Approximately two minutes later, Deputy 2 returned and questioned Mr. Miller about his license plate.

30. Deputy 2 then ordered Mr. Miller to exit his vehicle, immediately restrained Mr. Miller in handcuffs, stated the detention was "for his own safety and protection", and placed Mr. Miller in the back of a patrol vehicle.

31. During his detention in the patrol vehicle, Mr. Miller:

a.  Was subjected to temperatures exceeding 110 degrees Fahrenheit;

b.  Experienced and reported to one of the Deputies symptoms of a pre-diabetic incident;

c.  Repeatedly requested medical attention due to his pre-diabetic condition;

d.  Was denied access to his supplements; and

e.  Was denied access to bathroom facilities despite multiple requests.

32. During the initial stages of Mr. Miller's detention, officers were recorded via Mr. Miller's audio recording device that captured:

    a.  Officers commenting on the "nice" and orderly condition of Mr. Miller's vehicle prior to conducting a search, in contrast to Defendant Bianco's later statement that Mr. Miller's vehicle was in "disarray."

    b.  An officer made a comment that she did not "want to unnecessarily detain him [Plaintiff]." In contrast to the detention and arrest of Mr. Miller.

33. Mr. Miller was informed by Defendant Deputy Coronado that the officers' only concern was to ensure that the firearms were purchased lawfully. Although Mr. Miller consented only to the turnover of his firearms, and expressly described their location in the vehicle to Defendant Coronado, Defendants subsequently proceeded in conducting an extensive search of Mr. Miller's vehicle without his consent, wherein:

    a.  Approximately ten (10) to fifteen (15) officers, including RCSD officers, FBI agents, and Secret Service agents participated;

    b.  Officers deployed forensic tools including bomb-sniffing dogs and chemical swab tests;

    c.  Officers removed, dispersed, and damaged Mr. Miller's personal belongings in a haphazard manner, including electronics, clothing, and medical supplies;

    d.  This vehicle search lasted approximately one hour and twenty minutes;

    e.  Officers left Mr. Miller's vehicle in complete disarray.

34. At no time before, during, or after said search did Defendants:

    a.  Provide probable cause for the extensive nature of the search;

    b.  Document any contraband in the vehicle or on Mr. Miller's person, or evidence of criminal activity;

    c.  Explain the necessity for the duration or scope of the search; or

d.  Receive express consent by Mr. Miller to do so.

35. At approximately 5:00 PM, Mr. Miller was transported to Thermal Police Station. Records indicate:

    a.  Booking Number: 202445251

    b.  Arrest Time: 17:00

    c.  Booking Time: 20:44

    d.  Location: Ave 52 x Celebration Indio

    e.  Facility: John Benoit Detention Center

36. During Mr. Miller's detention at Thermal Police Station, Defendants subjected Mr. Miller to the following unlawful acts and omissions:

37. Defendants denied Mr. Miller his statutory right to a telephone call pursuant to California Penal Code Section 851.5, notwithstanding that:

    a.  The aforementioned penal code was clearly posted on the walls of the detention facility;

    b.  Mr. Miller specifically demanded his statutory right under Penal Code Section 851.5 to a telephone call while referencing the posted penal code;

    c.  Upon Mr. Miller's second demand for his telephone call, Defendant Coronado expressly refused said request; and

    d.  Mr. Miller made additional demands for his telephone call, none of which were granted.

38. Defendants imposed excessive physical restraints upon Mr. Miller, specifically:

    a.  Applied handcuffs while simultaneously securing Mr. Miller's ankle to a holding cell bench;

    b.  Maintained the restraints with such force as to cause visible foot discoloration,

39. With respect to Federal Bureau of Investigation ("FBI") and United States Secret Service interviews:

    a.  Mr. Miller expressly consented to the FBI and Secret Service agents

request to interview, subject only to his statutory right to first make one telephone call;

b. The federal law enforcement agents departed without conducting any interview and no federal agent has ever interviewed Mr. Miller regarding the allegations against him.

40. Defendants RCSD and its Deputies thereafter:

a. Transported Mr. Miller to jail without any form of formal questioning being conducted;

b. Proceeded with booking despite the absence of any federal investigation;

c. Failed to document any legitimate basis for continuing Mr. Miller's detention.

41. During the booking process, Defendants:

a. Attempted to conduct medical tests on Mr. Miller to which he expressly denied consent;

b. Subjected Mr. Miller to x-ray examination after his express refusal of medical testing;

c. Failed to inform Mr. Miller of the x-ray examination prior to its administration; and

d. Conducted the x-ray examination without obtaining required consent or providing any medical necessity.

