Eugene P. Ramirez (State Bar No. 134865)
*eugene.ramirez@manningkass.com*
Anthony J. Ellrod (State Bar No. 136574)
*anthony.ellrod@manningkass.com*
Yury A. Kolesnikov (State Bar No. 271173)
*yury.kolesnikov@manningkass.com*
Kayleigh Andersen (State Bar No. 306442)
*kayleigh.andersen@manningkass.com*
Natalya D. Vasyuk (State Bar No. 307419)
*natalya.vasyuk@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

*Attorneys for Defendants Chad Bianco and County of Riverside*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

VEM MILLER,

Plaintiff,

v.

CHAD BIANCO, in his individual and official capacities; COUNTY OF RIVERSIDE, a municipal entity; and DOES 1 through 100,

Defendants.

Case No.: 5:25-cv-00629 KK (DTB)

**Defendants' Notice of Motion and Motion to Dismiss and Special Motion to Strike Plaintiff's First Amended Complaint; Memorandum of Points and Authorities in Support Thereof**

*Filed concurrently with Declaration of Yury A. Kolesnikov and [Proposed] Order*

Judge: Hon. Kenly Kiya Kato
Courtroom: 3
Date: July 31, 2025
Time: 9:30 a.m.

Complaint Filed: March 10, 2025
Trial Date: Not Yet Set

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 31, 2025, at 9:30 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Kenly Kiya Kato, located in Courtroom 3 of the George E. Brown, Jr. United States Courthouse, 3470 12th Street, Riverside, California 92501, Defendants Chad Bianco and County of Riverside ("Defendants") will and hereby do move this Court to (1) dismiss Plaintiff's first amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6); and (2) strike Plaintiff's first amended complaint pursuant to California's anti-SLAPP statute, California Code of Civil Procedure § 425.16. This motion is made upon the following grounds:

1. Plaintiff's first cause of action for violation of the First Amendment fails to state a claim upon which relief can be granted because the first amended complaint ("FAC") reveals that the deputies had probable cause to arrest Plaintiff;

2. Plaintiff's second cause of action for municipal liability based on failure to train fails to state a claim upon which relief can be granted because there is no underlying constitutional violation, the FAC fails to plead something more than a single, isolated incident, and the FAC does not plausibly allege that any failure to train was done with deliberate indifference or was the moving cause of Plaintiff's injuries;

3. Plaintiff's third cause of action for failure to intervene fails to state a claim upon which relief can be granted because there is no underlying constitutional violation and because the County of Riverside cannot be liable under § 1983 on the theory of vicarious liability;

4. Plaintiff's fourth, fifth, and sixth causes of action for slander, libel, and intentional infliction of emotional distress ("IIED") are subject to a motion to strike because they arise out of protected activity and Plaintiff cannot demonstrate a reasonable likelihood of prevailing on the merits of these claims because these causes of action are absolutely barred under the "official duty" and/or "litigation" privileges;

/ / /

MK MANNING | KASS

5. Plaintiff's fourth and fifth causes of action for slander and libel are subject to a motion to strike because Plaintiff cannot demonstrate a reasonable likelihood of prevailing on the merits of these claims because the challenged oral and written statements are privileged under California law;

6. Plaintiff's fourth cause of action for slander is subject to a motion to strike because Plaintiff cannot demonstrate a reasonable likelihood of prevailing on the merits of this claim because no reasonable factfinder could conclude that the contested statements implied an assertion of an objective fact that was slanderous; and

7. Plaintiff's sixth cause of action for IIED is subject to a motion to strike because Plaintiff cannot demonstrate a reasonable likelihood of prevailing on the merits of this claim because the IIED claim is duplicative and redundant of Plaintiff's slander and libel causes of action.

This motion is based on this notice of motion and motion, the attached memorandum of points and authorities, the concurrently-filed declaration of Yury A. Kolesnikov, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

**STATEMENT REGARDING CONFERENCE OF COUNSEL**

This motion is made following two telephonic conferences of counsel pursuant to Civil L.R. 7-3, which took place on April 30, 2025, and June 4, 2025. Eugene P. Ramirez and Yury A. Kolesnikov participated on behalf of Defendants and Ethan Bearman participated on behalf of Plaintiff. The first conference lasted one hour and the second conference lasted 30 minutes. During both conferences, the parties engaged in thorough discussion of their respective positions and legal arguments with regard to each cause of action and Defendants' anticipated motions. Following the first conference, Plaintiff's counsel agreed to file an amended complaint. The parties discussed Plaintiff's first amended complaint on June 4, 2025, including all of the

MK MANNING | KASS

factual and legal grounds for Defendants' forthcoming motion to dismiss and anti-SLAPP motion to strike. Despite their good-faith efforts, the parties were unable to reach any further agreement, thus necessitating the filing of the present motion.

DATED: June 11, 2025

Respectfully submitted,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By: */s/ Yury A. Kolesnikov*
Eugene P. Ramirez
Anthony J. Ellrod
Yury A. Kolesnikov
Kayleigh Andersen
Natalya D. Vasyuk

*Attorneys for Defendants Chad Bianco and County of Riverside*

MANNING | KASS

MANNING | KASS

# MEMORANDUM OF POINTS AND AUTHORITIES

## Table of Contents

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 2

III. LEGAL STANDARD ........ 3

A. Motion to Dismiss for Failure to State a Claim ........ 3

B. Special Motion to Strike Under California's Anti-SLAPP Statute ........ 3

IV. INCORPORATION BY REFERENCE ........ 4

V. ARGUMENT ........ 4

A. The Court Should Dismiss All of Plaintiff's Federal Claims ........ 4

1. No First Amendment Violation ........ 4

2. Plaintiff's *Monell* Claim Fails ........ 7

3. Failure-to-Intervene Claim Fails ........ 8

B. The Court Should Grant Defendants' Anti-SLAPP Motion and Strike the State-Law Causes of Action in the FAC ........ 8

1. Plaintiff's Claims Arise Out of Protected Activity ........ 9

2. Plaintiff Cannot Establish Reasonable Probability of Prevailing on the Merits of the State-Law Claims ........ 11

a. Absolutely Barred by the "Official Duty" Privilege ........ 11

b. Absolutely Barred by the Litigation Privilege ........ 14

c. Slander *Per Se* and Libel *Per Se* Claims Fail ........ 16

i. Sending a text message stating that Plaintiff said "he was going to kill the President" ........ 17

ii. Claiming that Plaintiff was a "would-be assassin" ........ 17

iii. Possessing false IDs and fake press credentials ........ 22

iv. Alleged extremist affiliations ........ 23

v. Other statements ........ 23

d. IIED Claim ........ 24

VI. CONCLUSION ........ 24

CERTIFICATION PURSUANT TO LOCAL RULE 11-6.2 ........ 25

MANNING | KASS

ii

Defendants' Motion to Dismiss and Anti-SLAPP Motion re: Plaintiff's First Amended Complaint

MK MANNING | KASS

## Table of Authorities

**Cases**

*Action Apartment Ass'n, Inc. v. City of Santa Monica*,
41 Cal. 4th 1232 (2007) .......... 14

*Arizona Students' Ass'n v. Arizona Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) .......... 5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 3

*Balzaga v. Fox News Network, LLC*,
173 Cal. App. 4th 1325 (2009) .......... 15

*Barr v. Matteo*,
360 U.S. 564 (1959) .......... 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 3

