1  ETHAN BEARMAN (CA SBN 327490)
   ethan@thebearmanfirm.com
2  THE BEARMAN FIRM, INC.
   9460 Wilshire Blvd, Suite 830
3  Beverly Hills, CA 90212
   Phone: (747)232-7626
4
5  Attorney for Plaintiff
   VEM MILLER
6
7
8              UNITED STATES DISTRICT COURT
9             CENTRAL DISTRICT OF CALIFORNIA
10
11  VEM MILLER,                          CASE NO.: 5:25-cv-00629-KK (DTBx)

12            Plaintiff,                 **PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT; DECLARATIONS OF VEM MILLER, ETHAN BEARMAN, AND MICHAEL LUJAN IN SUPPORT THEREOF**
13       vs.
14  CHAD BIANCO, in his individual and
    official capacities; COUNTY OF
15  RIVERSIDE, a municipal entity; and
    DOES 1 through 100,
16
             Defendants.
17                                       Judge: Hon. Kenly Kiya Kato
                                         Courtroom: 3
18                                       Date: July 31, 2025
                                         Time: 9:30 a.m.
19
20                                       Complaint Filed: March 10, 2025
                                         Trial Date: Not Yet Set
21
22
23
24
25
26
27
28
                                    0

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................... - 1 -

STATEMENT OF FACTS ............................................................................ - 2 -

I.   THE RALLY AND ARREST .................................................................- 2 -

II.  FEDERAL AGENCIES IMMEDIATELY CLEAR MILLER .........................- 2 -

III. SHERIFF BIANCO'S MALICIOUS MEDIA CAMPAIGN ..........................- 3 -

   A.   *PHASE ONE: OCTOBER 2024 INITIAL FALSE CLAIMS* ...................... - 3 -

   B.   *PHASE TWO: SUSTAINED MEDIA AMPLIFICATION* .......................... - 4 -

   C.   *PHASE THREE: 2025 CONTINUATION DESPITE KNOWN FALSITY*. - 4 -

STANDARD OF REVIEW .......................................................................... - 6 -

I.   MOTION TO DISMISS STANDARD ......................................................- 6 -

II.  ANTI-SLAPP STANDARD .................................................................- 7 -

ARGUMENT .............................................................................................. - 7 -

I.   THE ANTI-SLAPP MOTION MUST BE DENIED BECAUSE DEFENDANTS'
DEFAMATORY STATEMENTS FALL OUTSIDE PROTECTED ACTIVITY .......................- 7 -

   A.   *Bianco's Statements Were Not Protected Activity Under Section 425.16(e* - 8 -

   B.   *Government Officials Acting Ultra Vires Cannot Invoke Anti-SLAPP Protection* ....................................................................... - 9 -

   C.   *The Anti-SLAPP Statute Cannot Shield First Amendment Violations* .... - 10 -

II.  DEFENDANTS' DEFAMATORY STATEMENTS CONSTITUTE ACTIONABLE FACTUAL
ASSERTIONS, NOT PROTECTED OPINION .................................................- 10 -

   A.   *The MILKOVICH TEST DEMONSTRATES BIANCO'S STATEMENTS WERE FACTUAL ASSERTIONS* ....................................... - 11 -

   B.   *Video Evidence Demonstrates Actual Malice* ......................... - 12 -

   C.   *Defendants' Substantial Truth Doctrine Defense Fails* .......................... - 14 -

   D.   *Mixed Opinion Doctrine Cannot Save Defendants* ................................ - 15 -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS AND SPECIAL MOTION TO STRIKE

1    *E.    Pending Misdemeanor Charges Do Not Privilege Defamatory Statements ...-*
2    *16 -*
3    III.    SHERIFF BIANCO'S STATEMENTS EXCEEDED HIS OFFICIAL DUTIES AND LOST
4    ANY QUALIFIED PRIVILEGE ................................................................- 16 -
5    *A.    The Litigation Privilege Does Not Extend to Unofficial Press*
6    *Communications Made with Actual Malice ..................................... - 16 -*
7    *B.    Garcetti's Limited Protection Does Not Apply to Ultra Vires Defamation ....-*
8    *17 -*
9    *C.    Qualified Privilege Is Lost Through Actual Malice ................................ - 18 -*
10    *D.    Lozman Creates Special Scrutiny for Retaliatory Official Conduct ....... - 19 -*
11    *E.    Rothman establishes that the litigation privilege does not extend to*
12    *"litigating in the press" ...................................................... - 20 -*
13    IV.    PLAINTIFF STATES VALID FIRST AMENDMENT RETALIATION CLAIMS THAT
14    SURVIVE DISMISSAL .........................................................................- 20 -
15    *A.    MILLER ENGAGED IN PROTECTED FIRST AMENDMENT ACTIVITY....-*
16    *20 -*
17    *B.    DEFENDANTS TOOK ADVERSE ACTION THAT WOULD CHILL*
18    *PROTECTED SPEECH ................................................................ - 21 -*
19    *C.    PROTECTED ACTIVITY WAS A SUBSTANTIAL MOTIVATING FACTOR .-*
20    *21 -*
21    *D.    CLEARLY ESTABLISHED RIGHT AGAINST RETALIATORY*
22    *DEFAMATION ............................................................................. - 21 -*
23    *E.    THE SUPREME COURT LOWERS EVIDENTIARY BURDEN ............. - 22 -*
24    *F.    THE TIMELINE DEMONSTRATES SHERIFF BIANCO'S ACTUAL*
25    *MALICE AND RECKLESS DISREGARD FOR TRUTH ............................... - 22 -*
26    *G.    DEFENDANT'S FAILED IN THEIR NIEVES ANALYSIS...................... - 23 -*
27    *H.    Incorporation by reference doctrine ........................................ - 23 -*
28    *i.    Bianco Knew Federal Agencies Found No Threat.............................. - 24 -*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS AND SPECIAL MOTION TO STRIKE

      ii.    *The Escalating Falsehoods Show Reckless Disregard* ........................ - 24 -

      iii.   *Failure to Correct Despite Opportunity* ............................................. - 24 -

V.    MUNICIPAL LIABILITY IS PROPERLY ALLEGED THROUGH BOTH RATIFICATION AND FAILURE TO TRAIN ........................................................................................ - 25 -

   A.    *SHERIFF BIANCO IS A FINAL POLICYMAKER WHOSE ACTIONS ESTABLISH MUNICIPAL POLICY* ................................................................ - 25 -

   B.    *RATIFICATION THEORY UNDER SABRA V. MARICOPA COUNTY* . - 26 -

   C.    *FAILURE TO TRAIN ON CONSTITUTIONAL LIMITS* ......................... - 26 -

   D.    *CUSTOM AND PRACTICE OF RETALIATORY STATEMENTS* ........... - 26 -

   E.    *Defendants' single incident argument mischaracterizes both the facts and the law* .............................................................................................. - 27 -

VI.   RIVERSIDE COUNTY IS LIABLE FOR FAILURE TO INTERVENE ........................ - 27 -

VII. ALL STATE LAW CLAIMS ARE PROPERLY PLED AND CANNOT BE DISMISSED. - 28 -

   A.    *DEFAMATION CLAIMS CONTAIN ALL REQUIRED ELEMENTS* ..... - 28 -

   B.    *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS* ................. - 29 -

**CONCLUSION** ........................................................................................... **- 29 -**

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

# **TABLE OF AUTHORITIES**

### CASES

*Abraham v. Lancaster Community Hospital*, 217 Cal. App. 3d 796 (1990) ........... - 17 -

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................... - 6 -

*Baral v. Schnitt,* 1 Cal.5th 376 (2016) ....................................................... - 8 -

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................... - 6 -

*Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999) ...................................... - 26 -

*City of Canton v. Harris,* 489 U.S. 378, 389 (1989) ............................... - 26 -

*Collins v. Waters*, 92 Cal. App. 5th 70 (2023) ......................................... - 7 -

*Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) ...................... - 6 -

*Dickinson v. Cosby*, 17 Cal.App.5th 655, 658-59 (Cal. Ct. App. 2017) ................. - 11 -

*Flowers v. Carville*, 310 F.3d 1118 (9th Cir. 2002) ................................. - 14 -

