ETHAN BEARMAN (CA SBN 327490)
ethan@thebearmanfirm.com
THE BEARMAN FIRM, INC.
9460 Wilshire Blvd, Suite 830
Beverly Hills, CA 90212
Phone: (747)232-7626

Attorney for Plaintiff
VEM MILLER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VEM MILLER,<br><br>        Plaintiff,<br><br>    vs.<br><br>CHAD BIANCO, in his individual and official capacities; COUNTY OF RIVERSIDE, a municipal entity; and DOES 1 through 100,<br><br>        Defendants. | CASE NO.: 5:25-cv-00629-KK (DTBx)<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1. 42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS (UNLAWFUL DETENTION, SEARCH, AND SEIZURE);<br><br>2. 42 U.S.C. § 1983 - FIRST AMENDMENT VIOLATIONS;<br><br>3. 42 U.S.C. § 1983 - MUNICIPAL LIABILITY - FAILURE TO TRAIN;<br><br>4. 42 U.S.C. § 1983 - FAILURE TO INTERVENE;<br><br>5. SLANDER PER SE;<br><br>6. LIBEL PER SE;<br><br>7. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;<br><br>8. VIOLATION OF CALIFORNIA CIVIL CODE § 52.1 (BANE ACT)<br><br>9. DEFAMATION BY IMPLICATION<br><br>**DEMAND FOR JURY TRIAL** |

As and for its complaint, Plaintiff VEM MILLER, an individual, alleges as follows:

### INTRODUCTION

1. Plaintiff VEM MILLER ("**Miller**" or "**Plaintiff**") is a political supporter of the 45th and 47th President of the United States of America, Donald John Trump.

2. Mr. Miller is deeply involved in political support for the President and has been since 2016, including websites, podcasts, political rallies, meetings, and involvement at the local, state, and national Republican parties.

3. As a long-time resident of Nevada, and Second Amendment supporter, Mr. Miller owns firearms.

4. On October 12, 2024, just before the historic presidential election, in his enthusiasm for President Trump, Mr. Miller requested and received tickets to the President Trump rally at Coachella, Riverside County, California.

5. In accordance with his experience of attending political rallies in Nevada, Mr. Miller did what he believed to be the right thing by approaching Riverside County Sheriff's Department deputies approximately one mile from the site of the rally to announce that he was in possession of firearms.

6. Instead of simply issuing a citation to a fully compliant citizen, the Defendants chose to violate Mr. Miller's constitutional rights when they detained him (intentionally causing him to miss the rally), excessively searched his vehicle, ignored his medical distress, arrested him, and repeatedly failed to grant him his request for a statutorily required telephone call.

7. Subsequently, Defendant Sheriff Chad Bianco ("**Bianco**") chose to make this incident a news story when he reported to and appeared on local and national news outlets to falsely proclaim that the Riverside County Sheriff's Department stopped the third "would-be Trump assassin." In reality, the Federal Bureau of Investigations and the United States Secret Service decided not to interview Mr.

Miller *because they determined Mr. Miller was NOT an attempted Presidential assassin.*

8. By the morning hours of October 13, 2024, Defendant Bianco knew that the FBI and the Secret Service had already dismissed the idea that Mr. Miller was an assassin, and still Defendant Bianco proceeded to falsely and maliciously inform The Epoch Times in a text message; "We arrested a man trying to get in the perimeter with two firearms who ended up *saying he was going to kill the president*." Subsequently, Defendant Bianco told the Southern California News Group that they "stopped another assassination attempt," and that Mr. Miller had "multiple phony passports and driver's licenses." Defendant Bianco continued these false assertions during a news conference held that very afternoon at 3 p.m. Following the news conference and proceeding the next day, Defendant Bianco appeared on many news outlets, including Fox News Channel and News Nation, where he falsely proclaimed that Mr. Miller was there to assassinate President Trump, and that he and his department prevented Mr. Miller from becoming the "third assassin."

9. Defendant Bianco took advantage of a perceived golden opportunity to boost his own political career and jumpstart his campaign for Governor of California[1] by falsely claiming he stopped an attempted assassination of President Trump, demonstrating an outrageous, reckless disregard for Mr. Miller and his rights.

10. Even worse, Defendant Bianco continued to change his story about what happened on October 12 and October 13, 2024, adding to his lies and impeachability about what transpired.

11. The aftermath of being falsely accused as a would-be presidential assassin has been utterly devastating to Mr. Miller. His employment prospects have been

---

[1] *Riverside County Sheriff Chad Bianco announces run for California governor*, ABC 7 Eyewitness News (Feb. 17, 2025, 11:16 PM) https://abc7.com/post/riverside-county-sheriff-chad-bianco-announce-run-california-governor/15921418/

destroyed. He has received numerous threats that forced him into hiding and continues to receive multiple threats weekly. The Las Vegas Metropolitan Police Department raided his parents' home on October 14, 2024. Furthermore, these allegations enabled his ex-wife to deny him contact with his own children.

## PARTIES

12. Plaintiff VEM MILLER is and at all times relevant to this Complaint an individual residing in the County of Clark, State of Nevada.

13. Defendant CHAD BIANCO is sued in his official capacity as the present Riverside County, California Sheriff, and individually. As the Sheriff, Defendant is responsible for employment practices and procedures within the Riverside County Sheriff's Department.

14. Defendant COUNTY OF RIVERSIDE ("Riverside"), California, is the county responsible for Defendant Bianco and the Riverside County Sheriff's Department.

15. The true names or capacities, whether individual, corporate, associate, or otherwise of the Defendants named herein as DOES 1-100, are presently unknown to Plaintiff, who therefore sue said Defendants by such fictitious names. Plaintiff prays for leave to amend this Complaint to show the true names or capacities of these Defendants if and when the same have been determined.

## JURISDICTION AND VENUE

16. This action arises under 42 U.S.C. §§ 1983 and 1988. Jurisdiction is proper in this Court as conferred by 28 U.S.C. § 1331.

17. The jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 29 U.S.C. § 794(a).

18. Venue is proper in this United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 in that County of Riverside, California

is where a substantial part of the events or omissions giving rise to all the actions complained of herein took place.

## CALIFORNIA TORT CLAIMS ACT

19. Plaintiff Miller exhausted his California Tort Claims Act statutory requirements under Cal. Gov't Code §§ 910-913.2 and §§ 915-915.4 in order to bring this action before this Court.

20. First, Plaintiff mailed his California Tort Claims Act Letter on January 16, 2025, via USPS Certified Mail to Riverside County, California; Clerk of the Board of Supervisors, Attention Claims Division, PO Box 1628, 4080 Lemon Street, 1st Fl., Riverside, CA 92502-1628. Plaintiff also mailed his California Tort Claims Act Letter on January 16, 2025, via USPS Certified Mail to the Riverside County Sheriff-Coroner at 4095 Lemon St., Riverside, CA, 92501-3600.

21. Second, Plaintiff received a NOTICE OF REJECTION OF CLAIM from the Riverside County Board of Supervisors dated January 22, 2025.

22. This action was brought within the six (6) months from the date of the Notice in accordance with Cal. Gov't Code § 945.6.

## FACTUAL ALLEGATIONS

23. Plaintiff Vem Miller is a media professional who operates The America Happens Network, a conservative media entity. Between 2020 and 2024, Mr. Miller attended over twenty (20) events for President Donald J. Trump in both journalistic and social capacities.

24. Mr. Miller has consistently demonstrated support for President Trump through:

    a. Production of pro-Trump media content since 2020;

    b. Service as a Trump team leader and captain;

    c. Campaign work as an America First Republican candidate in 2022; and

    d. Active engagement in voter outreach efforts.

25. At approximately 3:15 PM on October 12, 2024, Mr. Miller approached the 52nd Street parking lot, approximately a one-mile drive from the Trump rally venue

in Coachella, California. Mr. Miller possessed valid entry passes for the event.

26. Following standard practice from his home state of Nevada, before attempting to enter the venue parking area Mr. Miller voluntarily drove up to a Riverside County Sheriff's Department ("RCSD") Deputy, and then voluntarily disclosed to this RCSD Deputy ("Deputy 1") that he owned and possessed two firearms, secured in his vehicle.

27. This initial interaction was captured on audio recording, during which Mr. Miller:

    a.  Immediately disclosed the presence of firearms in his vehicle;

        i.  Miller, "How are you doing, sir? Hi. So I have a question. So I'm a Trump caucus captain, but I want to be totally transparent. I'm from Nevada, and I do have my firearms in the back."

        ii.  Deputy 1, "You have firearms with you?"

        iii.  Miller, "Yeah, in the back, in the trunk. But, you know, obviously I want to be totally transparent, but. Yeah."

        iv.  Deputy 1, "OK. How many firearms do you have?"

        v.  Miller, "I have a shotgun and I have a handgun. It's in all in the back right there. Obviously, I'm not taking this down with me, it's just in my car. And I want to let you guys know, okay?"

    b.  Offered to have law enforcement hold the firearms;

        i.  Miller, "You guys, do you guys want to hang on to it? I mean, I don't mind you guys holding that."

    c.  Presented valid identification and entry passes; and

    d.  Made no attempt to enter the actual venue with firearms where President Trump would be speaking to his supporters.

28. Following Mr. Miller's voluntary disclosure, Deputy 1 directed Mr. Miller to pull his vehicle into a nearby alcove. Subsequently, a second deputy ("Deputy 2") approached and asked Mr. Miller about why Mr. Miller was pulled over

there. Mr. Miller repeated his voluntary disclosure, "the gentleman that sheriff told me to pull in here because I told him I have two firearms in the back, and I'm just letting you guys know." At no time were the firearms "loaded" as defined under Cal. Penal Code § 16840.

29. Deputy 2 then ordered Mr. Miller to exit his vehicle, immediately restrained Mr. Miller in handcuffs, stated the detention was "for his own safety and protection", and placed Mr. Miller in the back of a patrol vehicle.

30. Mr. Miller had an audio recording device recording in his vehicle. The audio captured many other statements from RCSD Deputies. A complete, true, and accurate recording of the first 3 hours, 26 minutes, and 58 seconds from Mr. Miller's audio device captured on October 12, 2024, can be downloaded from https://drive.google.com/file/d/14RNILF2sbGvc2_SQRlxbqsbJ-Hw8RvhX

   a. A RCSD Deputy stated, "I don't want to unnecessarily detain him [Mr. Miller]." This statement indicated there was insufficient cause to detain Mr. Miller.

31. During his detention in the patrol vehicle, Mr. Miller:

   a. Was subjected to temperatures exceeding 110 degrees Fahrenheit;

   b. Experienced and reported to one of the Deputies symptoms of a pre-diabetic incident;

   c. Repeatedly requested medical attention due to his pre-diabetic condition;

   d. Was denied access to his supplements; and

   e. Was denied access to bathroom facilities despite multiple requests.