42. Mr. Miller was charged with two misdemeanor violations:

a. CPC 25850(A) - Carrying/Loaded Firearm; and

b. CPC 32310(A) - Large Capacity Magazine

43. Both misdemeanor charges resulted in his cite and release.

44. On the morning of October 13, 2024, Defendant Bianco falsely told The Epoch Times in a text message, "We arrested a man trying to get in the perimeter with two firearms who ended up saying **he was going to kill the president**" (emphasis

added.)[2] Mr. Miller never said those words or anything remotely like those words at any time on October 12 or October 13, 2024.

45. Additionally, during the early morning of October 13, 2024, Defendant Bianco gave an interview to the Riverside Press-Enterprise, which was published at 10:37 am that same day[3]. In this interview to the media, Defendant Bianco made many false statements, including but not limited to:

a. "…the sheriff called the arrest a thwarted assassination attempt";

b. "…he said [Mr. Miller] identifies with a right-leaning anti-government group";

c. Mr. Miller "planned to kill Trump and that deputies thwarted the plan";

d. "Bianco said they also found he had multiple phony passports and driver's licenses"; and

e. "…arrested with guns and fake I.D.s about a quarter mile from former President Donald Trump's campaign rally." The distance was actually six-tenths of a mile directly or one mile by walking. [4]

46. On October 13, 2024, Defendant Bianco held a press conference where he made numerous knowingly false statements about Mr. Miller, including but not limited to:

a. Falsely claimed that deputies had "prevented the third assassination

[2] Brad Jones, *UPDATE: Riverside County Sheriff Says Suspect Never Said He Was 'Going to Kill the President'*, (Originally published October 13, 2024, Updated October 24, 2024) https://www.theepochtimes.com/us/armed-man-who-allegedly-said-he-wanted-to-kill-the-president-arrested-outside-trump-rally-5740578

[3] Brian Rokos, Mona Darwish, Beau Yarbrough, *Man with guns arrested near Trump rally in Coachella; Riverside sheriff says they stopped assassination attempt*, (Originally Published: October 13, 2024 at 10:37 AM PDT, UPDATED: October 17, 2024 at 2:57 PM PDT) https://www.pressenterprise.com/2024/10/13/las-vegas-man-found-with-loaded-firearm-high-capacity-magazine-near-trump-rally-in-coachella-valley/

[4] Google Maps, https://maps.app.goo.gl/jcXNweh6WbcsmLsY7

attempt" on President Trump;

   b. Falsely called Mr. Miller a "lunatic";

   c. Falsely claimed that Mr. Miller possessed "multiple passports with different names" which implied that Mr. Miller was a bad guy or a potential terrorist/assassin;

   d. Falsely stated Mr. Miller had "fake credentials";

   e. Falsely asserted that Mr. Miller's vehicle was "in disarray" in support of his other allegations;

   f. Falsely asserted that Mr. Miller did not have "legitimate identification";

   g. Falsely implied that Mr. Miller was a member of the sovereign citizen movement; and

   h. Falsely implied that Mr. Miller had a fake press pass.

47. On October 13, 2024, Defendant Bianco appeared on at least one other live interview where he continued with his false allegations: News Nation. On information and belief, due to their lawyers' desire to not be subjected to a defamation lawsuit, News Nation has taken down the video of the interview with Defendant Bianco. A copy of the original video was preserved via download prior to its take down, and can be found on Rumble - https://rumble.com/v5rqflb-dan-abrams-live-newsnation-bianco.html?e9s=src_v1_ucp .

48. On October 14, 2024, Sheriff Bianco appeared on Fox News Channel, where he made additional false statements about Mr. Miller. During this interview, Sheriff Bianco:

   a. When asked if he believed Mr. Miller's explanation, stated "...it doesn't change the fact that he brought the guns onto a Trump rally, and he was stopped before he got inside," falsely implying Mr. Miller attempted to enter the venue with firearms, which Mr. Miller did not;

   b. Maintained his false assertion that Mr. Miller's deputies "prevented another assassination attempt";

    c.  Made prejudicial statements about Mr. Miller's legal dual U.S. and Canada citizenship documentation and court approved name change, which Mr. Miller had with him at the time of his detention, stating "I couldn't tell you what his real name is";

    d.  Falsely suggested criminal intent, stating Mr. Miller was "only a few hundred yards, couple hundred yards from the stage where President Trump eventually was"; and

    e.  Maintained the false allegations despite his acknowledgment, "we knew nothing about it."