*Benavidez v. Cnty. of San Diego*,
993 F.3d 1134 (9th Cir. 2021) .......... 3, 7, 8

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) .......... 5

*Connick v. Thompson*,
563 U.S. 51 (2011) .......... 7, 8

*CoreCivic, Inc. v. Candide Grp., LLC*,
46 F.4th 1136 (9th Cir. 2022) .......... 3, 9, 11

*Couch v. San Juan Unified Sch. Dist.*,
33 Cal. App. 4th 1491 (1995) .......... 16, 24

*Crowe v. Cnty. of San Diego*,
608 F.3d 406 (9th Cir. 2010) .......... 17, 21, 22

*Digerati Holdings, LLC v. Young Money Ent., LLC*,
194 Cal. App. 4th 873 (2011) .......... 11

*Disabled Rights Action Committee v. Las Vegas Events, Inc.*,
375 F.3d 861 (9th Cir. 2004) .......... 15

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) .......... 6

*FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133 (2019) ........ 10, 11

*Flores v. Cnty. of Los Angeles*, 758 F.3d 1154 (9th Cir. 2014) ........ 8

*Gilton v. City & Cnty. of San Francisco*, 2023 WL 5600082 (N.D. Cal. Aug. 29, 2023) ........ 8

*Green v. Cortez*, 151 Cal. App. 3d 1068 (1988) ........ 15

*Hagberg v. Cal. Fed. Bank*, 32 Cal. 4th 350 (2004) ........ 15

*Hayward v. Watsonville Reg.-Pajaronian & Sun*, 265 Cal. App. 2d 255 (1968) ........ 15

*Herring Networks, Inc. v. Maddow*, 8 F.4th 1148 (9th Cir. 2021) ........ 3, 4, 16, 17, 22

*Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136 (9th Cir. 2020) ........ 8

*Kenne v. Stennis*, 230 Cal. App. 4th 953 (2014) ........ 24

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ........ 4

*Kilgore v. Younger*, 30 Cal. 3d 770 (1982) ........ 12, 15

*Lockett v. Cnty. of Los Angeles*, 977 F.3d 737 (9th Cir. 2020) ........ 7

*Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir. 2013) ........ 11

*Maranatha Corr., LLC v. Dep't of Corr. & Rehab.*, 158 Cal. App. 4th 1075 (2008) ........ 11, 12, 14

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) ........ 8

*Morrow v. L.A. Unified School District*, 149 Cal. App. 4th 1424 (2007) ........ 13

MANNING | KASS

*Nieves v. Bartlett*,
587 U.S. 391 (2019) ....................5, 6

*Nygard, Inc. v. Uusi-Kerttula*,
159 Cal. App. 4th 1027 (2008)....................10

*Oklahoma City v. Tuttle*,
471 U.S. 808 (1985) ....................7

*Ringler Assocs. Inc. v. Maryland Cas. Co.*,
80 Cal. App. 4th 1165 (2000)....................23

*Rivero v. Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO*,
105 Cal. App. 4th 913 (2003)....................10

*Rubin v. Green*,
4 Cal. 4th 1187 (1993)....................14, 15

*Rudwall v. Blackrock, Inc.*,
2006 WL 3462792 (N.D. Cal. Nov. 30, 2006)....................24

*Rusheen v. Cohen*,
37 Cal. 4th 1048 (2006)....................16

*San Diegans for Open Gov't v. San Diego State Univ. Rsch. Found.*,
13 Cal. App. 5th 76 (2017)....................11

*Saroyan v. Burkett*,
57 Cal. 2d 706 (1962)....................12

*Shepard v. Perez*,
609 F. App'x 942 (9th Cir. 2015)....................8

*Silberg v. Anderson*,
50 Cal. 3d 205 (1990)....................14, 15

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011)....................7

*United States v. Borneo, Inc.*,
971 F.2d 244 (9th Cir.1992)....................15

*Wilbanks v. Wolk*,
121 Cal. App. 4th 883 (2004)....................10

MANNING | KASS

**Constitution and Statutes**

CAL. CONST. art. V, § 13 .......... 13
CAL. CONST. art. XI, § 1 .......... 13
CAL. CIV. CODE § 44 .......... 16
CAL. CIV. CODE § 45 .......... 16, 17
CAL. CIV. CODE § 46 .......... 16, 17
CAL. CIV. CODE § 47 .......... 11, 14, 15
CAL. CIV. PROC. CODE § 425.16 .......... 3, 9, 10
CAL. GOV'T CODE § 26600 .......... 13
CAL. PEN. CODE § 25850 .......... 4, 6
CAL. PEN. CODE § 32310 .......... 4, 6

**Rules**

FED. R. EVID. 201 .......... 14

MK MANNING | KASS

vi
Defendants' Motion to Dismiss and Anti-SLAPP Motion re: Plaintiff's First Amended Complaint

MANNING | KASS

## I. INTRODUCTION

Plaintiff brings this action against Sheriff Chad Bianco and County of Riverside, alleging constitutional violations and various state-law claims following Plaintiff's arrest on gun charges and Sheriff Bianco's press conference and interviews related to the incident. Plaintiff concedes that he had ***a loaded handgun*** and ***a large-capacity magazine*** in his vehicle as he made his way to President Trump's rally on October 12, 2024. This was only three months after the first failed assassination attempt on President Trump at Butler, Pennsylvania (7/13/24), and less than a month after the second failed assassination attempt at West Palm Beach, Florida (9/15/24).

The Court should dismiss the First Amendment claim because Plaintiff's first amended complaint ("FAC") concedes that the deputies had probable cause to detain and arrest him for possession of a loaded firearm in a vehicle in a public place and a large-capacity magazine in violation of Penal Code §§ 25850(a) and 32310. The Court should dismiss the municipal liability claim for lack of an underlying constitutional violation and because the FAC only alleges a single, isolated incident.

The Court should also strike Plaintiff's state-law claims for slander, libel, and intentional infliction of emotional distress ("IIED"). California's anti-SLAPP statute applies to Plaintiff's state-law claims because Sheriff Bianco's challenged statements were made "in connection with a public issue" or "an issue of public interest"—arrest of a suspect with loaded weapons at President Trump's rally, which generated extensive public interest and media coverage (as the FAC concedes). Furthermore, Plaintiff cannot demonstrate that he is likely to prevail on his state-law claims because all of the claims are barred under the "official duty" and/or "litigation" privileges.

Finally, Plaintiff's slander claim fails on the merits because, viewing the challenged statements in the full context of the press conference and interview videos, no reasonable person would interpret Sheriff Bianco's statements to say that Plaintiff ***in fact*** wanted to kill the President. Instead, all of the videos reveal that Sheriff Bianco was merely expressing his personal opinion and belief based on the available

information and disclosed all of the facts underlying his opinion. Plaintiff's other challenged statements also fail to state a claim for slander.

For all these reasons, the Court should grant the motion to dismiss and motion to strike in full and dismiss the FAC with prejudice and without leave to amend.