*Garcetti v. Ceballos,* 547 U.S. 410 (2006) ................................... - 17 -, - 18 -

*Gonzalez v. Trevino,* 602 U.S. ___ (2024) .................................... - 22 -, - 25 -

*Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722, 746 (9th Cir. 2025) ........... - 12 -

*Hawran v. Hixson*, 209 Cal. App. 4th 256 (2012) ......................... - 16 -, - 17 -

*Hughes v. Pair*, 46 Cal.4th 1035 (2009) ................................................ - 29 -

*Hunter v. Cnty. of Sacramento*, 652 F.3d 1225 (9th Cir. 2011) ................... - 27 -

*Khoja v. Orexigen Therapeutics*, Inc., 899 F.3d 988 (9th Cir. 2018) ................... - 23 -

*Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018) ............................. - 19 -

*Lytle v. Carl*, 382 F.3d 978 (9th Cir. 2004) ........................................... - 27 -

*Matal v. Tam*, 582 U.S. 218 (2017) ...................................................... - 7 -

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 .................................. - 11 -, - 14 -

*Mohamed Sabra v. Maricopa Cty. Cmty. Coll. Dist.,* 44 F.4th 867 (9th Cir. 2022) - 26 -

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ........................... - 25 -

*NAACP v. Button*, 371 U.S. 415 (1963) ................................................ - 21 -

*New York Times v. Sullivan,* 376 U.S. 254 (1964) .......................... - 8 -, - 18 -

*Nieves v. Bartlett*, 585 U.S. 1029 (2018) ............................................. - 23 -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

1   *O'Brien v. Welty*, 818 F.3d 920 (9th Cir. 2016)..................................................... - 21 -

2   *Patton v. Royal Indus., Inc.*, 263 Cal. App. 2d 760 (1968)..................................... - 24 -

3   *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)............................................. - 25 -

4   *Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement*

5      *Assn.* 125 Cal. App. 4th 343 (2004) ...................................................... - 9 -

6   *Rivera v. Lake County*, 974 F.Supp.2d 1179 (N.D. Ill. 2013)................................. - 14 -

7   *Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1145 (Cal. Ct. App. 1996) ............... - 20 -

8   *Sanborn v. Chronicle Pub. Co.*, 18 Cal. 3d 406 (1976) .......................................... - 17 -

9   *Sharper Image Corp. v. Target Corp.*, 425 F.Supp.2d 1056, 1078 (N.D. Cal. 2006)- 20

10     -

11  *Sloman v. Tadlock,* 21 F.3d 1462 (9th Cir. 1994) .................................................... - 10 -

12  *St. Amant v. Thompson*, 390 U.S. 727 (1968) ........................................................ - 14 -

13  *Standing Comm. on Discipline of the U.S. Dist. Court for the Cent. Dist. of Cal. V.*

14     *Yagman*, 55 F.3d 1430 (9th Cir. 1995)................................................................. - 11 -

15  *Sweetwater Union High School Dist. v. Gilbane Building Co.*, 6 Cal.5th 931 (2019) - 7

16     -

17  *Taus v. Loftus*, 40 Cal. 4th 683 (2007) .................................................................. - 28 -

18  *Timberlake v. O'Hara* 2025 Minn. App. LEXIS 43 (Feb. 11, 2025)....................... - 15 -

19  *Verceles v. Los Angeles Unified School District,* 63 Cal. App. 5th 776 (2021)- 8 -, - 9 -

20  *Wilson v. Parker, Covert & Chidester,* 28 Cal. 4th 811 (Cal. 2002) ........................ - 9 -

21                                S T A T U T E S

22  42 U.S.C. § 1983 ................................................................................................... - 20 -

23  Cal. Code Civ. Proc. § 425.16................................................................................- 7 -, - 8 -

24  Civil Code § 47 .....................................................................................- 16 -, - 18 -

25  Fed. R. Civ. P. 8 ....................................................................................- 6 -, - 28 -

26  Rule 12(b)(6) .......................................................................................................... - 6 -

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

When Sheriff Chad Bianco ("Bianco") stood before cameras on October 13, 2024, proclaiming he had stopped the "third would-be Trump assassin," he knew the FBI and Secret Service had already determined Plaintiff Vem Miller ("Miller") posed no threat. **This case is not about protected official speech, it is about a law enforcement official who weaponized his badge to destroy a private citizen through calculated lies for his own political desires.**

The undisputed facts reveal a stark timeline of malice. Federal agencies immediately assessed Miller as harmless, declining even to interview him. Yet Sheriff Bianco launched a media blitz falsely branding Miller an assassin, fabricating claims about "fake passports," "fake IDs," and sovereign citizen ties, and texting reporters that Miller had threatened to "kill the president," a horrific statement Miller never made. These were not opinions or official reports; they were deliberate falsehoods designed to generate headlines for Bianco at Miller's expense.

Defendants now seek refuge behind the anti-SLAPP statute and official duty privilege, arguing their defamatory campaign was merely protected speech on matters of public concern. This cynical defense fails on every level. California's anti-SLAPP law does not shield government officials who exceed their authority through malicious lies. The First Amendment does not protect law enforcement officers who retaliate against citizens through defamation. And official duty privilege evaporates when officials act with actual malice, making statements they know to be false.

This case presents precisely the conduct the Supreme Court warned against in *Lozman*: government officials using their power to retaliate against and silence critics. Miller, a registered Republican and Trump supporter with legitimate Trump rally credentials, became Bianco's target not for any actual threat, but because the Sheriff saw an opportunity for self-promotion through sensational false claims. That Defendants put forth the idea that Miller was a potential threat is complete nonsense.

Miller would have needed to park approximately 1 mile away, walk to a shuttle, ride to the venue, and pass through metal detectors at the venue, which makes any weapons entry impossible. The result was predictable and devastating resulting in death threats, career destruction, and permanent reputational harm to an innocent citizen.

For the reasons detailed below, defendants' motions must be denied. Discovery will reveal the full extent of defendants' knowledge and malice, but even at this early stage, plaintiff has alleged more than sufficient facts to proceed on all claims.

## STATEMENT OF FACTS

### I.  The Rally and Arrest

On October 12, 2024, plaintiff Vem Miller, a 49-year-old Nevada resident and registered Republican, traveled to Riverside County to attend a Trump rally at Calhoun Ranch in Coachella, California. FAC ¶ 4. Miller possessed legitimate passes provided by the Trump campaign, reflecting his status as a Trump supporter and media figure. *Id.*

Approximately one mile from the rally venue, Miller voluntarily approached a deputy before reaching any checkpoint or parking entry point. *Id.* ¶ 26. Consistent with his law-abiding nature, Miller voluntarily disclosed to deputies that he had firearms in his vehicle, legal firearms he was transporting in compliance with his home state of Nevada's applicable law. *Id.* ¶¶ 26-28. Following Miller's voluntary disclosure and specific directions, deputies located the firearms Miller had described, and a high-capacity magazine. *Id.* ¶ 32.

Miller was arrested on misdemeanor gun charges and was cited and released without posting bail. *Id.* ¶¶ 39-40. Critically, Miller made no threats against anyone, had legitimate credentials to attend the rally, and cooperated fully with law enforcement. *Id.* ¶¶ 25-26.

### II. Federal Agencies Immediately Clear Miller

The most damning fact for defendants' case occurred within hours of Miller's

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

arrest. **Both the FBI and Secret Service assessed the situation and immediately determined Miller posed no threat to former President Trump or anyone else.** *Id.* ¶ 36. These federal agencies, charged with protecting the former president, declined even to interview Miller, a decision that speaks volumes about their assessment of any alleged threat. *Id.*

The Secret Service explicitly stated: "The incident did not impact protective operations and former President Trump was not in any danger."[1] No federal charges were filed. The agencies responsible for presidential protection saw nothing warranting further action.

### III.    Sheriff Bianco's Malicious Media Campaign

Despite knowing federal agencies had cleared Miller, Sheriff Bianco launched an unprecedented and sustained defamation campaign that continues to this day. This was not an isolated incident or heat-of-the-moment response, but rather a calculated, months-long campaign of malicious falsehoods designed to advance Bianco's political career at Miller's expense.