32. Mr. Miller was informed by RCSD Deputy Coronado that the officers' only concern was to ensure that the firearms were purchased lawfully. Although Mr. Miller consented only to the turnover of his firearms, and expressly described their location in the vehicle to Defendant Coronado, Defendants subsequently proceeded to conduct an extensive search of Mr. Miller's vehicle without his consent, wherein:

    a. Approximately ten (10) to fifteen (15) law enforcement personnel participated, including RCSD officers, FBI agents, and Secret Service agents;

    b. RCSD officers deployed forensic tools including bomb-sniffing dogs and chemical swab tests;

    c. RCSD officers removed, dispersed, and damaged Mr. Miller's personal belongings in a haphazard manner, including electronics, clothing, and medical supplies;

    d. This vehicle search lasted approximately one hour and twenty minutes;

    e. Officers left Mr. Miller's vehicle in complete disarray, in contrast to the orderly and clean condition upon Mr. Miller's arrival.

33. At no time before, during, or after said search did Defendants:

    a. Provide probable cause for the extensive nature of the search;

    b. Document any contraband in the vehicle or on Mr. Miller's person, or evidence of criminal activity;

    c. Explain the necessity for the duration or scope of the search; or

    d. Receive express consent by Mr. Miller to do so.

34. At approximately 5:00 PM, Mr. Miller was transported to Thermal Police Station. Records indicate:

    a. Booking Number: 202445251

    b. Arrest Time: 17:00

    c. Booking Time: 20:44

    d. Location: Ave 52 x Celebration Indio

    e. Facility: John Benoit Detention Center

35. Defendants denied Mr. Miller his statutory right to a telephone call pursuant to California Penal Code § 851.5, notwithstanding that:

    a. The aforementioned penal code was clearly posted on the walls of the detention facility;

b. Mr. Miller specifically demanded his statutory right under Penal Code § 851.5 to a telephone call while referencing the posted penal code;

c. Upon Mr. Miller's second demand for his telephone call, Deputy Coronado expressly refused said request; and

d. Mr. Miller made additional demands for his telephone call, none of which were granted.

36. With respect to Federal Bureau of Investigation ("FBI") and United States Secret Service interviews:

a. Mr. Miller expressly consented to the FBI and Secret Service agents request to interview, subject only to his statutory right to first make one telephone call;

b. The federal law enforcement agents departed without conducting any interview and no federal agent has ever interviewed Mr. Miller regarding the allegations against him.

37. Defendants RCSD and its Deputies thereafter:

a. Transported Mr. Miller to jail without any form of formal questioning being conducted;

b. Proceeded with booking despite the absence of any federal investigation;

c. Failed to document any legitimate basis for continuing Mr. Miller's detention.

38. During the booking process, Defendants:

a. Attempted to conduct medical tests on Mr. Miller to which he expressly denied consent;

b. Subjected Mr. Miller to x-ray examination after his express refusal of medical testing;

c. Failed to inform Mr. Miller of the x-ray examination prior to its administration; and

d. Conducted the x-ray examination without obtaining required consent or

providing any medical necessity.

39. Mr. Miller was charged with two misdemeanor violations:

    a.  CPC 25850(A) - Carrying/Loaded Firearm; and

    b.  CPC 32310(A) - Large Capacity Magazine

40. Both misdemeanor charges resulted in his cite and release and as of this filing have not been adjudicated. Mr. Miller denies the two misdemeanor violations.

41. Early in the morning of October 13, 2024, Defendant Bianco falsely told The Epoch Times in a text message, "We arrested a man trying to get in the perimeter with two firearms who ended up saying **he was going to kill the president**" (emphasis added.)[2] Mr. Miller never said those words or anything remotely similar at any time on October 12 or October 13, 2024.

42. Additionally, during the early morning of October 13, 2024, Defendant Bianco gave an interview to the Riverside Press-Enterprise, which was published at 10:37 AM that same day.[3] In this interview to the media, Defendant Bianco made many false statements, including but not limited to:

    a.  "…the sheriff called the arrest a thwarted assassination attempt";

    b.  "…he said [Mr. Miller] identifies with a right-leaning anti-government group";

    c.  Mr. Miller "planned to kill Trump and that deputies thwarted the plan";

    d.  "Bianco said they also found he had multiple phony passports and driver's

---

[2] Brad Jones, *UPDATE: Riverside County Sheriff Says Suspect Never Said He Was 'Going to Kill the President'*, The Epoch Times (Oct. 24, 2024) (originally published Oct. 13, 2024), https://www.theepochtimes.com/us/armed-man-who-allegedly-said-he-wanted-to-kill-the-president-arrested-outside-trump-rally-5740578

[3] Brian Rokos, Mona Darwish, Beau Yarbrough, *Man with guns arrested near Trump rally in Coachella; Riverside sheriff says they stopped assassination attempt*, Press-Enterprise (Oct. 17, 2024) (originally published Oct. 13, 2024), https://www.pressenterprise.com/2024/10/13/las-vegas-man-found-with-loaded-firearm-high-capacity-magazine-near-trump-rally-in-coachella-valley/

licenses"; and

e.  "…arrested with guns and fake I.D.s about a quarter mile from former President Donald Trump's campaign rally." The distance was actually six-tenths of a mile directly or one mile by walking.[4]

43. On October 13, 2024, Defendant Bianco held a press conference where he made numerous knowingly false statements about Mr. Miller, including but not limited to:

a.  Falsely claimed that deputies had "prevented the third assassination attempt" on President Trump;

b.  Falsely called Mr. Miller a "lunatic";

c.  Falsely claimed that Mr. Miller possessed "fake IDs" and a "fake press pass";

d.  Falsely stated Mr. Miller had "fake credentials";

e.  Falsely asserted that Mr. Miller's vehicle was "in disarray" in support of his other allegations;

f.  Falsely asserted that Mr. Miller did not have "legitimate identification"; and

g.  Falsely implied that Mr. Miller was a member of the sovereign citizen movement based on nothing Mr. Miller said.

44. On October 13, 2024, Defendant Bianco appeared on at least one other live interview where he continued with his false allegations: News Nation. On information and belief, due to their lawyers' desire to not be subjected to a defamation lawsuit, News Nation has taken down the video of the interview with Defendant Bianco. A copy of the original video was preserved via download prior to its take down, and can be found on Rumble - https://rumble.com/v5rqflb-dan-abrams-live-newsnation-bianco.html?e9s=src_v1_ucp .

---

[4] Google Maps, https://maps.app.goo.gl/jcXNweh6WbcsmLsY7

45. On October 14, 2024, Sheriff Bianco appeared on Fox News Channel, where he made additional false statements about Mr. Miller. During this interview, Sheriff Bianco:

   a. When asked if he believed Mr. Miller's explanation, stated "...it doesn't change the fact that he brought the guns onto a Trump rally, and he was stopped before he got inside," falsely implying Mr. Miller attempted to enter the venue with firearms, which Mr. Miller did not;

   b. Maintained his false assertion that Mr. Miller's deputies "prevented another assassination attempt";

   c. Made prejudicial statements about Mr. Miller's legal dual U.S. and Canada citizenship documentation and court approved name change, which Mr. Miller had with him at the time of his detention, stating "I couldn't tell you what his real name is";

   d. Falsely suggested criminal intent, stating Mr. Miller was "only a few hundred yards, couple hundred yards from the stage where President Trump eventually was"; and

   e. Maintained the false allegations despite his acknowledgment, "we knew nothing about it."

46. The allegations and mischaracterizations made on behalf of Sheriff Bianco led to a number of incredibly damaging and facially harmful headlines on credible news outlets, including but not limited to:

   a. ABC News



SECOND AMENDED COMPLAINT

b. New York Post:



c. FOX 11 (Los Angeles):



d. FOX 5 (Washington DC):

**Trump third assassination attempt thwarted in California**



e. BBC News:



SECOND AMENDED COMPLAINT

**15:40 13 October 2024**

## Suspect possibly a member of far-right group Sovereign Citizens

Suspect Vem Miller told authorities he was a member of the far-right group called Sovereign Citizens, sheriff Bianco says.

**15:25 13 October 2024**

## Suspect was a 'lunatic', sheriff says

Sheriff Bianco says his office is still in contact with the Secret Service and the FBI to investigate the incident "until we get to the bottom of it".

**CALIFORNIA NEWS**

### Riverside Co. sheriff says deputies 'probably' prevented third assassination attempt on Trump

by: Austin Turner
Posted: Oct 13, 2024 / 11:41 AM PDT
Updated: Oct 13, 2024 / 04:57 PM PDT

f.  KTLA 5:

g.  Newsweek: "Vem Miller, Trump Assassination Attempt Suspect, Denies Plot to Kill."

h.  Daily Mail:



**EXCLUSIVE** Sheriff doubles down on Vem Miller 'red flags' after MAGA 'lunatic' is arrested at Trump rally with loaded gun

- Miller was arrested with two firearms outside Trump's Saturday rally
- Sign up here for DailyMail.com's U.S. Politics Newsletter
- Follow DailyMail.com's politics live blog for all the latest news and updates

By KATELYN CARALLE, SENIOR U.S. POLITICAL REPORTER IN WASHINGTON, D.C.
PUBLISHED: 16:50 EST, 14 October 2024 | UPDATED: 08:23 EST, 15 October 2024

47. Over 300 total news outlets around the world carried the false statements from Defendant Bianco in their headlines and stories.

48. On information and belief, Defendant Bianco finally recognized the severity of his false statement that Mr. Miller said he wanted "to kill the President", sometime on October 14, 2024, and sent a text message to the Epoch Times which stated, "He never said it. It was bad info ... given to me. He never told a deputy that…"

49. On Sunday, March 16, 2025, at the CAGOP convention in Sacramento, California, Defendant Bianco continued with his lies about what happened on October 12, 2024. After Shaun Frederickson asked Defendant Bianco about the events on October 12, 2024, Defendant Bianco falsely stated that "He [Vem Miller] didn't declare anything," regarding the firearms. He further lied, "This led my deputy to further investigate to which he discovered the weapon under the seat," and that, "they found a loaded handgun under the seat and the loaded shotgun in the trunk." A true and correct copy of the Declaration of Shaun Frederickson is attached herein as Exhibit "**A**."