49. The allegations and mischaracterizations made on behalf of Sheriff Bianco led to a number of incredibly damaging and facially harmful headlines on credible news outlets, including but not limited to:

  a.  ABC News



  b.  New York Post:



  c.  FOX 11 (Los Angeles):

**Possible third Trump assassination attempt thwarted in Coachella, Riverside County sheriff says**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

d.  FOX 5 (Washington DC):

**Trump third assassination attempt thwarted in California**



e.  BBC News.



**Suspect possibly a member of far-right group Sovereign Citizens**

Suspect Vem Miller told authorities he was a member of the far-right group called Sovereign Citizens, sheriff Bianco says.

15:25 13 October 2024

**Suspect was a 'lunatic', sheriff says**

Sheriff Bianco says his office is still in contact with the Secret Service and the FBI to investigate the incident "until we get to the bottom of it".

f. KTLA 5:



g. Newsweek: "Vem Miller, Trump Assassination Attempt Suspect, Denies Plot to Kill."

h. Daily Mail:

50. Over 300 total news outlets around the world carried the false statements from Defendant Bianco in their headlines and stories.

51. On information and belief, Defendant Bianco finally recognized the severity of his false statement that Mr. Miller said he wanted "to kill the President", sometime on October 14, 2024, and sent a text message to the Epoch Times which stated, "He never said it. It was bad info ... given to me. He never told a deputy that…"

52. As a direct result of Sheriff Bianco's false statements and their widespread, global dissemination, Mr. Miller has suffered severe and ongoing harm including:

a. International media coverage falsely identified Mr. Miller as a potential presidential assassin;

b. Forced relocation due to credible threats to personal safety;

c. Severe reputational damage affecting professional relationships;

d. Loss of business opportunities and income;

e. Destruction of professional reputation built over decades;

f. Severance of family relationships, including with his children;

g. Ongoing harassment and threats from members of the public;

h. Rejection from social relationships and opportunities due to the severe reputation damage; and

i. Severe emotional distress as a result of all of the above.

53. The false allegations have resulted in specific documented damages including:

a. The eviction of Mr. Miller's elderly parents (ages 80 and 77) from their residence due to Mr. Miller's residence with them at the time of the false allegations;

b. Mr. Miller's inability to secure housing due to reputational damage;

c. Loss of business relationships and opportunities;

d. Ongoing security concerns, requiring Mr. Miller to maintain undisclosed residence; and

e. Severe emotional distress and mental anguish.

54. Sheriff Bianco's statements specifically targeted Mr. Miller's dual citizenship status and legal name variations, despite:

a. Mr. Miller having maintained proper documentation of all legal name changes in the vehicle with him at the time of the detention;

b. Mr. Miller's Armenian heritage necessitating name variations for security during international journalism work;

c. Such documentation being common among dual citizens and immigrant families; and

d. Over 11 million U.S. residents maintaining dual citizenship status.

55. The actions of Defendants demonstrated a pattern of misconduct including:

a. Unlawful detention without probable cause;

b. Excessive use of force;

c.  Deliberate indifference to medical needs;

d.  Unlawful search and seizure;

e.  Intentional defamation through media statements; and

f.  Discriminatory treatment based on ethnic background.

### FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 - First Amendment Violations

### (Against all Defendants)

56. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 55.

57. The elements of 42 U.S.C. § 1983 are: (1) defendant acted under color of state law, (2) defendant's actions deprived plaintiff of a constitutional right; and (3) causation between defendant's actions and plaintiff's harm.

58. Plaintiff hereby repeats, realleges, and incorporates that Defendants violated Mr. Miller's First Amendment rights by: (a) preventing Mr. Miller from attending a political rally despite his possession of valid entry passes; (b) detaining Mr. Miller without probable cause when he voluntarily disclosed the presence of firearms; (c) using excessive force and unlawful detention to chill protected First Amendment activities.

59. Defendants acted under color of state law:

a.  All Defendants were operating within their official capacities as RCSD employees or as the Sheriff of Riverside County.

b.  Deputies were performing official law enforcement functions during the incident.

60. Defendants' actions deprived Mr. Miller of his Constitutional Rights:

a.  Mr. Miller was prevented from attending a political rally despite possessing valid entry passes.

b.  Mr. Miller's detention directly interfered with his right to political assembly.

c.  Mr. Miller's detention was precipitated by his voluntary firearm disclosure, not by any other illegal conduct.

61. As a direct and proximate result of Defendants' actions, Mr. Miller has suffered damages including: (a) deprivation of his First Amendment rights; (b) loss of journalistic opportunities; (c) damage to professional reputation; (d) emotional distress and mental anguish.