## II. BACKGROUND

Plaintiff alleges that he is a long-time political supporter of President Trump. ¶¶ 1–2, 23–24.[1] On October 12, 2024, Plaintiff was on his way to President Trump's rally at Coachella, Riverside County. ¶¶ 4, 25. Despite the high publicity of the two prior assassination attempts on President Trump, Plaintiff inexplicably had two firearms in his vehicle as he made his way to the rally: "a shotgun and .. a handgun." ¶¶ 26–28. More egregiously, ***at least one of the firearms was loaded***, and Plaintiff had ***at least one large-capacity magazine*** in his vehicle. *See* ¶ 39.

Plaintiff alleges that before attempting to enter the venue parking area, he voluntarily drove up to a Riverside County Sheriff's Deputy and voluntarily disclosed that he had two firearms in his vehicle. ¶¶ 26–27. According to Plaintiff, he offered to have the deputies hold the firearms, presented a valid identification and entry passes, and made no attempt to enter the venue with the firearms. ¶¶ 27–28. Plaintiff alleges that following his voluntary disclosure, he was handcuffed, and 10 to 15 officers and agents conducted an extensive search of his vehicle. ¶¶ 29, 32.

Plaintiff was arrested and taken to jail. ¶¶ 34, 37. He was released after being cited with two misdemeanor violations: (1) Penal Code § 25850(a) (carrying a loaded firearm); and (2) Penal Code § 32310 (possessing a large-capacity magazine). ¶ 39.

Given the high-profile nature of the incident, and the wide-spread attention it immediately received, Sheriff Bianco held a press conference the following day to provide updates for the public and to answer questions. Plaintiff alleges that Sheriff Bianco made defamatory statements regarding Plaintiff during the press conference

[1] "All ¶ __" references are to the FAC, Dkt. No. 28. Unless otherwise noted, all internal citations and quotation marks are omitted, and all emphasis is added.

and in interviews relating to the incident. ¶¶ 42–45. He also alleges that Sheriff Bianco sent a defamatory text message to *The Epoch Times*. ¶ 41. Plaintiff alleges additional defamatory statements in March and April 2025. ¶¶ 49–51.

Plaintiff brings three federal claims: (1) First Amendment, (2) municipal liability for failure to train, and (3) failure to intervene. ¶¶ 56–80. He also brings three state-law claims: (4) slander *per se*, (5) libel *per se*, and (6) IIED. ¶¶ 81–102.

## III. LEGAL STANDARD

### A. Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A plausible claim includes factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. Special Motion to Strike Under California's Anti-SLAPP Statute

"California's anti-SLAPP statute allows a defendant to file a 'special motion to strike' a plaintiff's complaint, and involves a two-step inquiry." *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021) (quoting CAL. CIV. PROC. CODE § 425.16(b)(1)). "The first step requires the defendant to make a *prima facie* showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech." *CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1140 (9th Cir. 2022). "At the second step, if, as here, the anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Id.* Courts are directed to "broadly" construe the anti-SLAPP statute. *See* CAL. CIV. PROC. CODE § 425.16(a).

/ / /

MANNING | KASS

MANNING | KASS

## IV. INCORPORATION BY REFERENCE

"[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."

"[A] defendant may seek to incorporate a document into the complaint if the plaintiff ***refers extensively*** to the document or the document ***forms the basis*** of the plaintiff's claim." *Id.* Here, Plaintiff's FAC refers extensively to Sheriff Bianco's press conference, his interviews, and the several news articles pertaining to those interviews. And the FAC premises Plaintiff's state-law claims on the statements allegedly made by Sheriff Bianco at the press conference and in interviews. As such, the videos from the challenged press conference and interviews and the challenged news articles are incorporated into the FAC. *See Khoja*, 899 F.3d at 1002; *Herring*, 8 Cal. 4th at 1154 (observing that the court properly considered the complaint and the challenged article containing the allegedly defamatory statements).

## V. ARGUMENT

### A. The Court Should Dismiss All of Plaintiff's Federal Claims

#### 1. No First Amendment Violation

Plaintiff's FAC is not a model of clarity. Despite having an opportunity to amend, it is still not clear what *exactly* the FAC challenges as a violation of the First Amendment. For example, the FAC alleges that Plaintiff's constitutional rights were violated because Plaintiff "was prevented from attending a political rally despite possessing valid entry passes." *See* ¶ 60(a). But the FAC concedes that Plaintiff was prevented from attending the rally ***because he had firearms in his car in violation of multiple state statutes***, not because of any speech or assembly activity. *See* ¶¶ 26–29, 39; *see also* CAL. PEN. CODE §§ 25850(a), 32310(c). Notably, the FAC does ***not*** challenge (facially or as applied) California's framework for prohibiting the carrying

of loaded firearms in public places or the possession of large-capacity magazines.[2]

At most, read liberally, it appears that the FAC alleges a First Amendment retaliation claim in the first cause of action. The First Amendment "prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected activity. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). To state a claim, "the plaintiff must allege that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was ***a substantial motivating factor*** in the defendant's conduct—*i.e.*, that ***there was a nexus between the defendant's actions and an intent to chill speech***." *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

Here, Plaintiff's claim fails at the third prong because he does not—and cannot—plausibly allege that Defendants' actions were taken ***because of any protected First Amendment activity***. Indeed, the FAC is absolutely devoid of any allegations that ***Plaintiff's attendance at the rally*** (or any other protected speech or assembly activity) were the motivating factors for Plaintiff's detention and subsequent arrest. On the contrary, the FAC concedes that the impetus for the detention and subsequent arrest were Plaintiff's allegedly voluntary disclosures that he had firearms in his vehicle as he made his way to President Trump's rally.

/ / /

[2] To the extent Plaintiff is asserting a broader First Amendment challenge to the prohibition of loaded firearms at a political rally, any such claim fails because the FAC does not plausibly alleging that the First Amendment ***even applies*** to this non-expressive conduct or that this is not a valid time, place, and manner regulation. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies") (regulation prohibiting camping in certain parks did not violate the First Amendment when applied to prohibit demonstrators from sleeping in a park in connection with a demonstration). Nor does the FAC allege how such content-neutral regulations violate the First Amendment.

MK MANNING | KASS

As the Supreme Court has explained, "[t]he plaintiff pressing a retaliatory arrest claim must plead and prove ***the absence of probable cause for the arrest***." *See Nieves*, 587 U.S. at 401–02. That is because the presence of probable cause to arrest the plaintiff generally "speaks to the objective reasonableness of an arrest" and suggests that the "officer's animus" is ***not*** what caused the arrest. *Id.* Here, the FAC concedes that the deputies ***had probable cause*** to arrest him for violation of Penal Code §§ 25850(a) and 32310. *See* ¶¶ 26–28, 39; *see also District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) ("probable cause" is "a fluid concept" that "requires only a probability or substantial chance of criminal activity").

*First*, § 25850 prohibits carrying "a loaded firearm … in a vehicle while in any public place." CAL. PEN. CODE § 25850(a). The FAC admits that Plaintiff had firearms in his vehicle and that he was in a public place. ¶¶ 25–28. There are no allegations in the FAC that the firearms were ***not*** "loaded." In any event, under the statute, the deputies were "***authorized to examine***" Plaintiff's firearms to determine if they were loaded in violation of § 25850(a). *See* CAL. PEN. CODE § 25850(b). More importantly, the statute expressly authorized the deputies to "make an arrest ***without a warrant***" where they had "reasonable cause to believe that [Plaintiff] has violated [§ 25850(a)], ***whether or not [that section] has, in fact, been violated***." *See id.* § 25850(g)(2).