### A.  PHASE ONE: OCTOBER 2024 INITIAL FALSE CLAIMS

On October 13, 2024, before there was <u>any</u> media coverage, Bianco privately texted the Epoch Times, "We arrested a man trying to get in the perimeter with two firearms who ended up ***saying he was going to kill the president***." *Id.* ¶ 8. Next, Bianco told the Southern California News Group that they "stopped another assassination attempt," and that Mr. Miller had "multiple phony passports and driver's licenses." *Id*. After federal agencies had made their determination to not even

---

[1] Julia Ainsley, Dennis Romero and Linda Takahashi, *Investigation underway after man tried to enter Trump California rally perimeter with guns in vehicle*, NBC News (October 13, 2024) https://www.nbcnews.com/politics/politics-news/investigation-underway-man-tried-enter-trump-california-rally-perimete-rcna175224

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

interview Miller and that Miller was not a threat[2], Bianco held a press conference proclaiming he had stopped the "third assassination attempt." *Id.* ¶ 43. Bianco's statements went far beyond any legitimate law enforcement purpose by fabricating specific false claims about Miller falsely stating that Mr. Miller said he, "was going to kill the president," "planned to kill Trump and that deputies thwarted the plan," "he had multiple phony passports and driver's licenses." *Id.* ¶¶ 41-42.

### B. PHASE TWO: SUSTAINED MEDIA AMPLIFICATION

Rather than correcting his false statements when the truth became apparent, Bianco doubled down October 13 through October 15, 2025, appearing on Fox News, News Nation, and granting interviews to multiple media outlets, each time repeating and expanding upon his fabricated assassination narrative. *Id.* ¶¶ 44-45.

### C. PHASE THREE: 2025 CONTINUATION DESPITE KNOWN FALSITY

Most damningly, Bianco continued his defamatory campaign well into 2025, demonstrating that this was not an honest mistake but sustained malice:

- March 16, 2025: At the CAGOP convention, Bianco falsely claimed Miller "didn't declare anything" about the firearms, directly contradicting the recorded evidence of Miller's voluntary disclosure. *Id.* ¶ 49.

- April 12, 2025: Bianco held a recorded event repeating his false claims and bizarrely blaming Miller for the very media attention Bianco himself created. *Id.* ¶ 50.

- April 11, 2025: On The Britt Mayer Show, Bianco continued changing his story while maintaining the core false narrative. *Id.* ¶ 51.

This eight-month campaign of sustained defamation, continuing well after Bianco knew the truth, establishes clear actual malice and demonstrates that Bianco

---

[2] U.S. Secret Service Office of Communications @SecretSvcSpox, Twitter (Oct. 13, 2024, 3:44 PM), https://x.com/SecretSvcSpox/status/1845596398659801132

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS AND SPECIAL MOTION TO STRIKE

prioritized his political ambitions over constitutional rights and basic truthfulness

## IV. The Devastating Impact

Bianco's false statements achieved their intended effect. Media outlets worldwide reported Miller as a would-be presidential assassin. *Id.* ¶¶ 46-47. Miller received death threats. His reputation was destroyed. His career was ruined. His safety was jeopardized. *Id.* ¶¶ 52.

Meanwhile, Bianco basked in the national spotlight, granting interviews and accepting praise for "saving" Trump which were all based on statements he knew to be false. *Id.* ¶¶ 41-42. The Sheriff's actions were not mistakes or opinions; they were calculated lies designed to generate publicity at Miller's expense.

## V. The Unique Professional Assassination of an Investigative Journalist

Beyond traditional defamation damages, Bianco's conduct constitutes what can only be described as the professional assassination of an investigative journalist. By broadcasting Miller's private investigative details to a global audience, including his dual citizenship status, name variations, birthdates, and passport information, Bianco engaged in what Miller aptly describes as "carpet bombing" Miller's journalistic career. *Id.* ¶¶ 54, 99(f).

This destruction goes far beyond typical reputational harm. Miller worked as an investigative journalist whose effectiveness depended on his ability to travel anonymously and work undercover. Bianco's decision to broadcast Miller's private investigative tools including his legal name variations necessitated by his Armenian heritage for security during international work, his dual citizenship documentation, and other operational details, permanently destroyed Miller's ability to work anonymously anywhere in the world.

The result is not merely lost income, but the complete obliteration of a professional identity built over decades. Miller can never again travel to overseas locations with anonymity. His investigative tools have been publicly exposed, making future undercover work impossible. This represents a unique form of professional

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

destruction that no investigative journalist should have to endure, and one that serves no legitimate law enforcement purpose.

Moreover, this release of private information subjected Miller to wild speculation and conspiracy theories such as that he is a spy, part of MKUltra, or other fabricated nonsense, all because Bianco chose to weaponize private investigative details for his own political gain.

## VI. Municipal Liability: Pattern and Practice

Discovery will reveal this was not an isolated incident. Riverside County Sheriff's Department has a pattern of making inflammatory public statements without verification, using media appearances to boost the Sheriff's profile, and failing to train officers on constitutional limits regarding public statements. FAC ¶ 72. Bianco, as final policymaker for media relations, both personally made and ratified these unconstitutional statements. *Id.* ¶¶ 41-45.

## **STANDARD OF REVIEW**

### I. Motion to Dismiss Standard

In reviewing a Rule 12(b)(6) motion, the Court must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party." *Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). The complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

To survive dismissal, plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Critically, at this stage, the Court does not weigh evidence or resolve factual disputes. The question is simply whether plaintiff has alleged sufficient facts that, if proven true, would entitle him to relief. Here, plaintiff has exceeded that standard on

every claim.

## II. Anti-SLAPP Standard

California's anti-SLAPP statute provides a procedural mechanism to quickly dismiss meritless lawsuits that chill protected speech. Cal. Code Civ. Proc. § 425.16. The analysis involves two steps:

1. **First Prong**: Defendant must show the challenged conduct arises from protected activity, acts in furtherance of free speech "in connection with a public issue." § 425.16(b)(1).

2. **Second Prong**: If defendant meets this burden, plaintiff must demonstrate a "probability of prevailing" by presenting admissible evidence supporting the claims. *Sweetwater Union High School Dist. v. Gilbane Building Co.*, 6 Cal.5th 931, 940 (2019).

However, the anti-SLAPP statute "is susceptible to dangerous misuse," particularly when government officials invoke it to shield unconstitutional conduct. *Matal v. Tam*, 582 U.S. 218 , 1758 (2017). The statute does not protect defamatory statements made with actual malice, nor does it shield government officials who exceed their authority through false statements targeting private citizens.

Finally, the burden of proof on Plaintiff at this stage of litigation is only minimal burden where Plaintiff, "must establish a reasonable probability they can produce clear and convincing evidence showing that the statements were made with actual malice." *Collins v. Waters*, 92 Cal. App. 5th 70, 80 (2023)

## ARGUMENT

## I. The Anti-SLAPP Motion Must Be Denied Because Defendants' Defamatory Statements Fall Outside Protected Activity

Defendants' invocation of California's anti-SLAPP statute represents exactly the "dangerous misuse" the Supreme Court warned against in *Matal*. 582 U.S. at 1758. The statute exists to protect legitimate speech on public issues, not to immunize government officials who weaponize their positions through malicious falsehoods.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

## A. BIANCO'S STATEMENTS WERE NOT PROTECTED ACTIVITY UNDER SECTION 425.16(E)

The anti-SLAPP statute protects only specific categories of speech and petitioning activity. Defendants cannot establish their defamatory statements fall within any protected category.

First, Bianco's false statements do not constitute protected "statement[s] or writing[s] made in a place open to the public or a public forum in connection with an issue of public interest." § 425.16(e)(3). While presidential security might be a public issue, **fabricating assassination attempts exceeds any protected discourse**. The Supreme Court made clear in *New York Times v. Sullivan* that even on public issues, "calculated falsehood" receives no constitutional protection. *New York Times v. Sullivan,* 376 U.S. 254, 279-80 (1964).