50. On April 12, 2025, Defendant Bianco held an event which was recorded on video and audio in which his story about the events of October 12 and October 13, 2024, changed yet again.[5] Defendant Bianco said:

    a. He falsely claimed that this entire case and international news story was because of Mr. Miller, not because of his own text message to The Epoch Times nor his interview with The Riverside Press-Enterprise which set off the media firestorm and brought this entire incident to the public's attention. "So the bottom line is, is this was media generated. And if you really want to get really deep into it, it was Vem Miller generated and all of his friends and social media that then the media started picking up on."

    b. He directly contradicted his own prior interviews and knowledge of the events regarding his false statements about Mr. Miller and an attempted

---

[5] Sheriff Chad Bianco for California Governor Apr 12, 2025, https://rumble.com/v6s4373-sheriff-chad-bianco-for-california-governor-apr-12-2025.html

assassination of President Trump, "We have no idea as a law enforcement officer, any crime against the president. That's not my investigation. We have absolutely no part of that. That's FBI and Secret Service. That is 100% theirs. And they were responsible for him… And I, I don't know what he [Vem Miller] was there for."

c. Again, Defendant Bianco contradicted his own prior statements regarding his false claims of an attempted assassination his beliefs, "if the FBI and the Secret Service determines that he wasn't, awesome." There is no evidence the FBI and the Secret Service determined he was ever a threat, let alone someone who was going to commit a serious federal crime.

d. Mr. Miller was only ever at the outside perimeter of the rally, approximately one mile from where President Trump would speak at the rally, outside of a parking lot, when he was directed into an alcove still outside the parking lot, by a Riverside County Sheriff's Deputy, yet Defendant Bianco falsely stated that, "We arrested him for bringing guns into a Trump rally."

e. Ignoring his own interview on Fox News Channel on October 14, 2024, after his press conference on October 13, 2024, he said, "I have not said one single thing since then, since that press conference, other than answering crazy allegations."

f. Continuing his baseless attacks on Mr. Miller, Defendant Bianco accused Mr. Miller of making this whole thing up for his own benefit, "Mr. Miller now apparently makes a living off of filing lawsuits. He filed a lawsuit against us the next business morning. Just the next business morning on a weekend and a holiday. How do you even find an attorney while you're in jail?" Mr. Miller was in jail for hours and was released early the morning of Sunday, October 13, 2024, and his own deputies wrongfully and illegally denied Mr. Miller's right to make a telephone call while he was

in their custody.

51. On April 11, 2025, podcaster Britt Mayer on her The Britt Mayer Show released an interview with Defendant Bianco wherein they discussed the events around this present case.[6] Defendant Bianco, yet again, chose to change his story and to repeat other false statements.

    a. Defendant Bianco said, "when information started getting out that we arrested someone for, you know, with guns and everything else at a Trump rally after he's already been two attempts on his life. The media went nuts." The media went nuts because Defendant Bianco falsely told The Epoch Times that Mr. Miller said, "he was going to kill the president." The media went nuts because Defendant Bianco followed that with an interview with the Riverside Press-Enterprise where he made numerous false statements about Mr. Miller.

    b. In direct contradiction to the evidence set forth above in ¶¶ 42-49, Defendant Bianco said, "the question went from was this a third assassination attempt to all of a sudden different outlets just started dropping the was and then saying this is a third assassination attempt." Then Defendant Bianco falsely claimed, "So we had that press conference the next day and I answered all of those questions." The press conference was held the afternoon of October 13, 2024, not the next day and he did not answer all of those questions.

    c. In direct contradiction to his answers on April 12, 2025, wherein he said it was the Secret Service and FBI, Defendant Bianco said, "And so the question that was asked of me is, did we believe that we prevented an

---

[6] Britt Mayer, *"Sheriff Chad Bianco: California's Next Governor?"* (Serial Podcast, Episode 37, Apr. 11, 2025) (video podcast), YouTube (Apr 11, 2025), https://www.youtube.com/watch?v=pvaeZVfUicg&list=PLU5w2frskedp8OA3XN-sM1UmIGhnfM64o&index=4

attack. And my answer was based on what the deputy found." He was back to pointing at a deputy for all of his false statements.

d. Defendant Bianco continued with a new false statement, "But in the end, we arrested him for fake license plates on his car…" There is no record of a citation for fake license plates on his car.

e. Instead of taking responsibility for what he has done, Defendant Bianco chose to blame the victim, Mr. Miller, for his false statements to the media "it's nonstop with him about this whole assassination attempt, the assassination investigation is up to the FBI and the Secret Service, not me. We arrested him for state crimes, and they do whatever it is they're going to do. And in the end, they chose to do nothing, which for local law enforcement, I don't care."

52. As a direct result of Sheriff Bianco's false statements and their widespread, global dissemination, Mr. Miller has suffered severe and ongoing harm including:

a. False identification as a potential presidential assassin through international media coverage;

b. Forced relocation due to credible threats to personal safety;

c. Severe reputational damage affecting professional relationships;

d. Loss of business opportunities and income;

e. Destruction of professional reputation built over decades;

f. Severance of family relationships, including with his children;

g. Ongoing harassment and threats from members of the public;

h. Rejection from social relationships and opportunities due to the severe reputation damage; and

i. Severe emotional distress as a result of all of the above.

53. The false allegations have resulted in specific documented damages including:

a. The eviction of Mr. Miller's elderly parents (ages 80 and 77) from their

residence due to Mr. Miller's residence with them at the time of the false allegations;

b. Mr. Miller's inability to secure housing due to reputational damage;

c. Loss of business relationships and opportunities;

d. Ongoing security concerns, requiring Mr. Miller to maintain undisclosed residence; and

e. Severe emotional distress and mental anguish.

54. Sheriff Bianco's statements specifically targeted Mr. Miller's dual citizenship status and legal name variations, despite:

a. Mr. Miller having maintained proper documentation of all legal name changes in the vehicle with him at the time of the detention;

b. Mr. Miller's Armenian heritage necessitating name variations for security during international journalism work;

c. Such documentation being common among dual citizens and immigrant families; and

d. Over 11 million U.S. residents maintaining dual citizenship status.

55. The actions of Defendants demonstrated a pattern of misconduct including:

a. Unlawful detention without probable cause;

b. Excessive use of force;

c. Deliberate indifference to medical needs;

d. Unlawful search and seizure;

e. Intentional defamation through media statements; and

f. Discriminatory treatment based on ethnic background.

56. At all relevant times, the Riverside County Sheriff's Department ("RCSD"), through its final policymakers, maintained policies, customs, or practices governing (a) First-Amendment event policing and firearm-related contacts at political assemblies, (b) threat-assessment procedures, and (c) public-information/media communications by the Sheriff and RCSD spokespersons.

# FIRST CAUSE OF ACTION

## 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violations (Unlawful Detention, Search, and Seizure)

## (Against All Individual Defendants; Municipal Liability Against County of Riverside)

57. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 56 and 82-100.

58. The Fourth Amendment prohibits unreasonable searches and seizures, requiring governmental intrusions be justified by probable cause or valid consent within clearly delineated scope parameters. *U.S. v. Jacobsen*, 466 U.S. 109, 113 (1984). Consent-based searches remain limited to scope reasonably understood by consenting party. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

59. Persuasive authority establishes that voluntary disclosure of firearms does not expand law enforcement's constitutional authority. In *Basel Soukaneh v. Andrzejewski*, 112 F.4th 107, 117 (2d Cir. 2024), the Second Circuit held that detaining an individual who voluntarily disclosed a firearm and presented valid permits constituted a de facto arrest without probable cause. The court specifically rejected the proposition that voluntary disclosure justified extended detention or vehicle searches beyond securing the disclosed weapons.

60. The temporal unreasonableness of Miller's detention aligns with established Fourth Amendment violations. *Hicks v. Ferreyra*, 64 F.4th 156, 170 (4th Cir. 2023), held that detention approaching one hour after justification ceased violated the Fourth Amendment. Here, Miller's 95-minute detention following voluntary disclosure and offer to surrender firearms exceeded constitutional limits by any objective measure.

61. The October 12, 2024 encounter comprises two distinct phases subject to different constitutional analysis:

a. Phase One - Lawful Initial Encounter (3:15 PM - 3:30 PM): Plaintiff's voluntary disclosure of lawfully possessed firearms provided reasonable suspicion justifying brief investigative detention under *Terry v. Ohio*, 392 U.S. 1 (1968), to verify weapon legality and confirm absence of California Penal Code violations;

b. Phase Two - Unconstitutional Extended Seizure (3:30 PM - 5:05 PM): Following confirmation of Plaintiff's identity, valid event credentials, and expressed willingness to surrender firearms, probable cause dissipated, transforming continued detention into unreasonable seizure absent new articulable suspicion

62. Plaintiff's limited consent extended exclusively to firearm retrieval from specifically identified vehicle locations:

a. Express Consent Parameters: Audio recording documents Plaintiff stating: "Obviously, I'm not taking this down with me, it's just in my car... You guys want to hang on to it? I mean, I don't mind you guys holding that";

b. Location Specification: Plaintiff precisely identified firearm locations: "I have a shotgun and I have a handgun. It's all in the back right there";

c. Scope Violation Evidence: Despite limited consent for firearm retrieval, Defendants conducted comprehensive vehicle search including:

　　i.　Electronic device examination without warrant

　　ii.　Personal effects inventory unrelated to weapons

　　iii.Bomb-detection canine deployment absent articulable suspicion

　　iv.Chemical swab testing without probable cause

　　v.　Duration extending approximately 80 minutes beyond firearm retrieval.

SECOND AMENDED COMPLAINT

63. The search intensity and duration bore no reasonable relationship to governmental interest justification:

    a. Disproportionate Resource Deployment: Ten to fifteen law enforcement personnel for misdemeanor weapon possession investigation;

    b. Forensic Overreach: Deployment of specialized units including bomb-detection assets absent any articulable suspicion of explosive devices;

    c. Temporal Unreasonableness: Eighty-minute search duration for two disclosed firearms constitutes approximately 40 minutes per weapon, exceeding any reasonable retrieval timeframe;

    d. Destruction of Property Interest: Vehicle left in complete disarray with personal effects strewn throughout, evidencing punitive rather than investigative intent.

64. No recognized exception justified warrantless search expansion:

    a. No Probable Cause: Federal authorities' contemporaneous determination of no threat negates probable cause for extended search;

    b. No Safety Exception: Plaintiff's cooperative demeanor and voluntary disclosure eliminated officer safety justification;

    c. No Plain View Doctrine: All searched items required active investigation beyond visible observation;

    d. No Inventory Exception: Vehicle remained under Plaintiff's control, precluding inventory search justification.

65. Beyond Fourth Amendment violations, Defendants deprived Plaintiff of liberty without due process through:

    a. Prolonged Detention Without Charge: 95-minute pre-arrest detention exceeded permissible investigative parameters;

    b. Denial of Medical Attention: Deliberate indifference to documented pre-diabetic symptoms during extreme heat exposure;

     c.  Coercive Conditions: Detention in patrol vehicle exceeding 110 degrees Fahrenheit constitutes punishment without adjudication;

     d.  Communication Deprivation: Systematic denial of statutory phone call rights under Cal. Penal Code § 851.5.

66. Sheriff Bianco's post-incident ratification through public statements defending search as preventing "assassination attempt" establishes County liability under *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (ratification by final policymaker creates municipal liability).

67. Defendants may contend that the subsequent misdemeanor charges under Cal. Penal Code §§ 25850(a) and 32310(a) validate the detention and search. However, at the pleading stage, Plaintiff's allegations must be taken as true. Plaintiff specifically alleges that his firearms were secured in the rear of his vehicle in compliance with California law, that he voluntarily disclosed their presence to deputies, and that he never possessed a loaded firearm under his seat. These facts, if proven, negate probable cause at the time of detention.