62. Mr. Miller is entitled to recover from Defendants for his general, noneconomic damages in an amount to be determined at trial.

63. Mr. Miller is entitled to recover his reasonable attorney fees, expert witness expenses, and litigation costs.

64. Mr. Miller is entitled to punitive damages for the malicious intent of the Defendants.

65. WHEREFORE, Plaintiff requests relief as hereafter provided.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 - Fourth Amendment Violation

### (Against Defendants RCSD, Coronado, and DOES 1-100)

66. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 55.

67. A Fourth Amendment Violation occurs when a defendant commits: (1) Unreasonable search or seizure, (2) without probable cause or warrant; and (3) conducted by person acting under color of state law. *Schmerber v. Cal.*, 384 U.S. 757 (1966) ("Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions"); *Winston v. Lee*, 470 U.S. 753 (1985) (performing surgery without express consent exceeded *Schmerber* limits); *Friedman v. Boucher*, 580 F.3d 847 (9th Cir. 2009) (forcibly taking a DNA sample from a pre-trial detainee without a warrant or court order violated the detainee's clearly established Fourth Amendment rights.)

68. The expressly non-consented x-ray examination of Mr. Miller was an unreasonable search or seizure by Defendants RCSD, Coronado, and DOES 1-100 while they acted under color of state law in their official capacities.

69. Defendants acted without probable cause or warrant:

    a.  No probable cause articulated for an intrusive x-ray of Mr. Miller's person.

    b.  No explanation provided for search scope or duration.

    c.  No express consent obtained for comprehensive search.

70. Mr. Miller is entitled to recover from Defendant for his general, noneconomic damages in an amount to be determined at trial.

71. Mr. Miller is entitled to recover his reasonable attorney fees, expert witness expenses, and litigation costs.

72. Mr. Miller is entitled to punitive damages for the malicious intent of the Defendants.

73. WHEREFORE, Plaintiff requests relief as hereafter provided.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 - Municipal Liability - Failure to Train

### (Against Defendant Riverside County and RCSD)

74. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 55, 58 through 60, 68, and 69.

75. The elements in Municipal Liability – Failure to train are: (1) inadequate training program, (2) deliberate indifference to constitutional rights, (3) and causal link between inadequate training and constitutional violation. *City of Canton v. Harris*, 489 U.S. 378 (1989) (failure to train standard); *Connick v. Thompson*, 563 U.S. 51 (2011) (pattern of violations); *Board of County Comm'rs v. Brown*, 520 U.S. 397 (1997) (deliberate indifference); *Rodriguez v. Cty. of L.A.*, 891 F.3d 776 (9th Cir. 2018) (unreasonable searches).

76. Mr. Miller hereby repeats, realleges, and incorporates that Defendants Riverside County and RCSD:

    a.  Failed to adequately train employees regarding: (a) proper procedures for voluntary firearm disclosure; (b) constitutional limits on searches; and (c) medical care for detainees.

    b.  Maintained inadequate policies regarding: (a) public statements about ongoing investigations; and (b) use of force protocols.

77. Defendants Riverside County and RCSD had inadequate training programs: (a) Officers demonstrated lack of proper training regarding voluntary firearm disclosure procedures; (b) inadequate training on constitutional search limitations; (c) insufficient training on detainee medical care protocols; and (d) improper training regarding public statements about ongoing investigations.

78. Defendants Riverside County and RCSD demonstrated deliberate indifference to Constitutional rights through: (a) pattern of misconduct demonstrating systemic failures; (b) Sheriff's prioritization of political advancement over constitutional protections; (c) failure to have proper RCSD policies in place regarding Constitutional limits when detaining an individual; and (d) failure to implement proper RSCD training despite known risks.

79. The evidence shows a causal link between inadequate training and constitutional violations: (a) direct connection between training deficiencies and constitutional violations; and (b) Sheriff Bianco's improper training on public statements directly led to defamatory statements and false light.

80. Defendant Riverside County has a lengthy history of prior incidents:

    a.  *Lexis v. County of Riverside*, Case No. 5:19-cv-01567 (C.D. Cal. 2019): alleging similar pattern of detention without probable cause and failure to provide medical care.

    b.  *Rodriguez v. Riverside County Sheriff's Department*, Case No. 5:21-cv-00892 (C.D. Cal. 2021): involving allegations of excessive vehicle search and seizure without probable cause.

    c.  *Castro v. County of Riverside*, 833 F.3d 1060 (9th Cir. 2016): establishing

18
COMPLAINT

Riverside County's deliberate indifference to constitutional violations in detention facilities.

d. The State of California Department of Justice and Attorney General Rob Bonta announced on February 23, 2023, that they opened a civil rights investigation into the Riverside County Sheriff's Office due to, "a pattern or practice of unconstitutional policing amid deeply concerning allegations relating to conditions of confinement in its jail facilities, excessive force, and other misconduct.[5]"

e. Riverside city councilwoman Clarissa Cervantes filed a defamation lawsuit against Defendant Bianco in 2022 for false statements he made about the councilwoman.[6]

81. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Mr. Miller has suffered substantial mental and emotional distress, embarrassment, and overall discomfort.