*Second*, § 32310 prohibits possession of "any large-capacity magazine." CAL. PEN. CODE § 32310(c). There are no allegations in the FAC that Plaintiff was ***not*** in the possession of a large-capacity magazine on the day of the incident.

Simply put, the FAC does not allege (because it cannot) that Plaintiff was not in possession of a loaded firearm or that he did not have a large-capacity magazine in his possession when he interacted with the deputies. As such, the deputies clearly had probable cause to arrest Plaintiff for violation of one or both of the criminal statutes. *See Wesby*, 583 U.S. at 57 (probable cause "is not a high bar"). Where, as here, the FAC on its face discloses probable cause to arrest Plaintiff, it fails to state a claim for violation of the First Amendment as a matter of law. *See Nieves*, 587 U.S. at 404

MANNING | KASS

("Absent such a showing [of lack of probable cause], a retaliatory arrest claim fails.").

**2. Plaintiff's *Monell* Claim Fails**

Plaintiff seeks to impose *Monell* liability under the theory of failure to train. To begin with, the claim fails because the FAC does not plausibly allege any underlying constitutional violation. *See Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020). The claim also fails on the merits.

To state a *Monell* claim based on failure to train, Plaintiff must allege something more than a single, isolated incident. *See Benavidez*, 993 F.3d at 1154. In addition, the pleading hurdle is higher where plaintiff alleges *Monell* liability under the theory of failure to train. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011); *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion).

Here, Plaintiff's conclusory allegations are insufficient to meet this heightened standard. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Plaintiff's claim is premised on the County's alleged failure to adequately train employees regarding (a) proper procedures for voluntary firearm disclosures, (b) constitutional limits on searches, and (c) medical care for detainees. ¶ 68(a). The FAC, however, fails to allege ***any*** prior incidents involving voluntary firearm disclosures or vehicle searches at political rallies. Instead, it relies on inapposite cases dealing with (1) leaving a body of a victim exposed in public view while the officers tried to apprehend an active shooter;[3] (2) an in-custody death of a pretrial detainee who experienced a medical emergency;[4] and (3) an arrest of an individual who was alleged to have impersonated an officer and brandished a firearm.[5] *See* ¶ 72(a)–(c). None of these cases comes close to matching the allegations asserted in the FAC. *See Connick*, 563 U.S. at 62

---

[3] *See Leon v. Cnty. of Riverside*, 14 Cal. 5th 910, 916 (2023).

[4] *See Estate of Richard Matus, Jr. v. Cnty. of Riverside*, Case No. 5:23-cv-00506 (C.D. Cal.).

[5] *See Bautista v. Cnty. of Riverside*, Case No. 5:24-cv-01658 (C.D. Cal.).

MK MANNING | KASS

(“A pattern of ***similar*** constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.”).

Similarly inapposite are the FAC’s conclusory references to: (1) an unrelated 2023 investigation by DOJ into in-custody deaths at the RCSD, and (2) an unrelated 2022 defamation suit that has since been dismissed. *See* ¶ 72(d), (e). The FAC does not plausibly allege that either of these had anything to do with Plaintiff or the FAC’s allegations and, thus, does not come close to meeting the heightened standard for alleging a *Monell* claim based on the failure to train. *See Connick*, 563 U.S. at 62.

Finally, failure to train may constitute a basis for *Monell* liability only where it “amounts to ***deliberate indifference***,” *Benavidez*, 993 F.3d at 1153, which requires Plaintiff to allege that “the need for more or different action” was “***obvious***.” *See Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020). Here, the FAC includes only conclusory allegations of deliberate indifference. Nor does it plausibly allege that any purported failure to train was ***the moving cause*** of Plaintiff’s injuries. *See Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014).

**3. Failure-to-Intervene Claim Fails**

Plaintiff’s claim for failure to intervene fails because, as discussed above, the FAC fails to plausibly allege any underlying constitutional violation. *See Shepard v. Perez*, 609 F. App’x 942, 942–43 (9th Cir. 2015); *Gilton v. City & Cnty. of San Francisco*, 2023 WL 5600082, at *11 (N.D. Cal. Aug. 29, 2023). It also fails because it is asserted only against the County of Riverside, even though the County (as a municipality) ***cannot*** be liable under § 1983, except under *Monell*. *See Monell v. Dep’t of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978).

**B. The Court Should Grant Defendants’ Anti-SLAPP Motion and Strike the State-Law Causes of Action in the FAC**

Plaintiff’s three state-law claims are premised on Sheriff Bianco’s protected activity and must be stricken because Plaintiff cannot demonstrate a reasonable probability of prevailing on the merits of those claims, particularly because each of

MK MANNING | KASS

these claims is barred under one or more privileges set forth in Civil Code § 47.

**1. Plaintiff's Claims Arise Out of Protected Activity**

The first step of the anti-SLAPP inquiry "requires the defendant to make a *prima facie* showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech." *CoreCivic*, 46 F.4th at 1140. As relevant here, this includes "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." *See* CAL. CIV. PROC. CODE § 425.16(e)(3), (4).

Here, the slander claim is premised on statements allegedly made by Sheriff Bianco during: (1) October 13, 2024 Southern California News Group interview, (2) October 13, 2024 press conference, (3) October 14, 2024 Fox News interview, (4) April 12, 2025 appearance, and (5) May 1, 2025 podcast appearance. *See* ¶ 83.[6] The libel claim is premised on a single alleged text message to *The Epoch Times* on October 13, 2024. *See* ¶ 93. As discussed below, each of these amounts to "protected activity" under the statute because ***the statements were made "in connection with a public issue" or "an issue of public interest"***—arrest of a suspect with loaded weapons at a Trump rally, which generated extensive public interest and media coverage (as the FAC concedes). *See* CAL. CIV. PROC. CODE § 425.16(e)(3), (4).

First, Sheriff Bianco's alleged statements during interviews and at a press conference relating to the arrest of a person with loaded weapons at President Trump's rally fall squarely within **category (e)(3)** of the anti-SLAPP statute for "any … oral statement … made in a place open to the public or a public forum in connection with an issue of public interest." *See id.* § 425.16(e)(3). Second, these statements and the

---

[6] Defendants note that there is no "***May 1, 2024***, podcast appearance" (*see* ¶ 83(f)) discussed elsewhere in the FAC. Instead, there is only a discussion of an ***April 11, 2025*** podcast appearance on The Britt Mayer Show. *See* ¶ 51.

October 13, 2024 text message also fall within the "catchall" provision in **category (e)(4)** of the anti-SLAPP statute because they were made "in connection with a public issue or an issue of public interest." *See id.* § 425.16(e)(4).

Given that the anti-SLAPP statute is to be "broadly" construed, it applies even to "private communications, ***so long as they concern a public issue***." *See Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 897 (2004). "In articulating what constitutes a matter of public interest, courts look to certain specific considerations, such as whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants'; and whether the activity 'occurred in the context of an ongoing controversy, dispute or discussion' or 'affected a community in a manner similar to that of a governmental entity.'" *See FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 145–46 (2019); *see also Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042 (2008) ("an issue of public interest" is "any issue in which the public is interested"); *Rivero v. Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO*, 105 Cal. App. 4th 913, 924 (2003).