*Baral v. Schnitt* established that courts must parse individual statements, striking only those that qualify as protected activity. 1 Cal .5th 376, 393-94 (2016). Applied here, Bianco's specific falsehoods which include claiming Miller threatened to kill the president, asserting fake passports, fake IDs, fake driver's licenses, and fabricating sovereign citizen connections, are severable from any legitimate law enforcement announcements. These targeted lies about a private citizen cannot claim anti-SLAPP protection.

The California Court of Appeal's recent decision in *Verceles v. Los Angeles Unified School District* directly supports this analysis. *Verceles v. Los Angeles Unified School District,* 63 Cal. App. 5th 776, 780 (2021). In *Verceles*, the court reversed a trial court's grant of an anti-SLAPP motion against a school district, holding that "in the absence of any oral or written statements from which the teacher's claims arose, the district's decisions to place him on leave and terminate his employment were not protected activity within the meaning of the anti-SLAPP statute, even if those decisions were made in conjunction with an official investigation." *Id.* at 788.

The *Verceles* court emphasized that government entities cannot invoke anti-

SLAPP protection simply because their discriminatory actions occur within official proceedings. *Id.* at 791 (citing *Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn.* 125 Cal. App. 4th 343, 354 (2004) ("acts of governance mandated by law, without more, are not exercises of free speech or petition.")). This principle applies directly to Sheriff Bianco's conduct, which exceeded any legitimate law enforcement communication function by fabricating assassination claims against a private citizen.

Most significantly, *Verceles* established that courts must distinguish between activities that form the basis for a claim and those that merely provide evidentiary support, noting that communications during official proceedings "do not convert the statements themselves into the basis for liability." *Id.* at 788. Here, Sheriff Bianco's false "assassin" statements constitute the wrongful conduct itself, not mere evidence of discrimination, thus removing any anti-SLAPP protection.

## B.  GOVERNMENT OFFICIALS ACTING ULTRA VIRES CANNOT INVOKE ANTI-SLAPP PROTECTION

California courts consistently deny anti-SLAPP protection when government officials exceed their authority. In *Wilson v. Parker, Covert & Chidester*, the California Supreme Court rejected anti-SLAPP protection where defendants' conduct went "beyond constitutionally protected petitioning activity." *Wilson v. Parker, Covert & Chidester,* 28 Cal. 4th 811, 824 (Cal. 2002).

Here, Sheriff Bianco acted far outside any legitimate law enforcement function by: fabricating statements Miller never made, continuing false claims after federal agencies cleared Miller, using his official position to launch personal attacks, and making statements for publicity rather than public safety.

The sustained nature of Bianco's defamation campaign which continues at least through April 2025, definitively establishes that this conduct exceeded any official authority. A single press conference explaining an arrest might arguably fall within official duties. An eight-month campaign of evolving false narratives, continuing

long after Bianco knew the truth, serves no legitimate governmental purpose and constitutes purely personal, political conduct designed to advance Bianco's gubernatorial campaign at Miller's expense. Here, Bianco's conduct was not merely beyond his authority, it was antithetical to his oath of office and constitutional obligations.

Most critically, Defendants cannot claim official duty privilege for conduct that violates clearly established constitutional rights. The Ninth Circuit established that official capacity cannot immunize retaliatory conduct targeting First Amendment activities. *Sloman v. Tadlock,* 21 F.3d 1462, 1469 (9th Cir. 1994), Here, Bianco's fabrication of assassination claims served no legitimate governmental purpose and exceeded any conceivable official duty. No sheriff's official duties include creating false narratives about citizens to advance personal political campaigns, as evidenced by Bianco's February 2025 gubernatorial announcement capitalizing on his supposed 'heroism' in stopping assassination attempts.

No legitimate government interest is served by false assassination claims. Bianco's ultra vires conduct strips him of statutory protection.

## C. THE ANTI-SLAPP STATUTE CANNOT SHIELD FIRST AMENDMENT VIOLATIONS

Defendants' position would create an absurd result: government officials could violate citizens' constitutional rights, then invoke anti-SLAPP protection against the victims' lawsuits. This turns the statute on its head. The anti-SLAPP law exists to protect First Amendment rights, not to enable their violation.

As the Ninth Circuit emphasized in *Sloman v. Tadlock*, "State action designed to retaliate against and chill political expression strikes at the very heart of the First Amendment." 21 F.3d at 1469. Allowing officials to hide behind anti-SLAPP protection while retaliating against citizens would eviscerate constitutional protections.

## II. Defendants' Defamatory Statements Constitute Actionable Factual

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

**Assertions, Not Protected Opinion**

Defendants will likely attempt to recharacterize Bianco's statements as protected opinion. This defense fails under *Milkovich v. Lorain Journal Co.*, where the Supreme Court rejected any broad opinion privilege for defamatory statements implying false facts. 497 U.S. 1, 18-19 (1990); *Standing Comm. on Discipline of the U.S. Dist. Court for the Cent. Dist. of Cal. V. Yagman*, 55 F.3d 1430, 1438 (9th Cir. 1995).

### A. THE *MILKOVICH* TEST DEMONSTRATES BIANCO'S STATEMENTS WERE FACTUAL ASSERTIONS

Under *Milkovich*, courts consider the following factors: (1) precision and specificity of language; (2) verifiability of the assertions; (3) context of the statements; and (4) whether statements imply undisclosed facts. *Milkovich*, 497 U.S. at 9. Applying these factors:

**Precision of Language**: The court considers whether the statement was cautiously phrased by considering the context, audience, the forum, and the author of the statement. *Dickinson v. Cosby*, 17 Cal.App.5th 655, 658-59 (Cal. Ct. App. 2017). Bianco's statements were specific and unequivocal:

-   "Third would-be Trump assassin";
-   "Multiple fake passports"; and
-   "He...ended up saying he was going to kill the president."

These are not loose opinions nor rhetorical hyperboles, but precise factual claims. These statements were made in press conferences and to news media outlets. ¶¶ 42-43.

**Verifiability**: Statements at issue that are capable of being proved true or false are considered statements of fact. *Weiner v. San Diego County*, 210 F.3d 1025, 1031 (9th Cir. 2000). The following statements can be proven false:

-   Federal agencies confirmed no assassination attempt;
-   Miller's documents were legitimate; and

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

- Miller never threatened the president.

**Context**: In *Hartzell v. Marana Unified Sch. Dist.*, the court emphasized examining "the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person." 130 F.4th 722, 746 (9th Cir. 2025). As Sheriff speaking at official press conferences, Bianco's statements carried the imprimatur of official fact-finding. The public reasonably understood these as factual assertions based on law enforcement investigation, not personal opinions. When Sheriff Bianco declared Miller a would-be assassin, reasonable listeners understood this as a factual determination based on evidence, not opinion.

**Implied Facts**: Most critically, Bianco's statements implied knowledge of undisclosed facts: that Miller had made threats, possessed fake documents, and planned violence. The Supreme Court made clear such implications are actionable: "Simply couching a statement—'Jones is a liar'—in terms of opinion—'In my opinion, Jones is a liar'—does not dispel the factual implications contained in the statement." *Milkovich*, 497 U.S. at 19.

B.   UNDER THE *UNELKO* TEST, BIANCO'S STATEMENTS ARE FACTUAL ASSERTIONS

Under the *Unelko* framework, the 9th Circuit considers the following factors: "(1) whether the general tenor of the entire work of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false." *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995).

Applying these factors:

**General Tenor of Work:** The general tenor of the work is a broader "totality of the circumstances" test which includes examining the overall tone and nature of the work, the subject matter of the statements, the setting in which they were made, and the format of the work. *Rodriguez v. Panayiotou*, 314 F.3d 979, 986 (9th Cir. 2002).

Bianco's false statements at a press conference and in a few interviews had later spread through mainstream domestic and international news outlets. ¶¶ 42-46. This also occurred at a volatile moment of time during the presidential campaign, within three months of two previous assassination attempts. Making the claims of "phony passports," Miller "planned to kill Trump," and "the sheriff called the arrest a thwarted assassination attempt;" would naturally lead the public to view Miller as an "assassin." *Winter v. DC Comics*, 99 Cal.App.4th 458, 467 (Ct. App. 2002) ("the court must place itself in the position of the reader, and determine the sense or meaning of the statement according to its natural and popular construction") (citation modified).