68. Moreover, the existence of later-filed charges does not retroactively create probable cause where none existed at the moment of seizure. Here, deputies lacked specific, articulable facts to believe Plaintiff committed any offense when he was handcuffed and placed in the patrol vehicle upon his voluntary disclosure.

69. In addition, Plaintiff expressly limited any consent to deputies securing his firearms. By expanding that consent into a full-scale vehicle search including canine sweeps, chemical swabs, and rummaging through personal belongings, Defendants exceeded the scope of consent in violation of *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Such conduct is unconstitutional even if firearms charges were later alleged.

70. Finally, independent of the arrest, Defendants' prolonged denial of Plaintiff's statutory right to telephone calls under Cal. Penal Code § 851.5, despite posted

notices and repeated demands, violated clearly established Fourteenth Amendment liberty interests recognized in *Carlo v. City of Chino*, 105 F.3d 493 (9th Cir. 1997) and *Henry v. Cty. of Shasta*, 132 F.3d 512 (9th Cir. 1997). This denial constitutes a standalone constitutional violation, irrespective of probable cause.

71. Riverside County is liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), because the constitutional violations were caused by: inadequate training on handling voluntary firearm disclosures at political rallies; customs and practices of conducting pretextual searches and detentions without probable cause; and deliberate indifference to statutory and constitutional limits on detention and consent scope.  Plaintiff was subjected to prolonged exposure to temperatures exceeding 110 degrees Fahrenheit, he was repeatedly denied access to his pre-diabetic supplements, and unable to seek relief after being repeatedly denied access to bathroom facilities. *See Peck v. Cty. Of Orange*, 501 F.Supp.3d 852, 869 (C.D. Cal. 2020).

72. The constitutional violations directly and proximately caused compensable injuries including:

   a. Dignitary Harm: Humiliation through public excessive search before political event;

   b. Property Damage: Vehicle and personal effects requiring restoration;

   c. Liberty Deprivation: 95 minutes unlawful detention preventing rally attendance;

   d. Physical Injury: Medical distress from heat exposure and supplement denial;

   e. Consequential Damages: Reputational destruction flowing from unlawful arrest..

73. WHEREFORE, Plaintiff requests judgment against Defendants for general and special damages, punitive damages against individual defendants, attorney's

fees and costs under 42 U.S.C. § 1988, and such further relief as the Court deems proper.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 - First Amendment Retaliation

### (Against all Defendants)

74. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 56.

75. The First Amendment prohibits government officials from subjecting individuals to retaliatory actions for engaging in constitutionally protected activity. To establish a First Amendment retaliation claim, a plaintiff must demonstrate: (1) engagement in constitutionally protected activity; (2) adverse action by defendants that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) a substantial causal relationship between the constitutionally protected activity and the adverse action. *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022).

76. While *Nieves v. Bartlett*, 587 U.S. 391 (2019), establishes that probable cause generally defeats retaliatory arrest claims, this limitation applies exclusively to challenges to the arrest itself. Post-arrest retaliatory conduct by government officials constitutes a distinct constitutional violation not subject to Nieves's probable cause bar.

77. Plaintiff engaged in constitutionally protected First Amendment activities:

   a. Political assembly and association through attendance at President Trump's rally;

   b. Political journalism through operation of The America Happens Network;

   c. Political organizing as Trump team leader and captain;

   d. Creation and dissemination of political media content supporting conservative candidates;

   e. Truthful speech regarding lawful conduct in voluntarily disclosing firearm

possession.

78. Following Plaintiff's October 13, 2024 release from custody, Defendant Bianco, acting under color of state law as Riverside County Sheriff and with final policymaking authority over public communications regarding arrests, engaged in calculated retaliatory conduct specifically targeting Plaintiff's political activities:

    a. Around the time of Plaintiff's release on October 13, 2024, falsely informed The Epoch Times via text message that Plaintiff "said he was going to kill the president";

    b. Shortly thereafter on October 13, 2024, told the Riverside Press-Enterprise that deputies "stopped another assassination attempt";

    c. At 3:00 PM on October 13, 2024, conducted a press conference falsely characterizing himself as having "prevented the third assassination attempt" in reference to the Plaintiff;

    d. On October 14, 2024, appeared on Fox News Channel maintaining these false allegations nationally;

    e. Continued this retaliatory campaign through public appearances in March, April, and May 2025.

79. These post-arrest public statements constitute adverse governmental action distinct from and more severe than routine press releases about arrests. As recognized in *Hinkle v. Beckham Cty. Bd. of Cty. Comm'rs*, 962 F.3d 1204 (10th Cir. 2020), publication of press releases regarding arrests can satisfy the adverse action element when causally connected to retaliatory motive. Here, the false characterization as a presidential assassin exceeds any legitimate law enforcement communication.

80. The false labelling as an attempted presidential assassin would objectively deter any person of ordinary firmness from continuing political journalism and activism. As established in *Johnson v. DeKalb Cty.*, 391 F.Supp.3d 1224, 1249

(N.D. Ga. 2019), courts must objectively assess whether retaliatory acts would deter First Amendment exercise. No reasonable person would continue political activities after being falsely branded a would-be assassin.

81. The causal nexus between Plaintiff's protected activities and Defendant Bianco's retaliation is demonstrated through:

    a. Temporal proximity - defamatory statements commenced immediately following Plaintiff's attempted rally attendance;

    b. Content focus - Bianco specifically emphasized Plaintiff's Trump support and conservative political identity;

    c. Absence of legitimate purpose - federal authorities' explicit refusal to investigate undermines any law enforcement justification;

    d. Political animus - Bianco's use of the incident to advance his February 2025 gubernatorial campaign announcement;

    e. Conscious falsity - Bianco's October 24, 2024 admission that Plaintiff never stated intent to kill the president.

82. Plaintiff suffered severe chilling of First Amendment rights, satisfying the standard articulated in *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016), that adverse action need only be such that it "would chill a person of ordinary firmness." The consequences include:

    a. Termination of political journalism career;

    b. Inability to attend political events due to safety concerns;

    c. Exclusion from conservative media networks;

    d. Ongoing death threats preventing resumption of protected activities.

83. Defendant County of Riverside bears municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), based on two independent theories:

84. First, Sheriff Bianco acted as final policymaker for public communications regarding arrests. California sheriffs are recognized as final policymakers for law enforcement operations in various contexts. Under *Christie v. Iopa*, 176 F.3d

1231, 1235 (9th Cir. 1999), a single constitutional deprivation resulting from deliberate choice by an official with final policymaking authority establishes municipal liability without requiring a pattern.

85. A single decision by an official with final policymaking authority establishes municipal liability when that decision itself violates constitutional rights. *Christie* held that "a municipality can be liable for an isolated constitutional violation when the person causing the violation has 'final policymaking authority'." 176 F.3d at 1235; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (municipality liable for single decision by policymaker if decision constitutes deliberate choice to follow course of action). Here, Sheriff Bianco's deliberate choice to launch a retaliatory media campaign falsely labelling Plaintiff as an attempted assassin constituted official county policy subjecting Riverside County to liability.

86. Alternatively, Sheriff Bianco's repeated public statements over multiple months, from October 2024 through May 2025, demonstrate either: (a) ratification of unconstitutional conduct through deliberate indifference to known constitutional violations; or (b) a custom or practice of retaliatory public statements sufficient to establish municipal liability. *See Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) (ratification occurs when decision-maker approves subordinate's decision and basis for it).

87. WHEREFORE, Plaintiff requests relief as hereafter provided.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 - Municipal Liability - Failure to Train
### (Against Defendant Riverside County)

88. Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 56, 58-72, and 74-86.

89. To state a failure to train claim, a plaintiff must show: (1) he was deprived of a

constitutional right, (2) the City had a training policy that "amounts to deliberate indifference to the [constitutional] rights of the persons" with whom [its police officers] are likely to come into contact, and (3) his constitutional injury would have been avoided had the City properly trained those officers.'" *Peck v. City of Orange*, 501 F.Supp. 3d 852, 870 (C.D. Cal. 2020) (quoting *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007).

### A. Constitutional Rights Deprivation

90. Miller was deprived of multiple constitutional rights through a series of specific violations by RCSD officers:

a. Fourth Amendment Violations

 i. <u>Unlawful Detention</u>: Despite Deputy 1's voluntary disclosure at 3:15 PM on October 12, 2024, and an RCSD Deputy's acknowledgement that "I don't want to unnecessarily detain him." Plaintiff was handcuffed and detain him." Miller was handcuffed and detained for 95 minutes without probable cause when he voluntarily announced he possessed secured firearms in his trunk.

 ii. <u>Excessive Search Beyond Consent</u>: Although Plaintiff consented only to officers securing his disclosed firearms ("You guys want to hang on to it? I mean, I don't mind you guys holding that") deputies conducted an 80-minute comprehensive vehicle search involving ten to fifteen officers, bomb-sniffing dogs, chemical swab tests, and forensic examination that left his vehicle "in complete disarray" with personal electronics damaged and $300 worth of medication destroyed.

 iii. <u>Medical Indifference During Detention</u>: Miller was confined in a patrol vehicle exceeding 110 degrees Fahrenheit (reaching over 130 degrees inside the car) while experiencing and reporting pre-diabetic symptoms, yet he was denied access to his medical supplements and

bathroom facilities despite multiple request. This treatment violates the Fourteenth Amendment's substantive due process protections against official conduct that "shocks the conscience," as established in *Peck*, 501 F. Supp. 3d at 868.

   b.  First Amendment Violations:

        i.  <u>Retaliatory Media Campaign</u>: Beginning October 13, 2024, Sheriff Bianco launched a sustained defamatory campaign falsely labelling Miller as a "would-be Trump assassin" across multiple national media platforms including Fox News, despite knowing that the FBI and Secret Service had declined to investigate Miller as any threat

       ii.  <u>Chilling of Political Participation</u>: The false assassination allegations forced Miller to abandon his political journalism career, cease attending political events, and go into hiding due to credible threats, effectively ending his role as Trump team leader and captain.

   c.  Fourteenth Amendment Violations:

        i.  <u>Systematic Denial of Statutory Rights</u>: Despite Cal. Penal Code § 851.5 being "clearly posted on the walls of the detention facility," Deputy Coronado and other officers expressly refused Plaintiff's repeated demands for his statutory telephone call, even after Plaintiff specifically referenced the posted penal code requirement. The Ninth Circuit has established that denial of statutory telephone call rights violates federally protected liberty interests. *Carlo*, 105 F.3d at 495; *Henry*, 132 F.3d at 519. The statutory mandate eliminates officer discretion, making training need obvious to prevent constitutional violations.

       ii.  <u>Unauthorized Medical Procedures</u>: During booking, officers subjected Plaintiff to x-ray examination without consent and after

his express refusal, failing to inform him of the examination beforehand and providing no medical necessity justification.