82. Defendants committed the acts herein with malice against Mr. Miller with the wrongful intention of injuring Mr. Miller with conscious disregard to his health, safety, and rights.

83. WHEREFORE, Plaintiff requests relief as hereafter provided

**FOURTH CAUSE OF ACTION**

**42 U.S.C. § 1983 - Municipal Liability - Ratification**

**(Against Defendant Riverside County)**

84. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1

---

[5] *Attorney General Bonta Launches Civil Rights Investigation into Riverside County Sheriff's Office* (February 23, 2023) https://oag.ca.gov/news/press-releases/attorney-general-bonta-launches-civil-rights-investigation-riverside-county
[6] Tom Coulter, *Riverside councilwoman files libel suit against Sheriff Chad Bianco over vandalism comments,* Desert Sun (Oct. 1, 2022), https://www.desertsun.com/story/news/crime_courts/2022/10/01/riverside-councilwoman-clarissa-cervantes-libel-suit-sheriff-chad-bianco/8152766001/

COMPLAINT

1    through 55 and 76 through 80.

2    85. To establish municipal liability under 42 U.S.C. § 1983 per *Monell v. Dep't of*

3    *Soc. Servs.*, 436 U.S. 658 (1978), plaintiff must demonstrate that the

4    constitutional violation resulted from: (1) an official policy; (2) a widespread

5    custom or practice; (3) deliberate indifference in failure to train; or (4) ratification

6    by final policymakers.

7    86. Plaintiff hereby repeats, realleges, and incorporates that Defendant Riverside

8    County ratified unconstitutional conduct by: (a) failing to discipline officers for

9    violations; (b) supporting and amplifying false public statements; (c) allowing

10    continued harassment and targeting of Mr. Miller; and (d) maintaining policies

11    enabling constitutional violations.

12    87. Defendant Bianco occupies position of final policy-making authority in RCSD

13    for Riverside County. He is responsible for departmental policies and procedures.

14    88. Training failures by RCSD include:

15        a. Failure to implement adequate training regarding appropriate responses to

16           voluntary firearm disclosures by out-of-state visitors, creating foreseeable

17           constitutional violations.

18        b. RCSD demonstration of deliberate indifference through inadequate

19           training on scope limitations for consensual vehicle searches versus full

20           investigative searches.

21        c. Deputies' failure to receive sufficient training, specifically in regards to:

22           recognition of medical conditions requiring intervention, appropriate

23           responses to reported diabetic/hypoglycemic conditions, documentation

24           requirements for medical needs during detention, constitutional limits of

25           medical exams without express consent from the detainee.

26        d. A sheer lack of structured training for command staff regarding:

27           verification requirements before public statements, coordination protocols

28           with federal investigative partners, constitutional implications of

prejudicial public statements.

89. Defendant Riverside County ratified unconstitutional conduct: (a) Defendant Bianco's public press conference endorsing and amplifying RCSD actions; (b) Defendant Bianco's national media appearances reinforcing false claims; and (c) Defendant Bianco's continued assertions despite knowledge of falsity.

90. WHEREFORE, Plaintiff requests relief as hereafter provided.

**FIFTH CAUSE OF ACTION**

**42 U.S.C. § 1983 - Failure to Intervene**

**(Against Defendant Coronado and DOES 1-100)**

91. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 55, 59, 60, 68, and 69.

92. The elements of a Failure to Intervene cause of action are: (1) officer present at scene of constitutional violation, (2) officer had opportunity to intervene, (3) officer failed to intervene; and (4) constitutional violation occurred.

93. Deputy Coronado and additional officers were present during Mr. Miller's detention and search. Multiple officers: (1) witnessed Mr. Miller's medical distress, (2) witnessed and participated in the unauthorized medical exam of Mr. Miller, and (3) were aware of Mr. Miller's request for his statutory phone call.

94. The officers failed to intervene: (a) no action was taken to limit excessive search scope/duration; (b) no intervention was made to provide medical care; (c) no intervention was made to halt the unauthorized medical exam of Mr. Miller; and (d) express refusal to accommodate Mr. Miller's statutory rights.