Here, Sheriff Bianco's statements regarding the arrest of a person with loaded weapons at President Trump's rally—whether made at a press conference, during an interview, or in a text message to a newspaper—clearly concerned "***an issue of public interest***" because they concerned President Trump (a "nationally known figure" subject to "extensive media coverage," *see Rivero*, 105 Cal. App. 4th at 924, as well as "a person … in the public eye," *see FilmOn.com*, 7 Cal. 5th at 145–46) and were made during a presidential campaign closely followed by the entire nation that, at the time, already included ***two failed assassination attempts*** (three months and less than one month before this incident). Moreover, a potential assassination attempt on a former President of the United States and the leading candidate for President during a highly-contested election campaign is also clearly an event that "could affect large numbers of people beyond the direct participants," particularly because it "occurred in the context of an ongoing controversy, dispute or discussion" (*i.e.*, a highly-

contested election campaign) and because it "affect[s] [the country] in a manner similar to that of a governmental entity." *See FilmOn.com*, 7 Cal. 5th at 145–46.

Finally, ***the context*** of Sheriff Bianco's statements makes clear that they were made on a public issue because they were made to the media for dissemination to the public on a topic of great public interest. *See FilmOn.com*, 7 Cal. 5th at 140 ("the context of a defendant's statement is relevant"); *see also San Diegans for Open Gov't v. San Diego State Univ. Rsch. Found.*, 13 Cal. App. 5th 76, 101 (2017).

**2. Plaintiff Cannot Establish Reasonable Probability of Prevailing on the Merits of the State-Law Claims**

At second step, where the anti-SLAPP motion challenges only legal sufficiency of the claims, the Court applies the Rule 12(b)(6) standard to consider whether a claim is properly stated. *CoreCivic*, 46 F.4th at 1140. Here, Plaintiff cannot show a reasonable probability of prevailing on his claims because they are absolutely barred under the "official duty" and "litigation" privileges. *See Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 264 (9th Cir. 2013) (if defendant's statements "lie within California's statutory litigation privilege," then plaintiff "has no probability of success on the merits" and the special motion to strike should be granted); *Digerati Holdings, LLC v. Young Money Ent., LLC*, 194 Cal. App. 4th 873, 888 (2011) ("A plaintiff cannot establish a probability of prevailing if the litigation privilege precludes the defendant's liability on the claim."). The claims also fail on the merits.

**a. Absolutely Barred by the "Official Duty" Privilege**

Under Civil Code § 47(a), there is an ***absolute privilege*** for statements made "[i]n the proper discharge of an official duty." The privilege exists to allow public officials "the freedom to make tough policy decisions ***and tell the public about the reasons behind those decisions***," without fear of retaliation. *See Maranatha Corr., LLC v. Dep't of Corr. & Rehab.*, 158 Cal. App. 4th 1075, 1079 (2008).

"Cases applying the doctrine are legion." *See id.* at 1087–88 (collecting cases). For example, in *Barr v. Matteo*, a scandal developed in the office of a federal agency

concerning employees who had been permitted to take their accumulated terminal-leave payments and then be rehired as temporary employees. 360 U.S. 564, 565–66 (1959). The affair received widespread publicity, prompting the acting director of the agency to suspend two of his subordinates and issue a press release implying that they were responsible for the misdeeds. *Id.* at 567. In a suit for libel by the two officials, the U.S. Supreme Court held that the director's statements were absolutely privileged. *Id.* at 574. In so holding, the Court observed that the director headed "an important agency of government" and "a publicly expressed statement of the position of the agency head … was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." *Id.* at 574–75.

California Supreme Court followed suit in *Saroyan v. Burkett*, finding that the privilege applied to bar a defamation suit based on statements by the Superintendent of Banks to the press relating to plaintiff's conduct as attorney for the state banking department. 57 Cal. 2d 706, 707–08 (1962). The Court observed that the defendant was "the head of the State Banking Department" and that he "was acting in the exercise of an executive function when he defended the policy of his department," entitling him to an absolute privilege. *Id.* at 710–11. And in *Kilgore v. Younger*, Court upheld the application of the privilege to statements in a report distributed by the Attorney General at a press conference, which claimed that plaintiff was involved in illegal bookmaking. 30 Cal. 3d 770, 774–75, 781–82 (1982).

In *Maranatha*, Court of Appeal found the privilege to apply to a letter published by the director of the Department of Corrections that accused a private prison contractor of misappropriating public funds. 158 Cal. App. 4th at 1079. The Court observed that "[l]ike the government officials in *Barr*, *Saroyan* and *Kilgore*, [the director] released the termination letter to the press in defense of a policy decision she made." *Id.* at 1088. Similarly, in *Morrow v. L.A. Unified School District*, Court of Appeal applied the privilege to statements in an interview by the Superintendent of Schools that criticized the plaintiff's handling of a series of violent campus

disturbances. 149 Cal. App. 4th 1424, 1429 (2007). The court observed that the superintendent "was publicly explaining the district's response to a matter of widespread concern, which was one of his official duties." *Id.* at 1442–43.

In California, sheriffs are ***constitutionally-mandated officials*** who are supervised directly by the state Attorney General. *See* CAL. CONST. art. V, § 13; *id.* art. XI, § 1(b). As the sheriff, Sheriff Bianco exercises significant responsibilities. *See* CAL. GOV'T CODE §§ 26600–26604. Chief among the sheriff's duties is the obligation to "preserve peace," including through participation in "any project of crime prevention." *See* CAL. GOV'T CODE § 26600.

Here, Sheriff Bianco was properly discharging his official duties as the sheriff when he made the challenged statements. As the sheriff, he has an obligation to keep the public informed about the operation of the Sheriff's Department, which includes conducting press conferences and submitting to interviews about high-profile arrests and incidents. Indeed, Plaintiff's FAC concedes that Plaintiff's detention and arrest received wide media coverage and were of great public interest. *See* ¶¶ 46–47; *see also* Press Conference Video at 0:50–1:20 (noting that there was ***a lot of media attention*** regarding Plaintiff's arrest and that Sheriff Bianco was there to give information regarding the arrest and to answer questions).[7]

Nor can there be any dispute that the subject of the press conference, interviews, and text message to *The Epoch Times* involved ***public and official business***. Indeed, just like the government officials in *Barr*, *Saroyan*, *Kilgore*, *Maranatha*, and *Morrow*, Sheriff Bianco held the press conference, sat for interviews, and sent the challenged text message to *The Epoch Times* to defend and explain the deputies' decision to detain and arrest Plaintiff. "Because a public official's duty includes the duty to keep the public informed of his or her management of the public business, ***press releases,***

[7] *See* Riverside County Sheriff, Trump Rally Arrest Press Conference, *available at* https://www.youtube.com/watch?v=F1Uj2xaUBWs (Oct. 13, 2024) (hereinafter, "Press Conference Video").

***press conferences and other public statements by such officials are covered by the 'official duty' privilege***, although similar statements by private litigants are not covered by the litigation privilege." *See Maranatha*, 158 Cal. App. 4th at 1089.

In sum, the "official duty" privilege completely bars all of Plaintiff's state-law claims against Sheriff Bianco and, by extension, against the County as his employer.