**Hyperbolic Language:** Courts assess whether the use of loose, figurative, or exaggerated language negates the impression that the statement is asserting an objective fact. *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990). Bianco's statements were anything but figurative or exaggerated. He sent a text saying "[w]e arrested a man trying to get in the perimeter with two firearms who ended up saying he was going to kill the president." ¶ 41. He also claimed in an interview that Miller "planned to kill trump and that deputies thwarted the plan." ¶ 42(c).

**Susceptible of Falsity:** If a statement cannot be proved true or false, it is generally considered nonactionable as opinion. *Gilbrook v. City of Westminster*, 177 F.3d 839, 862 (9th Cir. 1999). One of Bianco's claims is that Miller "identifies with a right-leaning anti-government group." ¶ 42(b). Another claim is that Miller possessed "fake IDs" and a "fake press pass." ¶43(c). There are a number of statements that can be proven true or false and are actionable.

### C. VIDEO EVIDENCE DEMONSTRATES ACTUAL MALICE

Defendants demonstrate actual malice through their evolving false narrative about Miller. Despite knowing that the FBI and Secret Service had declined to interview Miller because he was deemed nonthreatening, Bianco proclaimed Miller was a "would-be assassin" who "ended up saying he was going to kill the president." ¶ 41. Biano's inflammatory assertion despite contrary official findings goes directly to the subjective

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS AND SPECIAL MOTION TO STRIKE

1   standard of actual malice. *See Flowers v. Carville*, 310 F.3d 1118, 1131 (9th Cir. 2002)
2   (actual malice turns on defendant's state of mind and requires evidence beyond the
3   publication itself.

4      While Bianco occasionally hedge his statements with words like "speculation," these
5   specific factual assertions cannot be transformed into protected opinion through
6   qualifying language, *see Rivera v. Lake County*, 974 F.Supp.2d 1179, 1193 (N.D. Ill.
7   2013), especially when Biano later admitted the central claim was "bad info."
8   *Milkovich*, 497 U.S. at 18-19. His shifting explanations across different interviews, from
9   assassination prevention to media-generated controversy, demonstrate the reckless
10  disregard for truth characteristic of actual malice under *St. Amant v. Thompson*, 390
11  U.S. 727, 732 (1968).

12      D.  DEFENDANTS' SUBSTANTIAL TRUTH DOCTRINE DEFENSE
13      FAILS

14     Defendants' 'substantial truth' defense because the falsity of their statements
15  materially altered their impact on the audience. *Masson v. New Yorker Magazine*, 501
16  U.S. 496, 510 (1991). The substantial truth doctrine protects minor inaccuracies in
17  details, not fundamental mischaracterizations that transform lawful conduct into
18  apparent criminal behavior. *Masson*, 501 U.S. at 516-17.

19     Bianco's 'gist and sting' of calling someone's identification documents 'fake' or
20  'phony' implies criminality and fraud, which is materially different from possessing
21  legitimate legal documents with court-approved name variations. Bianco's statements
22  that Miller possessed "multiple phony passports and driver's licenses," ¶ 42(d), and
23  "fake press pass," ¶ 43(c), clearly implied document fraud which is a serious federal
24  crime, rather than the reality of legitimate dual citizenship documentation and legal
25  name variations common among Armenian-Americans for security purposes during
26  international journalism. This false characterization of criminal conduct, where none
27  existed, significantly altered the effect of the readers' minds compared to the truth. *See*
28  *Karimi v. Golden Gate Sch. of Law*, 361 F.Supp.3d 956, 977 (N.D. Cal. 2019).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS AND SPECIAL MOTION TO STRIKE

### E.   MIXED OPINION DOCTRINE CANNOT SAVE DEFENDANTS

Even if some portions of Bianco's statements contained opinion, the "mixed opinion" doctrine provides no shield. Statements mixing opinion with false factual assertions remain actionable for their factual components. *Baral* requires courts to parse statements, protecting only pure opinion while allowing claims based on false facts to proceed. 1 Cal.5th at 394. Statements of opinion may imply assertions of objective fact. For example, a statement such as "in my opinion, John Jones is a liar" implies knowledge of facts leading to that conclusion and may be actionable if those implied facts are false or incomplete. *John Doe 2 v. Superior Court*, 1 Cal. App. 5th 1300, 1314 (Cal. Ct. App. 2016).

Here, even accepting arguendo that calling someone an "assassin" might sometimes be hyperbolic opinion, Bianco's specific supporting facts—fake passports, threats to kill the president, sovereign citizen evidence—are pure factual assertions. These lies cannot claim opinion protection.

While not binding, recent Minnesota appellate precedent provides direct support for denying privilege protection to Sheriff Bianco's media statements. Recently, the Minnesota Court of Appeals specifically addressed whether law enforcement executives possess absolute privilege for public statements to media. *Timberlake v. O'Hara,* 2025 Minn. App. LEXIS 43, *3 (Feb. 11, 2025). The district court in that case denied absolute privilege claims for the police chief's public statements, finding "no precedent supporting absolute privilege for law enforcement executives making extrajudicial statements." *Id.*

The *Timberlake* court's analysis directly undermines any claim that Sheriff Bianco's "would-be assassin" statements fall within official duty privilege. The court distinguished between official duties and public relations statements to media, allowing defamation claims to proceed against the police chief despite his official position. *Id.* This ruling establishes that law enforcement officials cannot claim broad immunity for inflammatory public statements that exceed their core investigative

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

functions.

This precedent aligns with established California law that litigation privilege does not protect press conferences or "litigating in the press." The *Timberlake* decision reinforces that when law enforcement officials make extrajudicial statements to media, particularly inflammatory accusations lacking factual basis, they forfeit any claim to privileged communication protection. *Id.*

### F. PENDING MISDEMEANOR CHARGES DO NOT PRIVILEGE DEFAMATORY STATEMENTS

The existence of pending misdemeanor charges does not retroactively privilege Defendants' defamatory statements for multiple reasons. First, the litigation privilege protects communications made in good faith relation to contemplated proceedings, not false statements made to generate publicity. Second, Bianco's statements went far beyond the actual charges (misdemeanor firearm violations) to fabricate assassination claims that no prosecutor ever contemplated charging. Third, the privilege does not protect statements made with actual malice, and Bianco's October 14 text acknowledging 'He never said it. It was bad info' establishes knowledge of falsity. Fourth, extrajudicial statements to media fall outside traditional litigation privilege protection, as established in *Hawran v. Hixson*, 209 Cal. App. 4th 256 (2012).

### III. Sheriff Bianco's Statements Exceeded His Official Duties and Lost Any Qualified Privilege

Defendants invoke official duty privilege, arguing Bianco's statements were protected law enforcement communications. This defense fails because Bianco exceeded any legitimate official function and acted with actual malice.

### A. THE LITIGATION PRIVILEGE DOES NOT EXTEND TO UNOFFICIAL PRESS COMMUNICATIONS MADE WITH ACTUAL MALICE

California courts have consistently refused to extend Civil Code § 47(b) privilege protection to unofficial communications with the press, particularly when made with

1 actual malice. This limitation directly undermines Defendants' privilege claims

2 regarding Sheriff Bianco's media statements.

3     In *Hawran v. Hixson*, the Court of Appeal explicitly rejected the argument that a

4 press release constituted absolute privileged communication under § 47(b),

5 emphasizing that the privilege applies only to "statements made in official proceedings

6 or in the proper discharge of official duties." 209 Cal. App. 4th at 264. The *Hawran*

7 court's analysis is directly applicable here; Sheriff Bianco's statements to media outlets

8 were unofficial communications designed for public consumption, not integral

9 components of any official proceeding.

10     Similarly, in *Abraham v. Lancaster Community Hospital*, 217 Cal. App. 3d 796,

11 804 (1990), the court clarified that § 47(b) "does not protect communications made with

12 malice unless they are part of an official proceeding." This precedent is particularly

13 damaging to Defendants' position given the timeline of actual malice established in the

14 FAC wherein Sheriff Bianco continued making false statements about Miller months

15 after acknowledging their falsity.

16     The California Supreme Court's decision in *Sanborn v. Chronicle Pub. Co.*, 18

17 Cal. 3d 406, 413 (1976), reinforces this limitation, emphasizing that the privilege "does

18 not extend to private or unofficial communications" beyond the scope of official

19 proceedings.