## B. Training Policy Amount to Deliberate Indifference

91. Riverside County maintained training policies that amounted to deliberate indifference to constitutional rights in the following areas where constitutional violations were highly predictable: (a) voluntary firearm disclosure protocols; (b) media communication and pre-trial due process; (c) statutory detention rights compliance; and (d) political event security conditions.

92. **Voluntary firearm disclosure protocols:** RCSD lacked adequate training protocols for handling voluntary firearm disclosures at political events, despite this being a recurring scenario that creates obvious constitutional risks. The training deficiency is evidenced by the deputies' response to Miller's cooperative approach:

   a. Escalation Despite Compliance: When Miller voluntarily stated "I want to be totally transparent. I'm from Nevada, and I do have my firearms in the back" and specifically offered the officers to handle the firearms, properly trained officers would have recognized this as reducing rather than increasing suspicion.

   b. Transformation of Cooperation into Detention: Deputy 2's immediate response to handcuff Plaintiff and place him in a patrol vehicle for "his own safety and protection" demonstrates the absence of training on how voluntary disclosure affects the Fourth Amendment calculus, as established in *Basel Soukaneh*, 112 F.4th at 127 (voluntary disclosure of lawfully possessed firearms with valid permits does not justify prolonged detention or expanded vehicle searches). Similarly, *U.S. v. Porche*, 616 F. Supp. 3d 1068 (D. Mont. 2022) demonstrates that cooperative behavior by citizens does not vitiate Fourth Amendment protections against unreasonable search and seizure. RCSD's absence of training protocols

specifically addressing voluntary disclosures at political events created predictable constitutional violations when deputies transformed Miller's cooperation into 95-minute detention and comprehensive vehicle search.

   c. Disproportionate Resource Deployment: The deployment of ten to fifteen officers, including FBI and Secret Service agents, bomb-sniffing dogs, and chemical swab testing for two voluntarily disclosed firearms demonstrates the absence of proportionality training for misdemeanor firearm violations.

93. **Media communication and pre-trial due process:** Riverside County failed to train Sheriff Bianco and command staff regarding constitutional limitations on pre-trial publicity and media communications about ongoing investigations, as evidenced by a pattern of escalating false statements.

   a. False Text Message to Media: On the morning of October 13, 2024, Sheriff Bianco texted The Epoch Times: "We arrested a man trying to get in the perimeter with two firearms who ended up saying he was going to kill the president," despite audio recordings proving Miller never made any such statement.

   b. Press Conference False Allegations: At 3:00PM on October 13, 2024, Sheriff Bianco publicly declared deputies had "prevented the third assassination attempt," called Miller a "lunatic," and claimed he possessed "fake IDs" and "fake credentials," all while knowing federal authorities had determined Miller posed no threat.

   c. National Media Campaign: Sheriff Bianco appeared on Fox News Channel on October 14, 2024, stating "we probably stopped another assassination attempt" and "I couldn't tell you what his real name is," despite having access to Miller's legitimate dual citizenship documentation and court-approved name change records.

   d. Continued False Statements Through 2025: Sheriff Bianco's March 16, 2025 statement at the CAGOP convention that Plaintiff "didn't declare

anything" regarding firearms directly contradicted audio evidence, while his April 2025 claims of "fake license plates" had no basis in any citation or arrest record.

94. **Statutory detention rights compliance:** RCSD demonstrated inadequate training regarding mandatory compliance with Cal. Penal Code § 851.5 telephone call requirements through systematic violations:

    a. <u>Posted Notice Ignored</u>: Despite the statutory requirement being "clearly posted on the walls of the detention facility," multiple officers including Deputy Coronado refused Plaintiff's repeated demands for his telephone call.

    b. <u>Express Refusal of Statutory Rights</u>: When Miller "specifically demanded his statutory right under Penal Code § 851.5 to a telephone call while referencing the posted penal code," Deputy Coronado "expressly refused said request," demonstrating willful violation of clearly established law.

    c. <u>Federal Interview Conditioning</u>: Although Miller "expressly consented to the FBI and Secret Service agents request to interview, subject only to his statutory right to first make one telephone call," federal agents departed without conducting interviews rather than honor the statutory requirement, while local officers continued the denial.

95. **Political event security conditions**: The October 12, 2024 incident revealed fundamental training gaps in coordinating constitutional law enforcement with federal security protocols:

    a. <u>Timing and Context Ignored</u>: The incident occurred just weeks before the 2024 presidential election, following two actual assassination attempts on President Trump, yet officers lacked training on how heightened security concerns must still respect constitutional limitations.

    b. <u>Federal Agency Assessment Ignored</u>: Despite FBI and Secret Service determining by the morning of October 13, 2024, that Plaintiff posed no

threat (evidence by their refusal to interview him), local officers lacked training on how federal threat assessments should inform local enforcement decisions

c. <u>Credential Verification Failures</u>: Officers treated Plaintiff's legitimate dual citizenship documentation and court-approved name change as "fake IDs," demonstrating absence of training on common immigration documentation and legal name variations among dual citizens and immigrant families.

d. <u>Rally Access Procedures</u>: Officers lacked training distinguishing between attendees voluntarily disclosing firearms before entering secured areas versus those attempting to bring weapons into events, as evidenced by treating Miller's voluntary disclosure one mile from the venue as attempted infiltration. Unlike the routine protest policing addressed in *Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018), this case involves RCSD's active constitutional violations against a compliant citizen, not failure to protect from third-party violence. The absence of training for federal security event coordination constitutes deliberate indifference to obvious constitutional risks.

## C. Proper Training Would Have Prevented Constitutional Violations

96. Had Riverside County implemented constitutionally adequate training in the identified areas, the specific constitutional violations experienced by Miller would have been avoided through proper officer decision-making at critical intervention points.

97. Fourth Amendment Training Causation

a. <u>Voluntary Disclosure Response Training</u>: Proper training would have instructed deputies that when a citizen voluntarily approaches law enforcement stating "I want to be totally transparent" and offers to surrender firearms ("You guys want to hang on to it?"), this cooperation reduces suspicion and justifies only brief verification procedures. Such

training would have prevented: (a) the immediate handcuffing and 95-minute detention that began when Deputy 2 ordered Plaintiff to exit his vehicle despite his voluntary compliance; (b) the transformation of a willing citizen's disclosure into a perceived threat requiring ten to fifteen officers and extensive forensic examination; (c) the medical endangerment of confining Plaintiff in a patrol vehicle exceeding 110 degrees despite his reported pre-diabetic symptoms.

b. <u>Search Scope Limitations Training</u>: Adequate Fourth Amendment training would have established clear protocols limiting searches to the scope of citizen consent. When Plaintiff specifically stated his firearms were "in the back right there" and offered surrender, proper training would have prevented: (a) 80-minute comprehensive vehicle search that included electronic device examination, personal effects inventory, bomb-detection canine deployment, and chemical swab testing; (b) the destruction of Plaintiff's personal property, including damaged computer hard drives, electronics, and $300 worth of medication; (c) the deployment of specialized forensic units for voluntarily disclosed firearms, which consumed resources disproportionate to the disclosed misdemeanor violations.

98. First Amendment and Due Process Training Causation

a. <u>Media Protocol Verification Training</u>: Constitutional training on pre-trial due process limitations would have required Sheriff Bianco to verify facts before public statements, preventing the constitutional violations through several specific checkpoints: (i) **October 13, 2024 Morning Text**: Training requiring fact verification before media communication would have prevented Sheriff Bianco from texting The Epoch Times that Plaintiff "ended up saying he was going to kill the president" when no such statement existed in any recording or report; (ii) **Press Conference False**

**Claims**: Verification protocols would have prevented Sheriff Bianco from claiming deputies "prevented the third assassination attempt" when FBI and Secret Service had already determined no threat existed; (iii) **National Media Appearances**: Proper training would have prevented Sheriff Bianco's Fox News appearance claiming he "couldn't tell you what his real name is" when Plaintiff's legitimate documentation was available for review.

   b. Statutory Rights Compliance Training: Mandatory training on Cal. Penal Code § 851.5 requirements would have prevented the systematic denial of Plaintiff's telephone rights through clear procedural protocols: (i) **Posted Notice Recognition**: Training would have required officers to honor the statutory requirements clearly posted in their own facility, preventing Deputy Coronado's express refusal of Plaintiff's legally protected phone call; (ii) **Federal Interview Coordination**: Proper training would have established that statutory rights must be honored before any interview, preventing the situation where federal agents departed rather than allow Plaintiff his required phone call; (iii) **Booking Procedure Compliance**: Training would have prevented the unauthorized medical x-ray examination conducted without consent and after Plaintiff's express refusal.

### D. Constructive and Actual Notice of Training Deficiencies

99. Riverside County possessed actual and constructive notice of systematic training deficiencies through multiple sources:

   a. Federal Court Findings: The ongoing *Gray v. County of Riverside* federal consent decree (Case No. 5:13-cv-00444) establishes judicial findings of systematic constitutional violations in jail operations, placing county on notice of training inadequacies.

   b. California Attorney General Investigation: The February 23, 2023 launch

SECOND AMENDED COMPLAINT

of a pattern-or-practice investigation under Cal. Penal Code § 52.3 for "conditions of confinement, excessive force, and other misconduct" provides formal state notice of systemic deficiencies.

c. Settlement History: Riverside County's payment of over $97 million in civil rights settlements from 2010-2025 demonstrates actual notice of recurring constitutional violations stemming from training deficiencies. Repeat settlements for false arrest, excessive force, and due process violations establish obvious need for enhanced training.

d. Grand Jury Findings: Multiple Riverside County Grand Jury reports from 2014-2024 documented systematic misconduct and training inadequacies, providing formal notice to county policymakers of constitutional risks.

e. In addition, the Riverside County Civil Grand Jury issued a report entitled "In-Custody Homicide at Site B Blamed on Prisoner Identification Errors" (2025), which found systemic operational and identification failures within RCSD. This report provides further official notice to County policymakers of serious constitutional risks arising from deficient training, supervision, and systemic neglect. The documented failures underscore RCSD's pattern of deliberate indifference to detainee rights and align with the widespread deficiencies noted in prior DOJ investigations and grand jury findings.

f. Further, retired Riverside County Sheriff's Department Captain Michael Lujan submitted a sworn declaration describing RCSD's mandatory protocols when a noteworthy arrest occurs, including: (a) preparation of a Notification of Incident forwarded to executive staff and the Sheriff; (b) immediate availability of arrest reports and body-worn camera footage to command staff; (c) preparation of a "briefing packet" including suspect background, records checks, photographs, and weapons documentation; and (d) verification of identification documents through the FBI Joint Terrorism Task Force. (See Exhibit "B," Declaration of Michael Lujan.)