95. Constitutional violations occurred: (a) Fourth Amendment violation through search/seizure as described above; and (b) procedural due process violations through Defendants denial of Mr. Miller's statutory rights.

WHEREFORE, Plaintiff requests relief as hereafter provided.

**SIXTH CAUSE OF ACTION**

**Tom Bane Civil Rights Act - Cal. Civ. Code § 52.1**

21

COMPLAINT

**(Against Defendants Bianco, Coronado, and DOES 1-100)**

96. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 55, 59, 60, 68, and 69.

97. The elements of a Tom Bane Civil Rights Act cause of action are: (1) interference or attempted interference with plaintiff's rights, (2) by threats, intimidation, or coercion, (3) made by defendant; and (4) causing plaintiff harm.

98. For the first element of interference or attempted interference with Mr. Miller's rights: (a) subjection to unreasonable search and seizure through the expressly declined x-ray of Mr. Miller's person; (b) denial of medical care; and (c) repeated denial of Mr. Miller's statutory telephone call.

99. For the second element of "by threats, intimidation, or coercion:" (a) application of handcuffs and excessive physical restraints; (b) confinement in patrol vehicle and jail facilities; and (c) intimidation through excessive officer presence.

100. For the third element of "made by defendant:" (a) the actions described were perpetrated by RCSD deputies; and (b) the public threats and intimidation by Sheriff Bianco.

101. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Mr. Miller suffered substantial mental and emotional distress, embarrassment, and overall discomfort.

102. WHEREFORE, Plaintiff requests relief as hereafter provided.

### SEVENTH CAUSE OF ACTION

### Slander Per Se

### (Against Defendant Bianco)

103. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 55.

104. The elements of slander per se are: (1) a false and unprivileged publication; (2) orally uttered to a person; and (3) naturally tending directly to injure a person; (4) slander per se statements include: charging the commission of crime, tending

directly to injure a plaintiff in respect to the plaintiff's business by imputing something with reference to the plaintiff's business that has a natural tendency to lessen its profits, or by natural consequence, causes actual damage. California Civil Code Section 46; *Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90 (2004); *Burrill v. Nair*, 217 Cal.App.4th 357, 358 (2013) ("accusations of crime were defamatory per se and were specific enough that they were not mere hyperbole").

105. Defendant Bianco made unprivileged oral statements during his:

    a.  Interview with the Southern California News Group.

    b.  Public press conference on October 13, 2024.

    c.  Fox News national television appearance on October 14, 2024.

    d.  Resulting in widespread media dissemination.

106. Defendant Bianco made false statements about Mr. Miller when he:

    a.  Falsely claimed Mr. Miller was a "would-be Trump assassin."

    b.  Falsely alleged Mr. Miller of possessing false identification

    c.  Falsely alleged Mr. Miller had fake press credentials.

    d.  Falsely alleged Mr. Miller had extremist affiliations.

    e.  Falsely called Mr. Miller a "lunatic."

107. The false statements were slanderous per se:

    a.  "Would-be Trump assassin" is commonly understood as an attempted assassination, as the media headlines show. Especially in light of the two temporally connected actual attempted assassinations of President Trump.[7] Attempted assassination of a major presidential candidate is a very serious federal crime under 18 U.S.C. § 351(c).

    b.  The false accusation that Mr. Miller possessed and presented false identification and fake press credentials is identity fraud, a crime under

---

[7] *Ryan Wesley Routh Indicted for Attempted Assassination of Former President Trump*, U.S. Department of Justice (Sept. 24, 2024), https://www.justice.gov/archives/opa/pr/ryan-wesley-routh-indicted-attempted-assassination-former-president-trump

California Penal Code Sections 529 and 148.9.

    c. Falsely stated the Mr. Miller had extremist affiliations is naturally causing harm due to our society's rejection of such groups.

    d. Recklessly and falsely calling Mr. Miller a lunatic, particularly in conjunction with the "assassin" tag, is naturally damaging.

108. Defendant Bianco knew or, with reckless disregard for the truth, should have known that the statements were false:

    a. FBI and Secret Service declined to interview Mr. Miller because he was deemed to be non-threatening.

    b. Defendant Bianco knew the federal agencies had dismissed assassination theory.

    c. Mr. Miller possessed legitimate identification documentation.

    d. Mr. Miller never stated that he was a "sovereign citizen."

    e. Mr. Miller acted rationally throughout his interactions with law enforcement during the time of his detention and arrest, the opposite of a "lunatic."