**b. Absolutely Barred by the Litigation Privilege**

Under Civil Code § 47(b), a "publication or broadcast" made as part of the "judicial proceeding" or " in any other official proceeding authorized by law" is also absolutely privileged. The privilege is applicable "to ***any communication***, whether or not it amounts to a publication, and all torts except malicious prosecution." *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990). "This privilege is absolute in nature, applying to ***all*** publications, ***irrespective of their maliciousness***." *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1241 (2007).

This "litigation" privilege is given a "broad interpretation" (*id.*) and, as relevant here, extends to statements made ***preliminary to litigation***. *See Rubin v. Green*, 4 Cal. 4th 1187, 1194–95 (1993). To that end, a prelitigation communication is absolutely privileged so long as it has "***some relation*** to a proceeding ***actually contemplated in good faith and under serious consideration***." *See id.*

Here, Sheriff Bianco's statements during the press conference and interviews and in the text message to *The Epoch Times* were made in his official capacity as the sheriff and ***in relation to the arrest and citation of Plaintiff*** for violation of California Penal Code §§ 25850(a) and 32310(a). ¶ 39. At the time that the alleged statements were made, and given Plaintiff's arrest, a criminal prosecution was contemplated in good faith and under serious consideration, triggering the litigation privilege. Indeed, since the incident, ***charges have been filed against Plaintiff*** for the firearm violations and are currently pending. *See* Kolesnikov Decl., Exs. 1, 2, 3.[8]

---

[8] Under FRE 201(b)(2), the Court can take judicial notice of the misdemeanor

In addition, the privilege under § 47(b) applies to communications made "in any other ***official proceeding*** authorized by law." *See* CAL. CIV. CODE § 47(b). As relevant here, California courts have extended the privilege to police investigations, at least so far as to protect statements made by persons reporting a crime. *See Hagberg v. Cal. Fed. Bank*, 32 Cal. 4th 350, 370 (2004) ("communications are privileged under section 47(b) when they are intended to instigate official governmental investigation into wrongdoing, ***including police investigation***") (resolving split in authority). In addition, California courts have interpreted a similar phrase ("public official proceeding") in § 47(d) to include police investigations. *See Balzaga v. Fox News Network, LLC*, 173 Cal. App. 4th 1325, 1337 (2009) ("A 'public official proceeding' ***includes a police investigation***."); *see also Kilgore*, 30 Cal. 3d at 774, 776 (applying the privilege to a news conference convened by the Attorney General to discuss a report relating to persons suspected of involvement in organized criminal activity); *Green v. Cortez*, 151 Cal. App. 3d 1068, 1073 (1988) (applying the privilege to statements relating to a police investigation into alleged use of excessive force by the police); *Hayward v. Watsonville Reg.-Pajaronian & Sun*, 265 Cal. App. 2d 255, 259–61 (1968) (applying the privilege to information obtained from a police crime report and FBI "rap sheet" upon which a criminal complaint was filed).

In sum, Sheriff Bianco's statements made during the press conference and interviews or to any newspaper (including *The Epoch Times*) relating to the detention and arrest of Plaintiff are absolutely privileged under § 47(b) because they have "***some connection or logical relation***" to the police investigation into Plaintiff's criminal violations and the subsequent criminal action instituted against Plaintiff. *See Silberg*, 50 Cal. 3d at 212 (the communication must "have some connection or logical relation to the action"); *Rubin*, 4 Cal. 4th at 1193 (the communication must have "***some***

---

complaint against Plaintiff and the docket from Plaintiff's criminal action. *See United States v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992); *Disabled Rights Action Committee v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004).

MANNING | KASS

***relation***" to the proceeding and extends to prelitigation conduct that is "actually contemplated in good faith and under serious consideration"); *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1057 (2006) (privilege extends to steps taken prior to the proceeding).

**c. Slander *Per Se* and Libel *Per Se* Claims Fail**

Defamation can be effected by either "slander" or "libel." CAL. CIV. CODE § 44. Slander is "a false and ***unprivileged*** publication, orally uttered" that, among other things, "[c]harges any person with crime" or which "by natural consequence, causes actual damage." *Id.* § 46(1), (5). Libel is "a false and ***unprivileged*** publication by writing" that "exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." CAL. CIV. CODE § 45. Here, Plaintiff's slander and libel claims fail as a matter of law because, as discussed above, the challenged oral and written statements ***were privileged*** under § 47(a) and/or (b). *See* CAL. CIV. CODE § 46 (to qualify as slander, the statement must be "unprivileged"); *id.* § 45 (same for libel).

The slander *per se* claim also fails because no reasonable factfinder could conclude that the contested statements implied an assertion of an objective fact that was slanderous *per se*. As the Ninth Circuit explained, "the threshold question in every defamation suit is whether a reasonable factfinder could conclude that the [contested] statement implies an assertion of objective fact." *Herring*, 8 F.4th at 1157. The Ninth Circuit applies "a three-factor test in resolving this question: (1) whether ***the general tenor of the entire work*** negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used ***figurative*** or ***hyperbolic*** language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false." *Id.* "Whether published material is reasonably susceptible of an interpretation which implies a provably false assertion of fact—the dispositive question in a defamation action—is a question of law for the court." *Couch v. San Juan Unified Sch. Dist.*, 33 Cal. App. 4th 1491, 1500 (1995).

/ / /

MK MANNING | KASS

More importantly, "defamatory meaning must be found, if at all, in a reading of ***the publication as a whole***. Defamation actions cannot be based on snippets taken out of context." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 443 (9th Cir. 2010). "The context of a statement may control whether words were understood in a defamatory sense." *Herring*, 8 F.4th at 1157. "The broad context includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work." *Id.* As such, Sheriff Bianco's challenged statements regarding Plaintiff's detention and arrest "must be analyzed ***in the context of the entire interview [and the entire press conference]***, not just the portion[s]" that Plaintiff has chosen to highlight or Plaintiff's interpretation of those statements. *See Crowe*, 608 F.3d at 443.

**i. Sending a text message stating that Plaintiff said "he was going to kill the President"**

The first statement challenged by Plaintiff in the slander cause of action is that Sheriff Bianco allegedly claimed that Plaintiff said "he was going to kill the President." *See* ¶ 84(a). However, as the FAC concedes, this statement was only made ***in a text message*** to *The Epoch Times*. *See* ¶¶ 8, 41. Slander applies to statements "orally uttered," *see* CAL. CIV. CODE § 46, while libel applies to statements made "by writing," *see id.* § 45. Because Sheriff Bianco's alleged text message to *The Epoch Times* was made in writing, it is actionable only as libel, ***not*** slander.

**ii. Claiming that Plaintiff was a "would-be assassin"**

As noted above, the Court must examine the entire work (here, the press conference and the interviews) to determine "whether a reasonable factfinder could conclude that the [contested] statement implies an assertion of objective fact." *See Herring*, 8 F.4th at 1157; *see also Crowe*, 608 F.3d at 443. Here, a review of the press conference and interview videos clearly demonstrates that Sheriff Bianco was only expressing ***his opinion*** that, in his mind, the deputies prevented a third assassination attempt on President Trump when they detained Plaintiff with loaded guns on his way to the rally. Indeed, Sheriff Bianco repeatedly states that this is ***his personal opinion***

MK MANNING | KASS

and, detrimentally to Plaintiff's claims, discloses all of the facts known at the time, ***including Plaintiff's denials*** that he did not intend to harm the President.