20     B. *GARCETTI*'S LIMITED PROTECTION DOES NOT APPLY TO

21       ULTRA VIRES DEFAMATION

22     The Supreme Court held that public employees speaking "pursuant to their

23 official duties" may face employer discipline without First Amendment protection.

24 *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006). Defendants misread this case as

25 providing blanket immunity for all official speech. It does not.

26     *Garcetti* addressed whether public employees could claim First Amendment

27 protection against employer discipline. It did not hold that officials can defame

28 private citizens with impunity by claiming official capacity. The critical question is

1  whether the speech was "ordinarily within the scope of the officer's duties." *Id.* at
2  422.

3      Law enforcement officers have authority to: report factual information about
4  arrests, inform the public about legitimate threats, and provide accurate investigation
5  updates.

6      They lack authority to: fabricate statements suspects never made, continue false
7  claims after federal agencies provide contrary information, and use their positions for
8  personal publicity through lies.

9          C.   QUALIFIED PRIVILEGE IS LOST THROUGH ACTUAL MALICE

10     Even if Bianco initially possessed qualified privilege, he forfeited it through
11 actual malice. Under California law, qualified privilege protects statements made
12 "without malice, to a person interested therein." Civ. Code § 47(c). Malice destroys
13 the privilege. Further, a defamatory statement is made with actual malice – "with
14 knowledge that it was false or with reckless disregard of whether it was false or not."
15 *New York Times*, 376 U.S. at 280.

16     The sequence of events spanning eight months provides overwhelming
17 evidence of actual malice, not merely knowledge of falsity, but sustained, deliberate
18 perpetuation of known falsehoods for political gain, clearly improper motive and a
19 lack of good-faith belief.

20     **October 12, 2024**: Miller voluntarily approached deputies approximately 20
21 yards before any checkpoint, proactively disclosing firearms and offering to let
22 officers hold them. Audio recordings captured Miller's full cooperation and
23 transparency.

24     **October 12-13, 2024**: Federal agencies immediately assessed and dismissed
25 any threat, even declining to interview Miller.

26     **October 13, 2024**: Despite federal findings, Bianco launched his defamation
27 campaign with fabricated claims that Miller threatened to kill the President.

28     **October 14, 2024**: Bianco acknowledged in a text to The Epoch Times: "He

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS AND SPECIAL MOTION TO STRIKE

never said it. It was bad info ... given to me. He never told a deputy that…" FAC ¶ 48.

**Critical Point**: At this moment, Bianco had actual knowledge that his central claim was false. Any reasonable person would have issued public corrections and apologies.

**March 2025-April 2025**: Instead of correcting his known falsehoods, Bianco continued and expanded his defamatory campaign, now claiming Miller "didn't declare anything" about firearms which is a statement directly contradicted by bodycam footage Bianco possessed.

Here, the undisputed timeline establishes that Sheriff Bianco's press communications were both unofficial and made with actual malice. His October 14, 2024 text acknowledging "He never said it. It was bad info" definitively establishes knowledge of falsity, yet he continued the media campaign through April 2025. FAC ¶ 48. Under *Hawran* and *Abraham*, such unofficial press communications made with actual malice fall outside § 47(b) protection entirely.

## D.  *LOZMAN* CREATES SPECIAL SCRUTINY FOR RETALIATORY OFFICIAL CONDUCT

The Supreme Court's decision in *Lozman v. City of Riviera Beach*, 585 U.S. 87, 138 S. Ct. 1945 (2018), established that official retaliation claims can proceed despite facial legitimacy when there is evidence of an unconstitutional retaliatory policy.

Chief Justice Roberts, disturbed by video of a citizen's arrest, noted: "I found the video pretty chilling. I mean, the fellow is up there for about 15 seconds, and the next thing he knows, he's being led off in handcuffs." *Id.* (Transcript of Oral Argument, Docket No. 17-21, page 34.) This concern applies with even greater force here, where a citizen was not merely arrested but falsely branded a would-be assassin before a global audience.

*Lozman* factors supporting retaliation include: a pattern of targeting critics, objective evidence of retaliatory motive, disproportionate official response, and

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS AND SPECIAL MOTION TO STRIKE

1    departure from normal procedures

2        All factors are present. Bianco's extraordinary step of proclaiming an

3    assassination attempt, directly contradicting federal agencies, reflects clear departure

4    from legitimate law enforcement practice.

5        E.    *ROTHMAN* ESTABLISHES THAT THE LITIGATION PRIVILEGE

6            DOES NOT EXTEND TO "LITIGATING IN THE PRESS"

7        Bianco's statements to various news outlets, particularly his text message to The

8    Epoch Times, do not appear to have a functional connection to any litigation process.

9    A communication is privileged under § 47(b) if made in judicial proceedings by litigants

10   or other authorized participants to achieve objects of the litigation, and if the

11   communication has some connection logical relation to the action. *Rothman v. Jackson*,

12   49 Cal. App. 4th 1134, 1145 (Cal. Ct. App.1996). Rather than being connected to

13   judicial proceedings, Bianco's statements are aimed to influence public perception

14   similar to the press statements in *Rothman*.

15       Additionally, Bianco's false statements knowingly made to the press would not meet

16   the requirement of advancing a litigant's case intrinsically and apart from the speaker's

17   intent, further supporting the inapplicability of litigation privilege. *Sharper Image Corp.*

18   *v. Target Corp.*, 425 F.Supp.2d 1056, 1078 (N.D. Cal. 2006).

19   **IV.    Plaintiff States Valid First Amendment Retaliation Claims That Survive**

20       **Dismissal**

21       The complaint alleges sufficient facts to establish First Amendment retaliation

22   under 42 U.S.C. § 1983. The Ninth Circuit recognizes such claims when officials

23   retaliate against protected speech through defamation or other adverse actions.

24       A. MILLER ENGAGED IN PROTECTED FIRST AMENDMENT

25           ACTIVITY

26       Miller exercised multiple First Amendment rights:

27   -    **Political Association**: Attending a Trump rally as a registered Republican

28       supporter.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS AND SPECIAL MOTION TO STRIKE

- **Press Freedom**: Possessing media credentials for the event.
- **Political Expression**: Supporting and seeking to cover a political candidate.

These activities lie at the First Amendment's core. As the Supreme Court emphasized in *NAACP v. Button*, "the First Amendment protects vigorous advocacy." 371 U.S. 415, 429 (1963).

## B. DEFENDANTS TOOK ADVERSE ACTION THAT WOULD CHILL PROTECTED SPEECH

Bianco's false assassination claims constitute *prima facie* adverse action. Being falsely labeled a would-be presidential assassin would chill any reasonable person from political participation. The Ninth Circuit defines adverse action as conduct that would "chill a person of ordinary firmness from continuing to engage in protected activity." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016).

The chilling effect here is obvious and severe, including: death threats preventing future rally attendance, reputational destruction inhibiting political participation, fear of further retaliation for supporting candidates; and inability to work as media covering political events.

## C. PROTECTED ACTIVITY WAS A SUBSTANTIAL MOTIVATING FACTOR

The timeline establishes causation. Miller was targeted precisely because he attempted to park his car approximately one mile away from and attend a Trump rally, wherein he legally possessed and voluntarily disclosed firearms in his vehicle. Bianco saw an opportunity to gain publicity by creating a sensational false narrative about stopping an assassination.

But for Miller's attempt to exercise his First Amendment rights by attending the rally, Bianco would never have defamed him. The protected activity more than a factor, it was the *sine qua non* of defendants' retaliation.

## D. CLEARLY ESTABLISHED RIGHT AGAINST RETALIATORY DEFAMATION

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

Defendants cannot claim qualified immunity because the right against retaliatory defamation by law enforcement was clearly established. By October 2024, no reasonable officer could believe the First Amendment permitted fabricating assassination claims against political participants, retaliating against rally attendees through false statements, or using their official position to destroy critics through lies.

*Sloman*, *Lozman*, and decades of First Amendment jurisprudence provided clear notice that such conduct violates the Constitution.