Captain Lujan's testimony establishes that Sheriff Bianco either had direct access to, or deliberately disregarded, readily available exculpatory information before making public accusations that Plaintiff was a "would-be assassin," thereby evidencing both deliberate indifference in training and ratification of unconstitutional conduct at the final policymaker level.

### E.    Pattern Evidence Supporting Deliberate Indifference

100.  Unlike in *Goodin v. City of Glendora*, 380 F. Supp. 3d 970, 995 (C.D. Cal. 2019), Riverside County's deliberate indifference is demonstrated through extensive pattern evidence:

a. The California Department of Justice investigation finding "concerning levels of in-custody deaths and allegations of misconduct" establishes pattern recognition at the state level.

b. Federal oversight through the *Gray* consent decree demonstrates recurring constitutional violations despite court-mandated remedial measures.

c. Systematic failure to discipline officers with multiple constitutional violation settlements demonstrates institutional tolerance for misconduct.

d. The 2022 record of 18 jail deaths represents the highest number in fifteen years, evidencing systemic training failures despite obvious need for improvement.

101.    Had RCSD adopted and enforced constitutionally sufficient event-policing, firearms-disclosure, and PIO verification training and protocols, the chain of decisions culminating in the Sheriff's false accusations would not have occurred. The County's deliberate indifference thus directly and proximately caused Plaintiff's injuries.

102.    Defendant Riverside County demonstrated deliberate indifference to constitutional rights through documented patterns of systemic failures:

a. Medical Care Violations: The federal consent decree in *Gray v. Cty. of Riverside*, Case No. 5:13-cv-00444 (C.D. Cal. 2015), established court-

recognized systemic deficiencies in medical care delivery, including medication administration failures and inadequate emergency response protocols. Despite court-ordered remedial measures, thirty-three (33) individuals died in RCSD custody during 2022-2023, demonstrating ongoing deliberate indifference to known constitutional risks.

b. California Attorney General Pattern-or-Practice Investigation: On February 23, 2023, Attorney General Rob Bonta initiated formal investigation into RCSD pursuant to Cal. Civil Code § 52.3, citing "deeply concerning allegations relating to conditions of confinement in jail facilities, excessive force, and other misconduct," constituting state-level confirmation of systemic constitutional violations requiring remediation.

c. Final Policymaker Media Protocol Violations: Sheriff Bianco's documented pattern of defamatory public statements, including the admitted fabrication regarding Plaintiff Miller, demonstrates institutional failure to implement constitutionally adequate training protocols governing official communications regarding arrests and investigations.

d. High-Security Event Constitutional Training Deficiencies: The October 12-13, 2024 incident revealed fundamental procedural disconnects between RCSD protocols and federal security standards, evidenced by Secret Service's explicit contradiction of RCSD's threat assessment, establishing obvious necessity for specialized constitutional training governing law enforcement operations during protected political assemblies.

103.    Riverside County's systemic failure to train deputies regarding mandatory intervention duties demonstrates deliberate indifference warranting municipal liability:

a. Absence of Intervention Protocols: Despite clearly established Ninth

Circuit precedent requiring intervention when witnessing constitutional violations, RCSD maintains no documented training protocols establishing when intervention becomes mandatory, how deputies must intercede, or consequences for non-intervention;

b. Multi-Officer Operation Deficiencies: The October 12, 2024 incident involved ten to fifteen officers yet produced zero interventions across 80 minutes of constitutional violations, demonstrating systemic training failure regarding collective intervention duties during joint operations;

c. Supervisory Intervention Failures: RCSD's failure to train supervisory personnel regarding enhanced intervention obligations—including authority to order cessation of constitutional violations—created predictable constitutional injuries. See *Farmer*, 423 F. Supp. 3d at 1018;

d. Retaliatory Culture Against Interveners: Absence of anti-retaliation protections for intervening officers creates systemic disincentive to constitutional compliance, establishing deliberate indifference through policy omission.

104.   The constitutional deprivations suffered by Plaintiff constitute predictable manifestations of Riverside County's deliberate indifference to training requirements in areas presenting obvious constitutional risks.

105.   As a direct and proximate result of the County's policies, customs, and failures to train/supervise/discipline, Plaintiff suffered severe reputational, professional, emotional, and security harms, including international media coverage identifying him as a would-be assassin, continuing stigma, and safety risks.

106.   As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Mr. Miller has suffered substantial mental and emotional distress, embarrassment, and overall discomfort.

107.    Defendants committed the acts herein with malice against Mr. Miller with the wrongful intention of injuring Mr. Miller with conscious disregard to his health, safety, and rights.

108.  WHEREFORE, Plaintiff requests relief as hereafter provided.

### FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983 - Failure to Intervene

### (Against Defendant County of Riverside and DOES 1-100)

109.    Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 56, 58-70, and 73-84.

110.    Law enforcement officers maintain affirmative constitutional duty to intercede when witnessing fellow officers violate citizens' constitutional rights. *U.S. v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), rev'd on other grounds, 518 U.S. 81 (1996). This duty extends to officers who constitute "integral participants" in constitutional violations, even when their individual actions fail to independently establish constitutional deprivation. *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692 (9th Cir. 2019).

111.    The temporal parameters establishing intervention duty require fact-specific analysis examining violation duration and officer proximity. Extended violations provide realistic intervention opportunity distinguishing them from rapidly unfolding events.

112.    During the October 12, 2024 incident spanning approximately 80 minutes, multiple RCSD deputies designated as Does 1-100 possessed realistic opportunities to intervene yet deliberately abstained:

   a. Extended Vehicle Search (3:45 PM - 5:05 PM): Ten to fifteen law enforcement personnel participated in or observed warrantless search exceeding consent scope. The prolonged duration—distinguishable from split-second excessive force scenarios—afforded multiple intervention

SECOND AMENDED COMPLAINT

opportunities;

    b. Medical Emergency Non-Intervention: Multiple deputies witnessed Plaintiff's documented pre-diabetic symptoms while detained in patrol vehicle exceeding 110 degrees Fahrenheit. Supervising officers possessed authority to order medical intervention;

    c. Systematic Phone Call Denial: Deputy Coronado and unidentified deputies participated in hours-long denial of statutory communication rights despite Cal. Penal Code § 851.5 being conspicuously posted within facility, constituting integral participation in ongoing constitutional violation;

113.    Each observing officer maintained realistic intervention opportunity through available mechanisms: a. Verbal objection to ongoing violations; b. Physical intervention within lawful parameters; c. Supervisory notification protocols; d. Constitutional violation documentation; e. Facilitation of statutory rights compliance.

114.    The failure to intervene established causation for Plaintiff's constitutional injuries. Officers' fundamental involvement in prolonged constitutional violations, combined with deliberate non-intervention despite realistic opportunity, renders them liable as integral participants. *Nicholson*, 935 F.3d at 692 (liability attaches to officers with "fundamental involvement" in violation causation).

115.    WHEREFORE, Plaintiff requests relief as hereafter provided.

## FIFTH CAUSE OF ACTION

### Slander Per Se

### (Against Defendants Bianco and Riverside County)

116.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 56.

117.    California law recognizes slander per se for statements charging commission of crime or tending directly to injure plaintiff in respect to

profession. Cal. Civ. Code § 46. Accusations of attempted assassination of presidential candidate constitute archetypal slander per se requiring no proof of special damages. Cal. Civ. Code § 46.

118.     Defendant Bianco, acting within scope of employment as Riverside County Sheriff, made following false statements of fact to identified third parties:

   a. Morning of October 13, 2024 -  Statement to Riverside Press-Enterprise: "deputies prevented the third assassination attempt";

   b. October 13, 2024, 3:00 PM PST - Press conference statement: "We probably stopped another assassination attempt";

   c. Morning of October 14, 2024 - Fox News Channel: "prevented another assassination attempt."

119.     These statements constitute provably false assertions of fact, not protected opinion:

   a. "Prevented assassination attempt" - Factual assertion regarding thwarted criminal act susceptible to empirical verification through federal investigation records demonstrating no assassination attempt occurred;

   b. Temporal Knowledge of Falsity: By 7:00 AM October 13, 2024, Defendant Bianco possessed actual knowledge that neither FBI nor Secret Service considered Plaintiff assassination threat, having been directly informed of federal agencies' assessment.

120.     Defendant Bianco acted with actual malice through deliberate fabrication or reckless disregard for truth:

   a. Fabrication Evidence: October 24, 2024 text to Epoch Times admitting "He never said it. It was bad info";

   b. Reckless Disregard: Continued dissemination after federal authorities' contrary determination;

   c. Political    Motivation:    Exploitation    for    gubernatorial    campaign

advancement demonstrates knowing falsity;

121.     The false claim that Mr. Miller said "*he was going to kill the president*" is prima facie slander per se.

122.     "Would-be Trump assassin" is commonly understood as an attempted assassination, as the media headlines show. Especially in light of the two temporally connected actual attempted assassinations of President Trump. [7] Attempted assassination of a major presidential candidate is a serious federal crime under 18 U.S.C. § 1751.

123.     Mr. Miller announced to RCSD deputies two times that he had firearms. No reasonable person would believe that someone intending to kill the President would announce his firearms to law enforcement <u>before</u> committing the crime. Furthermore, there is no record of either firearm legally in Mr. Miller's possession used in high level political assassinations in the United States of America.

124.     Defendant Bianco clearly demonstrated reckless disregard for factual accuracy with his own contradictions and failure to determine facts before spreading them to the media and beyond.

125.     The false statements caused presumed and actual damages including destruction of journalistic career, death threats necessitating relocation, and quantifiable economic losses exceeding $75,000.

**SIXTH CAUSE OF ACTION**

**Libel Per Se**

**(Against Defendants Bianco and Riverside County)**

126.     Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 56, 121-128.

127.  The elements of libel per se are: (1) a false and unprivileged publication; (2)

---

[7] *Ryan Wesley Routh Indicted for Attempted Assassination of Former President Trump*, U.S. Department of Justice (Sept. 24, 2024), https://www.justice.gov/archives/opa/pr/ryan-wesley-routh-indicted-attempted-assassination-former-president-trump

by writing; and (3) naturally tending directly to injure a person; (4) libel per se statements are those "without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact." Cal. Civ. Code §§ 45, 45a.

128. Defendant Bianco texted the Epoch Times the malicious, false statement regarding Mr. Miller, "We arrested a man trying to get in the perimeter with two firearms who ended up *saying he was going to kill the president*" [emphasis added]. This is an objective statement of purported utterance capable of verification through audio recordings, witness testimony, and booking records demonstrating Plaintiff never made such statement.

129. Defendant Bianco with knowledge of the falsity or reckless disregard for the truth, allegedly relied on only one deputy who informed him of the falsely attributed statement to Mr. Miller. Defendant Bianco later tried to blame the FBI and Secret Service for that false information.

130. A sheriff alleging an attempted assassination of a major presidential candidate needs no explanation, as it is prima facie libelous and harmful to Mr. Miller.