109. Defendant failed to use reasonable care to determine truth:

    a. Defendant Bianco proceeded despite knowledge of federal agencies' assessment.

    b. Defendant Bianco with reckless disregard for the truth, allegedly relied on only one deputy who informed him of the falsely attributed statement to Mr. Miller.

    c. Defendant Bianco made statements for his own political advancement and media opportunities.

    d. Defendant Bianco clearly demonstrated reckless disregard for factual accuracy.

110. Mr. Miller suffered harm, including:

    a. International media coverage as potential presidential assassin.

b.  Forced relocation due to threats resulting from the false statements.

c.  Severe reputational damage affecting livelihood.

d.  Family relationship severance.

e.  Ongoing harassment and threats.

111. Statements were substantial factor in causing Mr. Miller's harm:

a.  Prima facie direct causal connection between Sheriff Bianco's statements and Mr. Miller's damages.

b.  Specific documented damages resulting from Sheriff Bianco's statements.

112.  WHEREFORE, Plaintiff requests relief as hereafter provided.

## EIGHTH CAUSE OF ACTION

## Libel Per Se

## (Against Defendants Bianco and Riverside County)

113. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 55.

114.  The elements of libel per se are: (1) a false and unprivileged publication; (2) by writing; and (3) naturally tending directly to injure a person; (4) libel per se statements are those "without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact." California Civil Code Sections 45, 45a.

115.  Defendant Bianco texted the Epoch Times the malicious, false statement regarding Mr. Miller, "He was going to kill the president."

116.  Defendant Bianco with reckless disregard for the truth, allegedly relied on only one deputy who informed him of the falsely attributed statement to Mr. Miller.

117.  A sheriff alleging an attempted assassination of a major presidential candidate needs no explanation, as it is prima facie libelous and harmful to Mr. Miller.

118.  WHEREFORE, Plaintiff requests relief as hereafter provided.

# NINTH CAUSE OF ACTION

## False Light

### (Against Defendants Bianco, Riverside County, and DOES 1-100)

119. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 55, 105 through 110, and 115 through 117.

120. The elements of a false light cause of action are: (1) defendant made a public statement about the plaintiff, (2) the statement is an unfair or inaccurate description, (3) that is highly offensive to a reasonable person, (4) the defendant had knowledge of, or acted in reckless disregard of, the falsity of the publicized fact and the false light in which the plaintiff would be placed; and (5) the statement harmed the plaintiff. *M. G. v. Time Warner Inc*., 89 Cal. App. 4th 623 (Cal. Ct. App. 2001) (discussing elements of "false light" tort including the requirement that the communication be made to the public); *Jackson v. Mayweather*, 10 Cal. App. 5th 1240 (Cal. Ct. App. 2017) (referencing "highly offensive to a reasonable person" standard, and noting that defendant must have known or acted in reckless disregard as to the falsity of the publicized matter); *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845 (Cal. Ct. App. 2018) (stating "In order to be actionable, the false light in which the plaintiff is placed must be highly offensive to a reasonable person.")

121. Defendants Bianco and Riverside County placed Mr. Miller in a false light before the public by orchestrating and disseminating a deliberately misleading narrative that transcends mere defamatory statements. Specifically:

    a. Defendants strategically juxtaposed Mr. Miller with prior genuine assassination attempts against President Trump, creating a knowingly false contextual framework despite awareness of federal authorities' determination that Mr. Miller posed no threat;

    b. Defendants selectively presented factual information in a distorted manner, characterizing Mr. Miller's legitimate dual citizenship

documentation as "multiple passports with different names" to foster public suspicion;

c. Defendants fabricated a narrative with nefarious intent by asserting Mr. Miller was "only a few hundred yards from the stage where President Trump eventually was," deliberately, factually contradicting that Mr. Miller voluntarily approached officers at least one-half mile from the venue specifically to disclose his firearms;

d. Defendants cultivated a false impression of Mr. Miller as a "sovereign citizen" extremist despite possessing no evidence substantiating such association, thereby falsely associating Mr. Miller with known anti-government ideologies;

e. Defendants deliberately mischaracterized the condition of Mr. Miller's vehicle as being "in disarray" to substantiate their manufactured narrative of criminal intent, contradicting officers' own recorded observations that the vehicle was "nice" and "orderly" when they searched the vehicle; and

f. These misleading portrayals were disseminated through multiple high-profile media appearances designed to maximize exposure and create an enduring false public impression substantially more damaging than isolated factual inaccuracies.

122. Defendant made a public statement about Plaintiff:

a. Public press conference.

b. News interviews.

c. National television appearances.

d. Media dissemination creating false public impression.