For example, the video of the press conference reveals that Sheriff Bianco commenced the conference by noting that there was a lot of media attention regarding Plaintiff's arrest and that he was there to give information regarding the arrest and to answer questions. Press Conference Video at 0:50–1:20. Sheriff Bianco notes that the deputies recovered a loaded handgun and a shotgun from Plaintiff's vehicle. *Id.* at 5:10–5:20. He repeatedly comments that the investigation into Plaintiff ***is ongoing***. *Id.* at 1:15–1:35, 5:30–6:00. He then notes that Plaintiff was taken into custody, booked into jail on gun charges, then released, and will need to further his court case in the future. *Id.* at 5:20–5:45. He observes that ***from the state law enforcement perspective***, the firearm charges were what Plaintiff was arrested and booked for. *Id.* at 5:55–6:10. He specifically clarifies that the deputies did ***not*** arrest Plaintiff for going inside the rally but for having illegal guns in his car. *Id.* at 9:15–9:30.

Sheriff Bianco specifically acknowledges that there is absolutely no way for anyone to know what was in Plaintiff's head and that people can only "speculate" what Plaintiff's frame of mind was. *Id.* at 8:40–8:55, 9:25–9:35; *see also id.* at 10:15–10:25 (only speculation as to what Plaintiff's intentions were). It was at this juncture, in response to a question, that Sheriff Bianco stated: "I ***probably*** did have deputies that prevented a third assassination attempt." *Id.* at 10:35–10:45. Sheriff Bianco continues by again emphasizing that ***investigation was still ongoing***. *Id.* at 13:40–14:00. ***He clearly discloses all of the facts that his opinion is based on***. *See id.* at 20:50–21:45 (two guns; multiple boxes of ammunition; cited for the unregistered loaded firearm; booked and released with a promise to appear at next court date).

He then notes that any charge for potential assassination would be a federal crime and handled by federal authorities, and specifically notes that he is "***not*** saying that they are going to be able to" prove it. *Id.* at 23:25–23:45. He then again explains that it was "***the weapons charges*** that we arrested him for." *Id.* at 23:40–23:45.

MK MANNING | KASS

The same is true of the statements during Sheriff Bianco's interviews. For example, during the Fox News appearance, Sheriff Bianco right off the bat states that he has read Plaintiff's denials and that "they are believable statements" and that "I hope that was the case for his sake." Fox News Video at 0:45–0:55.[9] He then observes that this does not change the fact that Plaintiff brought guns to a Trump rally and that he was stopped before he got inside. *Id.* at 0:50-1:05. It was only in response to a question as to whether he thought he stopped a third assassination attempt, that Sheriff Bianco responded: "***in our minds***, we did." *Id.* at 2:15–2:30. Sheriff Bianco then once again acknowledges that "there is a lot of speculation" that Plaintiff is "just an innocent person" and observes that "he very well could be." *Id.* at 2:30–2:45.

Plaintiff also challenges statements allegedly made in an interview with the Southern California News Group (*see* ¶ 83(a)), but there are no factual allegations regarding that interview anywhere in the FAC.

Sheriff's Bianco's News Nation interview (*see* ¶ 44)[10] is consistent with the press conference and Fox News interview. The host asks him to address "conflicting reports" regarding Plaintiff's intentions and whether he still sees this as a third assassination attempt. News Nation Video at 0:05–0:35. Sheriff Bianco responds that the Sheriff's Department will not be investigating any assassination charges, as that would be the purview of the Secret Service and/or the FBI. *Id.* at 0:35–0:45. He again notes that the Sheriff's Department only arrested Plaintiff for gun violations. *Id.* at 1:15–1:25. He acknowledges that it would be the FBI's responsibility to investigate the incident and to determine whether Plaintiff "was a threat at all" and agreed that it "certainly is" a plausible explanation that Plaintiff was innocent and, if

[9] Fox News, Man arrested outside Trump's Coachella rally had multiple guns, passports, *available at* https://www.youtube.com/watch?v=Ff30o9N5N2Y (Oct. 14, 2024) (hereafter, "Fox News Video").

[10] News Nation, *available at* https://rumble.com/v5rqflb-dan-abrams-live-newsnation-bianco.html (Oct. 13, 2024) (hereinafter, "News Nation Video").

that's what the FBI determines, then "more power to him." *Id.* at 1:20–1:45. Sheriff Bianco also once again emphasizes that the deputies' responsibility was to make sure that Plaintiff did not get into the rally with weapons, and they did, and Plaintiff was arrested for that; what his intentions were is "irrelevant." *Id.* at 1:45–2:00.

The FAC also adds additional allegations based on an April 12, 2025 video.[11] There, as part of responding to questions during his appearance at an event regarding his gubernatorial campaign, Sheriff Bianco was again asked about Plaintiff's arrest. 4/12/24 Video at 58:55–59:45. Sheriff Bianco once again clarifies that the Sheriff's Department arrested Plaintiff for weapons violations. *Id.* at 1:00:25–1:00:30. He again explained that any investigation into any attempted assassination was the purview of the FBI and Secret Service. *Id.* at 1:00:30–1:00:50. He noted, once again, that he "did not know what [Plaintiff] was there for" and acknowledged Plaintiff's statements that he is a big supporter of President Trump. *Id.* at 1:00:45–1:01:05.

More importantly, Sheriff Bianco once again ***disclosed all of the facts*** under which he and his deputies were operating and noted that, at the time of the press conference, he did believe that they may have prevented a third assassination attempt, given all of the available facts. *Id.* at 1:01:05–1:02:10. He also once again noted that if this turned out not to be the case, great for Plaintiff. *Id.* at 1:02:10–1:02:25. He emphasized once again that for him, this was irrelevant, because all that the Sheriff's Department arrested Plaintiff for were the gun violations. *Id.* at 1:02:20–1:02:30.

The same is true of Sheriff Bianco's appearance on The Britt Mayer Show.[12] There, the podcaster asked Sheriff Bianco about the incident and Sheriff Bianco

---

[11] Sheriff Chad Bianco for California Governor, *available at* https://rumble.com/v6s4373-sheriff-chad-bianco-for-california-governor-apr-12-2025.html (Apr. 12, 2025) (hereinafter, "4/12/25 Video").

[12] The Britt Mayer Show, Ep 37 - Sheriff Chad Bianco: California's Next Governor?, *available at* https://www.youtube.com/watch?v=pvaeZVfUicg (Apr. 11, 2025) (hereinafter, "Mayer Video").

provided the same response he did at the April 12, 2025 event. Mayer Video at 16:10–18:30. He discussed the media attention that the incident received, which prompted him to hold the press conference on October 13, 2024, to address Plaintiff's arrest and answer questions. *Id.* at 16:45–18:30. As before, Sheriff Bianco reiterated that the question that he was asked at the press conference was whether he thought that they had prevented a third assassination attempt, and he answered that based on the information available to them at the time (once again, ***providing all of the details underlying his opinion***), he thought that they did. *Id.* at 18:30–19:25. He also once again explained that he did say at the press conference that he hoped that Plaintiff was innocent, but that this was irrelevant to the gun violations. *Id.* at 19:20–19:50.