### E.   THE SUPREME COURT LOWERS EVIDENTIARY BURDEN

The Supreme Court in 2024 fundamentally strengthened Miller's position by dramatically lowering the evidentiary burden for First Amendment retaliation claims. The Court unanimously rejected the Fifth Circuit's "overly cramped view" requiring specific comparator evidence, holding instead that plaintiffs need only provide "objective evidence" of differential treatment. *Gonzalez v. Trevino,* U.S. ___, ___ (2024) (slip op. at 1, 4).

Critical to Miller's case, *Gonzalez* explicitly approved statistical evidence showing novel or selective enforcement patterns. The plaintiff's evidence of reviewing 215 felony indictments and finding none for similar conduct exemplifies the type of objective proof now sufficient to survive dismissal. *Id.* at 3. For Miller, evidence that no other citizens were publicly labeled "assassins" without criminal charges would easily satisfy this relaxed standard.

The *Gonzalez* decision represents a watershed moment for retaliation plaintiffs, as Justice Alito's concurrence emphasized that the *Nieves* exception "is most easily satisfied by strong affirmative evidence that the defendant let other individuals off the hook for comparable behavior." *Id.* at 10-11 (Alito, J., concurring). Sheriff Bianco's unprecedented step of proclaiming an assassination attempt while federal agencies remained silent demonstrates precisely the type of differential treatment that *Gonzalez* recognizes as actionable.

### F.   THE TIMELINE DEMONSTRATES SHERIFF BIANCO'S ACTUAL

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

MALICE AND RECKLESS DISREGARD FOR TRUTH

The sequence of events provides compelling evidence of actual malice, the ultimate factual question that precludes dismissal at this stage.

### G.   DEFENDANT'S FAILED IN THEIR *NIEVES* ANALYSIS

Defendants' reliance on *Nieves v. Bartlett,* fails for multiple reasons. *Nieves v. Bartlett*, 585 U.S. 1029 (2018). First, *Nieves* recognizes an exception where a plaintiff can show that similarly situated individuals were not arrested, demonstrating selective enforcement. Here, Miller can establish that no other Trump rally attendees who voluntarily disclosed lawful firearm possession were subjected to arrest and public defamation as would-be assassins. Second, the Supreme Court's recent decision in *Gonzalez v. Trevino* explicitly lowered the evidentiary burden for this exception, requiring only 'objective evidence' of differential treatment rather than specific comparator evidence. Third, even accepting arguendo that probable cause existed for the initial arrest, it cannot justify Defendants' subsequent sustained defamation campaign continuing through April 2025, eight months after the arrest. The constitutional violation here is not the arrest itself, but the malicious defamation campaign that followed, which bears no relationship to any legitimate law enforcement purpose and cannot be justified by probable cause for underlying charges.

Moreover, *Nieves* addresses retaliatory arrests, not post-arrest defamation campaigns. Even accepting probable cause existed for the arrest, it cannot justify Bianco's subsequent eight-month campaign of deliberate lies.

### H.   INCORPORATION BY REFERENCE DOCTRINE

Defendants' attempt to incorporate video evidence through *Khoja* fails because incorporation by reference is inappropriate where, as here, the videos are disputed evidence subject to interpretation rather than documents that form the basis of plaintiff's claims. *Khoja v. Orexigen Therapeutics*, Inc., 899 F.3d 988 (9th Cir. 2018). Unlike financial documents in securities fraud cases where *Khoja* typically applies, these videos contain ambiguous statements requiring factual development through discovery.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS AND SPECIAL MOTION TO STRIKE

Moreover, even accepting the videos' content, they support Miller's claims by showing Bianco's evolving and contradictory narratives, demonstrating actual malice through changing stories and admissions of 'bad info.' The doctrine of incorporation by reference cannot be weaponized to convert disputed fact questions into grounds for dismissal.

### I. *BIANCO KNEW FEDERAL AGENCIES FOUND NO THREAT*

Discovery will establish precisely when Bianco learned of the federal agencies' determination, but the complaint's allegations support a reasonable inference he knew before his press conferences. Federal threat assessments for presidential events occur immediately. The Secret Service never even interviewed Mr. Miller, which indicates their rapid evaluation found no concern.

Bianco's position as Sheriff responsible for rally security means he would have been immediately informed of federal findings. His continuation of false claims despite this knowledge proves actual malice.

### II. *THE ESCALATING FALSEHOODS SHOW RECKLESS DISREGARD*

Bianco's statements grew more inflammatory over time:

- Initial: "Possible threat" (arguable opinion);
- Next: "Would-be assassin" (false factual assertion); and
- Finally: "He said he was going to kill the president" (complete fabrication).

This escalation while federal agencies remained silent demonstrates reckless disregard for truth. Each iteration moved further from any factual basis, showing Bianco's increasing desperation to maintain his false narrative.

### III. *FAILURE TO CORRECT DESPITE OPPORTUNITY*

Most damningly, Bianco never corrected his false statements even after: federal agencies publicly confirmed no threat, no federal charges were filed, Miller was cited and released, and the media began questioning the narrative. FAC ¶ 45.

California law recognizes that failure to correct known falsehoods evidences malice. *Patton v. Royal Indus., Inc.*, 263 Cal. App. 2d 760 (1968). Bianco's steadfast

1   refusal to acknowledge the truth even as contradictory evidence mounted, proves his
2   malicious intent.

3   **V.    Municipal Liability Is Properly Alleged Through Both Ratification and**
4   **Failure to Train**

5       The complaint adequately alleges municipal liability under *Monell v.*
6   *Department of Social Services*, 436 U.S. 658 (1978), through multiple theories that
7   easily survive dismissal.

8       A. SHERIFF BIANCO IS A FINAL POLICYMAKER WHOSE
9       ACTIONS ESTABLISH MUNICIPAL POLICY

10      Under *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), a single
11  decision by a final policymaker can establish municipal policy. Further, the *Gonzalez*
12  decision's emphasis on objective evidence of differential treatment directly supports
13  municipal liability theories under *Monell*. When a sheriff's department lacks
14  comprehensive media relations training and fact-checking protocols, the resulting
15  constitutional violations become attributable to the municipality through deliberate
16  indifference. The Supreme Court's recognition in *Gonzalez* that statistical evidence
17  of selective enforcement constitutes compelling proof of constitutional violations
18  establishes that municipalities cannot shield themselves from liability when their
19  training deficiencies enable such conduct. 602 U.S. at 5.

20      The absence of policies requiring verification before making serious criminal
21  allegations to media represents precisely the type of "deliberate indifference" that
22  supports *Monell* liability, particularly when combined with the *Gonzalez*
23  framework's recognition that objective evidence of differential treatment establishes
24  constitutional violations. Sheriff Bianco, as the elected Sheriff, is the final
25  policymaker for media relations and public statements, investigation policies and
26  procedures, and training on constitutional rights.

27      His decision to publicly defame Miller through false assassination claims
28  therefore constitutes official policy attributable to Riverside County.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS AND SPECIAL MOTION TO STRIKE

### B.   RATIFICATION THEORY UNDER *SABRA V. MARICOPA COUNTY*

The Ninth Circuit's recent decision in *Mohamed Sabra v. Maricopa Cty. Cmty. Coll. Dist.,* 44 F.4th 867 (9th Cir. 2022),clarifies ratification requirements. Plaintiff must show:

1. **Subordinate's unconstitutional act**: Deputies arrested Miller and provided information to Bianco. (FAC ¶ 48).
2. **Under color of law**: Official law enforcement capacity.
3. **Final policymaker acted under color of law**: Bianco acted as Sheriff.
4. **Final authority**: Bianco has final authority over public statements.
5. **Ratification**: Bianco knew of and approved the conduct by amplifying it through false public statements.

Even if Bianco himself made the statements (direct liability), his failure to correct them despite knowing their falsity constitutes ratification under *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).

### C.   FAILURE TO TRAIN ON CONSTITUTIONAL LIMITS

*City of Canton v. Harris* establishes liability for failure to train when the municipality shows "deliberate indifference" to constitutional rights. 489 U.S. 378, 389 (1989). The complaint alleges: no training on First Amendment limits for public statements, no policies governing press conferences about arrests, no procedures for verifying information before public release, and a pattern of inflammatory statements without factual basis. (FAC ¶¶ 68-72)

Given the obvious need for training on constitutional limits because sheriffs regularly interface with media, the failure to provide such training shows deliberate indifference.