131. WHEREFORE, Plaintiff requests relief as incorporated and hereafter provided.

## SEVENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (Against Defendants Bianco and Riverside County)

132.    Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 56, 58-70, 73-84, 121-128, and 131-133.

133.    The elements of Intentional Infliction of Emotional Distress are: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress, (2) plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050-51 (2009).

134.     Defendants' conduct constitutes extreme and outrageous behavior exceeding all bounds of decency tolerated in a civilized society, as evidenced by:

   a. Defendant Bianco's deliberate and calculated decision to publicly label Mr. Miller as a "would-be presidential assassin" despite contemporaneous knowledge that federal authorities had explicitly declined to investigate Mr. Miller as a potential threat, constituting conduct so extreme as to be utterly intolerable in a civilized society.

   b. The timing of Defendant Bianco's false accusations during the heightened political tensions of the final weeks of a presidential election cycle, a period when Defendants knew or should have known such accusations would generate maximum public outrage and threaten Mr. Miller's safety.

   c. Defendants' exploitation of Mr. Miller's status as a documented supporter of President Trump to create a particularly damaging narrative of "betrayal" that Defendants knew would subject Mr. Miller to unique forms of public hatred and condemnation.

   d. Defendants' reckless disregard for the entirely foreseeable consequences of falsely labelling someone as an attempted presidential assassin in the contemporary political climate, including death threats, family estrangement, and professional destruction that have forced Mr. Miller to change his life.

   e. Defendant Bianco's calculated expansion of defamatory statements into multiple high-profile national media appearances, demonstrating a deliberate intent to maximize harm rather than isolate it to local jurisdictions.

   f. Defendant Bianco's on-going statements at events and in media appearances which demonstrate his knowledge of the severity of his statements and the damage it has been causing.

135.    The extraordinary severity of emotional distress inflicted by Defendant Bianco's conduct, including, but not limited to: (i) acute psychological trauma, (ii) profound social isolation, (iii) persistent fear for personal safety, (iv) severance of parent-child relationships, and (v) comprehensive destruction of professional identity and livelihood prospects, all of which no reasonable person should be expected to endure.

136.    There is a clear, direct connection between Sheriff Bianco's statements and the ongoing media coverage of Mr. Miller which have resulted in specific damages flowing from public allegations and the ongoing consequences of nationwide publicity harming Mr. Miller's reputation and professional opportunities, severe mental distress, and other harms to be proven at trial.

137.    WHEREFORE, Plaintiff requests relief as incorporated and hereafter provided.

## EIGHTH CAUSE OF ACTION

### Violation of California Civil Code § 52.1 (Bane Act)

### (Against All Defendants)

138.    Plaintiff re-alleges as though set forth herein the allegations of Paragraphs 1 through 56, 58-70, 73-84, 121-127, 131-133, and 155-165.

139.    California Civil Code § 52.1 provides civil remedy against persons who interfere by "threat, intimidation, or coercion" with exercise or enjoyment of constitutional or statutory rights. Following *Cornell v. City and Cty. of San Francisco*, 17 Cal. App. 5th 766 (2017), and *Reese v. Cty. of Sacramento*, 888 F.3d 1030 (9th Cir. 2018), coercion inherent in intentional constitutional violations satisfies statutory requirements without requiring transactionally independent threats.

140.    Defendants engaged in pattern of intentional conduct constituting threats, intimidation, and coercion interfering with Plaintiff's constitutional rights

through deliberate, purposeful actions demonstrating specific intent or reckless disregard for constitutional protections.

141.  Coercion Through Intentional Fourth Amendment Violations: Defendants' deployment of ten to fifteen officers conducting eighty-minute search for the alleged misdemeanor violations constituted intentional excessive force analogous to *Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162 (E.D. Cal. 2019), where excessive force during Fourth Amendment violation satisfied coercion element. The grossly disproportionate force demonstration including, but not limited to bomb detection units, chemical testing, forensic examination for voluntarily disclosed firearms, constituted inherent coercion designed to intimidate and deter future constitutional rights exercise.

142.  Defendant Bianco demonstrated specific intent requirement through reckless disregard for Plaintiff's constitutional rights. *Cornell*, 17 Cal. App. 5th at 803 (reckless disregard satisfies specific intent). Evidence establishing reckless disregard includes:

    a.  Continuing detention after Deputy stated "I don't want to unnecessarily detain him";

    b.  Maintaining excessive search despite federal authorities finding no threat;

    c.  Falsely characterizing Plaintiff as assassin despite knowing federal assessment;

    d.  Deliberate prevention of political rally attendance despite valid credentials.

143.  Defendants' systematic denial of Cal. Penal Code § 851.5 telephone rights while displaying statutory notice constituted coercion through demonstrated willingness to violate clearly established protections. This deliberate isolation from counsel while exhibiting legal requirements, communicated threat that statutory protections would be systematically denied, satisfying coercion

element under *Rios v. Cty. of Sacramento*, 562 F. Supp. 3d 999, 1025 (E.D. Cal. 2021).

144. Confinement in patrol vehicle exceeding 110 degrees Fahrenheit, while observing pre-diabetic symptoms constituted deliberate infliction of suffering designed to coerce rights waiver. While direct precedent regarding detention conditions remains undeveloped, the intentional nature of maintaining extreme conditions despite medical distress parallels excessive force coercion recognized *in Estate of Osuna*.

145. Defendant Bianco's sustained media campaign falsely labelling Plaintiff as "would-be assassin" from October 2024 through May 2025 constituted ongoing intimidation deterring future political participation. While research revealed no direct precedent regarding defamatory statements satisfying coercion element, the systematic character assassination represents pattern of conduct demonstrating specific intent to interfere with constitutional rights under Civ. Code § 52.1(j).

146. Civ. Code § 52.1(c) authorizes actions to eliminate "pattern or practice" of conduct interfering with rights. Defendants' coordinated actions of excessive search, statutory violations, medical indifference, and false public statements, constitute pattern demonstrating deliberate interference with constitutional rights. *Johnson v. City of San Jose*, 591 F. Supp. 3d 649, 663 (N.D. Cal. 2022) (pattern of conduct supports Bane Act liability).

147. Riverside County bears vicarious liability under Cal. Gov't Code § 815.2 for Sheriff Bianco's and Does 1-100's tortious acts committed within employment scope. *Becerra v. Cty. of Santa Cruz*, 68 Cal. App. 4th 1450, 1458 (1998).

148. Plaintiff seeks remedies authorized under Civ. Code § 52.1(b), including:

   a. Actual damages for constitutional violations;

   b. Civil penalty of $25,000 per violation under § 52.1(b)(1);

c.  Treble and exemplary damages; *Wiley v. Kern High Sch. Dist.,* 107 Cal. App. 5th 765, 781 (2024)

d.  Attorney fees under Code of Civ. Pro. § 1021.5;

e.  Injunctive relief prohibiting future media defamation campaigns.

149.  WHEREFORE, Plaintiff demands judgment including compensatory damages, civil penalties, punitive damages against individual defendants, attorney fees, injunctive relief, and such further relief as justice requires.

## NINTH CAUSE OF ACTION

### Defamation by Implication

### (Against Defendants Bianco and Riverside County)

150.  Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 56, 121-127, and 131-133.

151.  California recognizes defamation by implication where statements, through selective presentation of facts or material omissions, create provably false and defamatory impressions. *Issa v. Applegate*, 31 Cal. App. 5th 689 (2019). A statement constitutes actionable defamation by implication when: (1) the plaintiff's interpretation is reasonable; (2) the implications convey defamatory facts rather than opinions; (3) the implications are not substantially true; and (4) the implications injure plaintiff's reputation.

152.  Defendant Bianco's orchestrated media campaign, while selectively presenting certain facts, deliberately omitted material information creating false implications that Plaintiff constituted a genuine assassination threat. These implications arose from Defendant Bianco's calculated presentation methodology rather than explicit false statements alone.

153.  The Defamatory Implications Through Selective Fact Presentation:

a.  <u>Implication of Criminal Intent</u>: By stating deputies "prevented the third assassination attempt" while omitting that Plaintiff voluntarily disclosed

firearms before any search, Defendant Bianco implied Plaintiff attempted
concealment with criminal purpose;

    b. <u>Implication of Federal Investigation</u>: By emphasizing arrest at Trump
rally while omitting federal agencies' explicit determination of no threat,
Defendant Bianco implied ongoing federal investigation for attempted
assassination;

    c. <u>Implication of Deception</u>: By stating Plaintiff possessed "multiple fake
IDs" while omitting these were legal documents reflecting court-
approved name change and dual citizenship, Defendant Bianco implied
fraudulent identity concealment consistent with assassination planning;

    d. <u>Implication of Infiltration Attempt</u>: By stating Plaintiff was "stopped
before getting inside" while omitting Plaintiff never attempted venue
entry with firearms, Defendant Bianco implied thwarted infiltration
attempt;

    e. <u>Implication of Extremist Affiliation</u>: By characterizing Plaintiff as
"sovereign citizen" while omitting Plaintiff's established conservative
media credentials and Trump team leadership, Defendant Bianco implied
anti-government extremist planning violence.

154. Reasonable Interpretation Standard: The implications identified constitute
reasonable interpretations as demonstrated by resulting media coverage. Over
300 news outlets interpreted Defendant Bianco's statements as asserting
Plaintiff represented genuine assassination threat, establishing objective
reasonableness of defamatory implications. *Wong v. Jing*, 189 Cal. App. 4th
1354, 1370-1372 (2010) (media and public interpretation evidence establishes
reasonable understanding).

155. Factual Rather Than Opinion-Based Implications: The implications convey
objective facts susceptible to verification rather than protected opinion;

a. Whether federal agencies investigated Plaintiff for assassination constitutes verifiable fact;

b. Whether Plaintiff's identification documents were fraudulent versus legal constitutes verifiable fact;

c. Whether Plaintiff attempted armed venue entry constitutes verifiable fact;

d. Whether Plaintiff maintains extremist affiliations constitutes verifiable fact.

156. Each implication asserts objectively provable facts rather than evaluative opinions.

157. The implications are demonstrably false: a. Audio recordings establish Plaintiff voluntarily disclosed firearms, negating concealment implication; b. Federal agency records confirm no investigation or threat determination, negating federal investigation implication; c. Court documents verify legal name change and citizenship documentation, negating fraudulent identity implication; d. Witness testimony confirms Plaintiff never attempted venue entry, negating infiltration implication; e. Documentary evidence establishes Plaintiff's legitimate conservative media role, negating extremist implication.

158. The pattern of selective omissions demonstrates intentional implication creation:

a. <u>Temporal Knowledge</u>: Defendant Bianco knew by October 13, 2024, in the morning, that federal agencies found no threat yet continued implying federal concern;

b. <u>Strategic Repetition</u>: Across multiple media appearances, Defendant Bianco consistently omitted exculpatory facts while emphasizing inflammatory details;

c. <u>Refusal to Clarify</u>: Despite opportunities across multiple interviews to provide complete context, Defendant Bianco maintained selective presentation;

    d.  <u>Political Exploitation</u>: Correlation between implication dissemination and gubernatorial campaign announcement demonstrates calculated narrative construction.

159. The false implications destroyed Plaintiff's reputation more effectively than explicit statements by creating appearance of journalistic investigation revealing hidden threat:

    a.  Public perception of Plaintiff as deceptive individual concealing weapons;

    b.  Assumption of ongoing federal investigation creating presumption of guilt;

    c.  Belief that legitimate documentation constituted criminal fraud;

    d.  Perception of thwarted violence rather than voluntary compliance;

    e.  Association with anti-government extremism destroying conservative media credibility.

160. Defendant Bianco acted with actual malice by knowingly creating false implications through calculated omissions. Knowledge of exculpatory facts combined with deliberate exclusion from public statements establishes reckless disregard for truth.

161. The defamatory implications directly caused quantifiable damages including professional destruction, forced relocation, ongoing threats, and economic losses exceeding statutory thresholds. The implications' viral dissemination through 300+ media outlets establishes proximate causation between Defendant Bianco's calculated omissions and Plaintiff's injuries.

162. Defendant Riverside County bears vicarious liability for Defendant Bianco's defamation by implication committed within scope of employment as Sheriff conducting official press communications regarding arrest. Cal. Gov't Code § 815.2.

163. WHEREFORE, Plaintiff requests relief as incorporated and set forth below.

SECOND AMENDED COMPLAINT

## PRAYER FOR RELIEF

164.     Plaintiff prays this Honorable Court to declare and adjudge that Defendants' conduct alleged herein constitutes violations of Plaintiff's constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution; statutory violations under 42 U.S.C. § 1983 and Cal. Civ. Code § 52.1; and tortious conduct constituting defamation per se, false light invasion of privacy, and intentional infliction of emotional distress under California law, all of which have caused Plaintiff to suffer severe, continuing, and irreparable damages to his reputation, employment prospects, family relationships, personal safety, and psychological well-being.

WHEREFORE, Plaintiff prays for Judgment against Defendant as follows:

A.  To declare Defendants' actions unlawful;

B.  Order that the Defendants pay Plaintiff compensatory damages, including but not limited to, lost back pay and benefits plus interest, according to proof;

C.  For general and special damages;

D.  For punitive damages, as allowed by law, that will sufficiently punish, make an example of, and deter future conduct by Defendants;

E.  For B, C, and D in an amount not less than $100,000,000;

F.  Order that the Defendants pay the Plaintiff's attorney fees and costs of this litigation, related litigation, and of the preceding administrative actions at the Agency level;

G.  For an award of pre-judgment and post-judgment interest; and

H.  For such other and further relief as the Court deems just and proper.

# JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


DATED: September 15, 2025                         Respectfully submitted,

                                        THE BEARMAN FIRM, INC.


                                        By: _____

                                        ETHAN BEARMAN
                                        Attorney for Plaintiff
                                        VEM MILLER

# EXHIBIT A

ETHAN BEARMAN (CA SBN 327490)
ethan@thebearmanfirm.com
THE BEARMAN FIRM, INC.
9460 Wilshire Blvd, Suite 830
Beverly Hills, CA 90212
Phone: (747)232-7626

Attorney for Plaintiff
VEM MILLER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

VEM MILLER,

        Plaintiff,

   vs.

CHAD BIANCO, in his individual and
official capacities; COUNTY OF
RIVERSIDE, a municipal entity; and
DOES 1 through 100,

        Defendants.

CASE NO.: 5:25-cv-00629-KK (DTBx)

**DECLARATION OF SHAUN
FREDERICKSON IN SUPPORT OF
PLAINTIFF'S SECOND AMENDED
COMPLAINT**

    I, Shaun Frederickson, do hereby declare and state as follows::

1. I am citizen of the United States of America, over 18 years of age. Except where stated on information and belief, the facts contained in this declaration are based on my personal knowledge. If called upon to testify, I could and would competently do so.

2. On the weekend of March 14-16, 2025 the California Republican Party (CAGOP) hosted their statewide convention in Sacramento, CA. As a Delegate for the Republican Party, I attend.

3. Sunday March 16th, in Sacramento, CA as the CAGOP Convention had finished voting for new party leadership, I exited the voting location crossing through the exhibit hall where I saw Riverside County Sheriff Chad Bianco behind his Gubernatorial Campaign Table with his team. I saw Sheriff Bianco throughout the CAGOP Convention speaking to gatherings as well as talking with groups but hadn't had an opportunity to speak with him. Previously, I met Sheriff Bianco several times from the 2020 Lockdowns through events and movie screenings we were both invited to. I approached the table and requested clarification on details of what transpired with the event that led to the arrest of Vem Miller at the Trump Rally in Coachella. Sheriff Bianco stood up to greet me, to which I explained to Sheriff Bianco the details from what I recalled that Vem Miller drove into the VIP parking lot, declared his weapons, then the deputy sent him to secondary for further investigation, to which the vehicle was searched, and Vem was placed in custody. Sheriff Bianco shaking his head while I recalled what I believed to be true, responded with "The whole thing is a lie.", "They've been planning this against me for a long time, its a coordinated effort." He then began to claim that Vem Miller is conspiring with others to destroy Sheriff Biancos reputation and stop his Gubernatorial campaign. Sheriff Bianco alleged that the lawsuit from Vem Miller was filed so quickly over a holiday weekend after the Trump Rally it was further evidence to the premeditated planning. I inquired about the correct version of events and he told me "He (Vem Miller) didn't declare anything.", in response to my understanding that Vem Miller declared his weapons. Sheriff Bianco went on to say, "My deputies are well trained to look for suspicious people, the car had fake plates, he had erratic behaviors, and the interior was a mess!" "This led my deputy to further investigate to which he discovered the weapon under the seat." I asked for clarification, "Under the seat? I thought the weapons were in the trunk, which is legal in the state of CA." To which Sheriff

EXHIBIT A P.3

Doc ID: 2a5d4da5f266694a26b0b8cb82c676a91eb331bf

1
2
3
4
5
6
7
8
9
10
11
12

Bianco corrected me saying they found a loaded handgun under the seat and the loaded shotgun in the trunk." I pushed back as that was new information that the handgun was under the seat from all I had heard and read, they were in the trunk. Sheriff Bianco went on to explain that's why they were able to charge Vem Miller with a loaded firearm. Sheriff Bianco went on to explain "This is the problem, all the information is out there but people believe the lies." He diverted the conversation to discuss the fake plates on the vehicle which I asked "Why wasn't that on the citation if there were fake plates?" to which he responded "It is!" Laughing he claimed that this further proves his point that the truth is there and I believe a lie. I asked for a photograph of the fake plates to which he did not provide.

13
14
15

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

16

EXECUTED: September 15, 2025

17
18

By: _____

Shaun Frederickson

19
20
21
22
23
24
25
26
27
28

2

**EXHIBIT A P.4**

Doc ID: 2a5d4da5f266694a26b0b8cb82c676a91eb331bf

# EXHIBIT B

ETHAN BEARMAN (CA SBN 327490)
ethan@thebearmanfirm.com
THE BEARMAN FIRM, INC.
9460 Wilshire Blvd, Suite 830
Beverly Hills, CA 90212
Phone: (747)232-7626

Attorney for Plaintiff
VEM MILLER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VEM MILLER,<br><br>        Plaintiff,<br><br>vs.<br><br>CHAD BIANCO, in his individual and official capacities; COUNTY OF RIVERSIDE, a municipal entity; and DOES 1 through 100,<br><br>        Defendants. | CASE NO.: 5:25-cv-00629-KK (DTBx)<br><br>**DECLARATION OF MICHAEL LUJAN IN SUPPORT OF PLAINTIFF'S SECOND AMENDED COMPLAINT** |

I, Michael Lujan, do hereby declare and state as follows::

1. I am citizen of the United States of America, over 18 years of age. Except where stated on information and belief, the facts contained in this declaration are based on my personal knowledge. If called upon to testify, I could and would competently do so.

2. My name is Captain Michael Lujan. I am an honorably retired captain with the Riverside County Sheriff's Department. My career encompassed 31 years of service with assignments in corrections, field operations, homicide and administration, from October 6, 1989 to December 30, 2020. I am highly

**EXHIBIT B P.2**

Doc ID: 97ceb6491d564ad2115b2bb5e83fb36b4d979dfb

experienced in the procedures within the Sheriff's department, and therefore I am qualified to provide analysis on the topic of Vem Miller's arrest on October 12, 2024, followed by the false accusations of him being a "3rd Trump assassin", with "Fake Ids", "fake passports", "fake entry passes", etc.

3. When a critical or noteworthy arrest is made, a Notification of Incident (NOI) is written and forwarded up the chain of command to include the sheriff's executive staff, who would then brief the sheriff of any serious offense that would require a response or comment to the media. The NOI provides a brief description of the arrest and investigation. In a case as this, the sheriff would require a direct briefing from the executive staff and boots on the ground.

4. Per policy, the arresting deputy is required to author a report before going home. The report would be scanned and forwarded to Sheriff's Administration for reference to include all supporting documentation, records, photos, interview summary etc.

5. The arresting deputy and assisting deputies will then dock their body worn cameras which are automatically downloaded to the server. Supervisors and administrators have immediate access to the footage and can be reviewed remotely from any sheriff's station within the county.

6. Additionally, a verbal briefing with the arresting deputy and supervisor can be requested by the Sheriff to clarify any confusion. A briefing is typically conducted to avoid disseminating false information to the public. In this briefing, there would be a "briefing packet" that includes the suspects background, records check, criminal history, weapons, photos of suspect, weapons and vehicle. Furthermore, the sheriff has TFO's (Task Force Officers) assigned to federal agencies with access to the FBI's JTTF (Joint Terrorism Task Force) with federal databases to assist with the intelligence gathering, Social Media, dissemination of intelligence and briefing to the sheriff.

**EXHIBIT B P.3**

DECLARATION OF MICHAEL LUJAN        CASE NO.: 5:25-CV-00629-KK (DTBX)

Doc ID: 97ceb6491d564ad2115b2bb5e83fb36b4d979dfb

7. In the Miller case, a review of his social media and quick background check would have been done prior to a press release. This review would have been conducted by the JTTF federal partners or the Special Investigations Bureau (SIB) Intel Unit that included the TFO's and numerous crime analysts assigned to the SIB.

8. Furthermore, the Riverside County Sheriff's Department has the ability to verify the authenticity of ID documents through the FBI's JTTF.

9. I have personally witnessed and or participated in major incident briefings that follow the protocol listed above.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

EXECUTED on September 15, 2025, in Los Angeles, California.

By: _____

Michael Lujan

**EXHIBIT B P.4**

Doc ID: 97ceb6491d564ad2115b2bb5e83fb36b4d979dfb