123. Statement is unfair or inaccurate description:

a. "He was going to kill the president."

b. "Third assassination attempt" characterization.

c. "Lunatic" label.

d.  False claims about identification documents.

e.  False sovereign citizen association.

124. Highly offensive to reasonable person:

a.  Presidential assassination attempt allegation represents an extreme and outrageous offensive characterization.

b.  Mental instability allegations professionally damaging.

c.  Identity fraud implications criminally stigmatizing.

125. Knowledge of or reckless disregard for falsity:

a.  Prior knowledge of federal agencies' dismissal of threat concerns.

b.  Statements made despite this knowledge.

c.  Political motivation superseding factual accuracy.

126. Statement harmed plaintiff:

a.  Comprehensive damages are detailed herein.

b.  Professional, personal, and psychological harm documented herein.

127.  WHEREFORE, Plaintiff requests relief as hereafter provided.

## TENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (Against Defendants Bianco and Riverside County)

128. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 55, 59, 60, 68, and 69.

129. The elements of Intentional Infliction of Emotional Distress are: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress, (2) plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050-1051 (2009).

130. Defendants' conduct constitutes extreme and outrageous behavior exceeding all bounds of decency tolerated in a civilized society, as evidenced by:

a. Defendant Bianco's deliberate and calculated decision to publicly label Mr. Miller as a "would-be presidential assassin" despite contemporaneous knowledge that federal authorities had explicitly declined to investigate Mr. Miller as a potential threat, constituting conduct so extreme as to be utterly intolerable in a civilized society.

b. The timing of Defendant Bianco's false accusations during the heightened political tensions of the final weeks of a presidential election cycle, a period when Defendants knew or should have known such accusations would generate maximum public outrage and threaten Mr. Miller's safety.

c. Defendants' exploitation of Mr. Miller's status as a documented supporter of President Trump to create a particularly damaging narrative of "betrayal" that Defendants knew would subject Mr. Miller to unique forms of public hatred and condemnation.

d. Defendants' reckless disregard for the entirely foreseeable consequences of falsely labelling someone as an attempted presidential assassin in the contemporary political climate, including death threats, family estrangement, and professional destruction that have forced Mr. Miller to change his life.

e. Defendant Bianco's calculated expansion of defamatory statements into multiple high-profile national media appearances, demonstrating a deliberate intent to maximize harm rather than isolate it to local jurisdictions.

131. The extraordinary severity of emotional distress inflicted by Defendant Bianco's conduct, including, but not limited to: (i) acute psychological trauma, (ii) profound social isolation, (iii) persistent fear for personal safety, (iv) severance of parent-child relationships, and (v) comprehensive destruction of professional identity and livelihood prospects, all of which no reasonable person should be expected to endure.

COMPLAINT

132. There is a clear, direct connection between Sheriff Bianco's statements and the ongoing media coverage of Mr. Miller which have resulted in specific damages flowing from public allegations and the ongoing consequences of nationwide publicity harming Mr. Miller's reputation and professional opportunities, severe mental distress, and other harms to be proven at trial.

133.    WHEREFORE, Plaintiff requests relief as hereafter provided.

## PRAYER FOR RELIEF

134. Plaintiff prays this Honorable Court to declare and adjudge that Defendants' conduct alleged herein constitutes violations of Plaintiff's constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; statutory violations under 42 U.S.C. § 1983 and California Civil Code § 52.1; and tortious conduct constituting defamation per se, false light invasion of privacy, and intentional infliction of emotional distress under California law, all of which have caused Plaintiff to suffer severe, continuing, and irreparable damages to his reputation, employment prospects, family relationships, personal safety, and psychological well-being.

WHEREFORE, Plaintiff prays for Judgment against Defendant as follows:

A.  To declare Defendants' actions unlawful;

B.  Order that the Defendants pay Plaintiff compensatory damages, including but not limited to, lost back pay and benefits plus interest, according to proof;

C.  For general and special damages;

D.  For punitive damages, as allowed by law, that will sufficiently punish, make an example of, and deter future conduct by Defendants;

E.  For B, C, and D in an amount not less than $100,000,000;

F.  Order that the Defendants pay the Plaintiff's attorney fees and costs of this litigation, related litigation, and of the preceding administrative actions at

the Agency level;

G.  For an award of pre-judgment and post-judgment interest; and

H.  For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: March 10, 2025                               Respectfully submitted,

                                                    THE BEARMAN FIRM, INC.

                                                    By: _____

                                                    ETHAN BEARMAN
                                                    Attorney for Plaintiff
                                                    VEM MILLER