All told, the full videos make clear that "a reasonable fact-finder could ***not*** conclude that [Sheriff Bianco] implied that [Plaintiff was ***in fact*** a 'would-be Trump assassin']." *See Crowe*, 608 F.3d at 443. In this regard, *Crowe* is on point. That case involved an allegedly egregious conduct by the detectives in pinning the stabbing of a young girl on her brother and several other teenagers. *Id.* at 417–425. A year later, DNA testing revealed the girl's blood on the shirt of a transient who had been seen in the neighborhood on the night of the murder. *Id.* at 425–26. The shirt had been collected as part of the initial investigation, but never fully tested. *Id.* Charges against the boys were eventually dropped, and the transient was convicted of the murder. *Id.*

The boys and their families sued. Among other things, they asserted defamation claims against the Deputy District Attorney "based on statements she made during an appearance on the news program '48 hours' shortly after the indictments against the boys were dismissed." *Id.* at 442. The Ninth Circuit affirmed the district court's conclusion that a reasonable fact-finder could not conclude that the Deputy District Attorney implied that the boys actually killed the girl:

> ***Viewed in the context of the interview as a whole***, even Stephan's most questionable statements can only be interpreted as ***describing the evidence*** that led the police to investigate the boys and allowed the prosecution to continue as far as it did and ***expressing the facts that the***

MK MANNING | KASS

> ***investigation had not concluded*** and that it was still possible that either the boys or Tuite would ultimately be tried for Stephanie's murder.

*Id.* at 443–44.

The same is true here. Viewed in the context of the press conference and interviews as a whole, Sheriff Bianco's statements regarding Plaintiff's detention and arrest "can only be interpreted as describing the evidence that led [the deputies to arrest Plaintiff for firearm violations] and expressing the facts that the investigation [was still ongoing]." *See id.* Simply put, "[t]he general context of [Sheriff Bianco's] statement[s] … ***negates the impression*** that [he] implied a false assertion of fact." *See Herring*, 8 F.4th at 1158. The videos confirm that, just like the defendant in *Herring*, Sheriff Bianco "***fairly described the general events involved***" in Plaintiff's arrest and "***offered [his] personal perspective***" on it. *See id.* at 1158–59. "A reasonable [listener] would be able to differentiate between [Sheriff Bianco's] commentary and the actual [details of the arrest he was discussing]." *See id.*

**iii. Possessing false IDs and fake press credentials**

The videos from the press conference and interviews also demonstrate that Sheriff Bianco provided all of the details regarding his belief that Plaintiff possessed identifications with different names. In fact, during the press conference, Sheriff Bianco expressly indicated that he could ***not*** comment if there was an actual physical "fake pass." *See* Press Conference Video at 21:45–22:30. Similarly, during the Fox News interview, Sheriff Bianco indicated that it was his "***personal belief***" that he didn't know what Plaintiff's real name was given the multiple IDs found with different names. *See* Fox News Video at 5:30–6:10. Likewise, during the News Nation interview, he discussed the fact that Plaintiff had multiple IDs and multiple passports with different names in his vehicle. *See* News Nation Video at 4:05–4:20.

These and similar statements in other interviews are not actionable as slander because they are ***substantially true***. As California courts have explained, "the defendant need not justify the literal truth of every word of the allegedly defamatory

matter. It is sufficient if the substance of the charge is proven true, irrespective of slight inaccuracy in the details, so long as the imputation is substantially true so as to justify the 'gist or sting' of the remark." *Ringler Assocs. Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1180–81 (2000). Here, Plaintiff's FAC concedes that Plaintiff was in possession of passports and IDs with different legal names and "name variations" (allegedly pursuant to a "court approved name change"). *See* ¶¶ 45(c), 54. Thus, Sheriff Bianco's statements that Plaintiff had multiple passports and IDs with different names and that Sheriff Bianco, personally, did not know what Plaintiff's real name were substantially true and, thus, are not actionable as slander.

**iv. Alleged extremist affiliations**

Contrary to the FAC's allegations, the videos make clear that Sheriff Bianco ***never*** stated as a matter of fact that Plaintiff had extremist affiliations. Instead, he accurately reported that Plaintiff's vehicle was unregistered (a fact that Plaintiff does ***not*** dispute) and had a license plate that was "***indicative***" of belonging to a sovereign citizens group. *See* Press Conference Video at 4:45–5:10, 26:05–26:25; Fox News Video at 4:25–5:00; News Nation Video at 4:20–4:25. In fact, Sheriff Bianco noted that he ***never*** said that Plaintiff ***was part of the sovereign citizens group***; he merely stated that Plaintiff was driving an unregistered car with a license plate that was "indicative" of that group. Fox News Video at 5:00–5:30.

**v. Other statements**

Elsewhere in the FAC (but not in claim 4 itself), Plaintiff also challenges a number of other statements that cannot reasonably be viewed as defamatory. For example, he takes issue with the distance offered by Sheriff Bianco (*see* ¶¶ 42(e), 45(d)), but Sheriff Bianco's actual statements reveal that he was just ***estimating*** where Plaintiff was detained and where he would have ended up, had he been permitted to enter the rally. *See, e.g.*, Press Conference Video at 15:40–16:00 (observing that the distance offered was an estimate; "please don't quote me on that"); Fox News Video at 1:45–2:10 (statement about distance where Plaintiff ***would have ended up*** had he

not been stopped, but observing that this was "all speculation").

**d. IIED Claim**

For the reasons discussed above, Plaintiff's IIED claim fails because it is barred by the official duty and litigation privileges. *See Kenne v. Stennis*, 230 Cal. App. 4th 953, 971–72 (2014) (applying litigation privilege to bar IIED claim). The IIED claim also fails because it is superfluous to the defamation claims. *See Couch*, 33 Cal. App. 4th at 1504 ("When claims for invasion of privacy and emotional distress are based on the same factual allegations as those of a simultaneous libel claim, they are superfluous and must be dismissed."); *Rudwall v. Blackrock, Inc.*, 2006 WL 3462792, at **5–6 (N.D. Cal. Nov. 30, 2006) (dismissing an IIED claim as superfluous), *aff'd* 289 F. App'x 240, 242 (9th Cir. 2008)

## VI. CONCLUSION

For all these reasons, the Court should grant Defendants' motion to dismiss and dismiss Plaintiff's federal claims. The Court should also grant the motion to strike and strike Plaintiff's state-law claims. Because any amendment would be futile, the dismissal should be with prejudice and without leave to amend.

DATED: June 11, 2025

Respectfully submitted,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By: *\/s/ Yury A. Kolesnikov*

Eugene P. Ramirez
Anthony J. Ellrod
Yury A. Kolesnikov
Kayleigh Andersen
Natalya D. Vasyuk

*Attorneys for Defendants Chad Bianco and County of Riverside*





MK MANNING | KASS

**CERTIFICATION PURSUANT TO LOCAL RULE 11-6.2**

The undersigned, counsel of record for Defendants Chad Bianco and County of Riverside, certifies that this brief contains 8,412 words, which complies with the Court's order dated May 1, 2025. *See* Dkt. No. 27.

DATED: June 11, 2025

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By: */s/ Yury A. Kolesnikov*
Eugene P. Ramirez
Anthony J. Ellrod
Yury A. Kolesnikov
Kayleigh Andersen
Natalya D. Vasyuk

*Attorneys for Defendants Chad Bianco and County of Riverside*

MK MANNING | KASS

25
Defendants' Motion to Dismiss and Anti-SLAPP Motion re: Plaintiff's First Amended Complaint