### D.   CUSTOM AND PRACTICE OF RETALIATORY STATEMENTS

Discovery will reveal Riverside County's pattern of using media statements to retaliate against perceived enemies. The complaint alleges sufficient facts to infer such a custom: Bianco's ready willingness to make false statements, the absence of

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

any internal review before press conferences or text messages to the press, multiple media appearances spreading falsehoods, another defamation case against Bianco, and no discipline or correction despite falsity. See Exhibit 4.

A custom need not be formal policy; informal practices demonstrating municipal acquiescence suffice. *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). Further the facts as argued, "for purposes of proving a *Monell* claim, a custom or practice can be supported by evidence of repeated constitutional violations which went uninvestigated and for which the errant municipal officers went unpunished." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1236 (9th Cir. 2011).

E. DEFENDANTS' SINGLE INCIDENT ARGUMENT MISCHARACTERIZES BOTH THE FACTS AND THE LAW

Defendants' single incident argument mischaracterizes both the facts and the law. First, this was not a single incident but a sustained eight-month defamation campaign involving multiple press conferences, interviews, and public statements, each representing a separate policy decision to continue false claims. Second, the Supreme Court in *Pembaur* recognized that a single decision by a final policymaker can establish municipal liability where, as here, the policymaker acts with deliberate indifference. Third, the complaint alleges sufficient pattern evidence through the California DOJ investigation, multiple pending civil rights lawsuits, and Bianco's 2022 defamation lawsuit, demonstrating systemic constitutional violations. Finally, under *Gonzalez v. Trevino*'s relaxed evidentiary standards, the unusual nature of falsely branding a citizen as a presidential assassin provides objective evidence of selective enforcement sufficient to survive dismissal.

VI. **Riverside County Is Liable For Failure To Intervene**

Defendants' argument that municipalities cannot face failure to intervene liability misunderstands the claim's structure. The failure to intervene claim is properly brought against individual defendants who were present during the constitutional violations, with the County's liability flowing through *respondeat superior* and the adequately

pleaded *Monell* theories. Alternatively, to the extent this claim requires individual officer defendants, Miller seeks leave to amend to add individual officers as defendants upon completion of discovery revealing their identities.

**VII.    All State Law Claims Are Properly Pled and Cannot Be Dismissed**

Beyond the federal constitutional violations, plaintiff adequately states claims under California law for defamation, false light invasion of privacy, and intentional infliction of emotional distress.

### A. DEFAMATION CLAIMS CONTAIN ALL REQUIRED ELEMENTS

Under California law, defamation requires: "involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007).

Each element is satisfied as Bianco published:

1. **False and Defamatory Statements**: Calling someone a would-be presidential assassin is defamatory per se. The specific false facts fake passports, threats to kill, sovereign citizen ties, are indisputably defamatory.

2. **Unprivileged Publication**: As discussed above, any privilege was lost through malice. Bianco's statements exceeded official duties and were made with knowledge of falsity.

3. **Fault**: Actual malice is adequately alleged through the timeline showing Bianco's knowledge of federal findings.

4. **Damages**: Being globally branded a would-be assassin caused presumed damages (defamation and libel per se) and special damages including death threats, lost business opportunities, and security costs.

To the extent Defendants argue the text message claim is improperly pleaded as slander rather than libel, Miller incorporates this statement into both the slander and libel causes of action. Moreover, under Fed. R. Civ. P. 8's notice pleading standard, this technical pleading distinction does not warrant dismissal where the substantive claim is clearly stated and Defendants suffer no prejudice from the

characterization.

### B.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

IIED requires: (1) extreme and outrageous conduct; (2) intent to cause or reckless disregard of probability of causing distress; (3) severe emotional distress; (4) causation. *Hughes v. Pair*, 46 Cal.4th 1035, 1050 (2009).

Knowingly falsely branding someone a presidential assassin is extreme and outrageous by any measure. Bianco knew or recklessly disregarded that global false assassination claims would cause severe distress. The death threats and life destruction establish both severe distress and causation.

Further, the IIED claim is not superfluous because it addresses distinct conduct beyond the defamatory statements, including the deliberate targeting of Miller's Armenian heritage and dual citizenship status, the strategic timing during election season to maximize harm, and the systematic destruction of his investigative journalism career through disclosure of operational details. These aspects of Defendants' conduct constitute extreme and outrageous behavior separate from the pure reputational harm addressed by defamation claims, warranting separate analysis under IIED standards.

## **CONCLUSION**

Sheriff Bianco's fabricated assassination narrative represents precisely the abuse of power our constitutional system exists to prevent. When law enforcement officials weaponize their positions to destroy innocent citizens through calculated lies, they forfeit any claim to protection under anti-SLAPP statutes, official immunity, or the First Amendment.

The facts alleged paint a disturbing picture: A sheriff who knew federal agencies found no threat nevertheless launched a global media campaign falsely branding a law-abiding citizen as a would-be presidential assassin. He fabricated statements the victim never made, invented evidence that did not exist, and persisted in his lies even as the truth emerged. This was not protected speech or privileged law

enforcement communication—it was malicious defamation designed to generate headlines at a citizen's expense.

Defendants now seek to short-circuit accountability through procedural gamesmanship. They invoke the anti-SLAPP statute designed to protect speakers against government censorship, perversely wielding it to shield government censorship and retaliation. They claim official duty privilege for conduct that no legitimate official duty could encompass. They assert opinion protection for specific factual lies.

These defenses cannot withstand scrutiny. At this early stage, with discovery yet to reveal the full extent of defendants' knowledge and malice, plaintiff has more than adequately stated claims for relief. The motion to dismiss and anti-SLAPP motion should be denied in their entirety.

The Court should reject defendants' attempt to immunize retaliatory defamation. Miller deserves his day in court to prove what the allegations strongly suggest: that Sheriff Bianco abused his office to destroy an innocent citizen through deliberate lies. In America, no sheriff, no matter how powerful, stands above the law. No badge confers the right to defame with impunity. And no procedural device should shield those who violate the public trust through malicious falsehood.

The legal landscape has shifted decisively in Miller's favor through recent judicial developments. *Gonzalez v. Trevino*'s relaxation of evidentiary standards for First Amendment retaliation, combined with *Verceles'* limitation of anti-SLAPP protection for government officials exceeding their authority, and *Timberlake*'s denial of absolute privilege for law enforcement media statements, creates a powerful convergence of favorable precedent. These decisions collectively establish that Sheriff Bianco's conduct falls outside any legitimate governmental protection while simultaneously lowering the threshold for proving constitutional violations.

For all the foregoing reasons, Plaintiff respectfully requests that the Court deny defendants' motion to dismiss and anti-SLAPP motion in their entirety, and permit

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

1  this case to proceed to discovery where the full extent of defendants' unconstitutional

2  conduct can be revealed. Alternatively, should the Court grant any part of

3  Defendants' motions, Plaintiff respectfully requests leave to amend the pleadings.

4

5

6  DATED: July 2, 2025                                    Respectfully submitted,

7                                                         THE BEARMAN FIRM, INC.

8

9                                                         By: */s/ Ethan Bearman*

10                                                        ETHAN BEARMAN
                                                          Attorney for Plaintiff
11                                                        VEM MILLER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS AND SPECIAL MOTION TO STRIKE

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 11-6.2</u>

The undersigned, counsel of record for Defendants Chad Bianco and County of Riverside, certifies that this brief contains 8,435 words, which complies with the Court's order dated May 1, 2025. See Dkt. No. 27.

DATED: July 2, 2025                                    THE BEARMAN FIRM, INC.


By: *<u>/s/ Ethan Bearman</u>*

ETHAN BEARMAN
Attorney for Plaintiff
VEM MILLER

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2025, a copy of the PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT; DECLARATIONS OF VEM MILLER AND MICHAEL LUJAN IN SUPPORT THEREOF was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

By: */s/ Ethan Bearman*
ETHAN BEARMAN
Attorney for Plaintiff
VEM MILLER

PLAINTIFF'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE